ORIGINAL

FILED
APR 16 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **GREAT LAKES DREDGE & DOCK COMPANY LLC,** **Plaintiff,** v. **UNITED STATES,** **Defendant.** | 08-282 C<br>**Civil Action No.** ________ |

**PLAINTIFF GREAT LAKES DREDGE & DOCK COMPANY LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Daniel C. Sauls
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902

Attorney of Record for Plaintiff
Great Lakes Dredge & Dock Company LLC

Dated: April 16, 2008

# TABLE OF CONTENTS

I. STATEMENT OF ISSUES ..... 1

II. STATEMENT OF FACTS/STATEMENT OF THE CASE ..... 1

III. ARGUMENT ..... 8

A. Jurisdiction And Standard Of Review In Bid Protest Cases ..... 8

B. The IFB Is Based On Defective Estimates That Do Not Accurately Represent the Government's Actual Needs And That Deprive GLDD Of The Opportunity To Fairly Compete For The Work ..... 9

C. The IFB's Price Evaluation Scheme For Maintenance Dredging Also Is Irrational And Defective Because It Does Not Consider The Full Scope Of the Work Being Completed And Does Not Assure That Award To The Low Bidder Will Result In the Lowest Cost To The Government ..... 14

D. GLDD Is Entitled To Injunctive Relief ..... 17

IV. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL COURT CASES


A&D Fire Prot., Inc. v. United States,
72 Fed. Cl. 126 (2006) .......... 17

Antarctic Support Assocs. v. United States,
46 Fed. Cl. 145 (2000) .......... 9

Axiom Res. Mgmt., Inc. v. United States,
80 Fed. Cl. 530 (2008) .......... 13

Bean Dredging Co. v. United States,
19 Cl. Ct. 561 (1990) .......... 10

Bean Stuyvesant LLC v. United States,
48 Fed. Cl. 303 (2000) .......... 9, 17

Citizens to Preserve Overton Park v. Volpe,
401 U.S. 402 (1971) .......... 9

Ellsworth Assocs., Inc. v. United States,
45 Fed. Cl. 388 (1999) .......... 17-18

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) .......... 17

Great Lakes Dredge & Dock Co. v. United States,
60 Fed. Cl. 350 (2004) .......... 9, 18

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 8, 14

In re Sang-Su Lee,
277 F.3d 1338 (Fed. Cir. 2002) .......... 9

Mike Hooks, Inc. v United States,
39 Fed. Cl. 147 (1997) .......... 12-13

Overstreet Elec. Co. v. United States,
47 Fed. Cl. 728 (2000) .......... 10, 17

Reilly's Wholesale Produce v. United States,
73 Fed. Cl. 705 (2006) .......... 17

## STATUTES

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ........ 8

Competition in Contracting Act, 10 U.S.C. § 2304(a)(1) ........ 13-14

28 U.S.C. § 1491(b) ........ 8

## FEDERAL ACQUISITION REGULATIONS

FAR 6.101(b) ........ 13, 14

FAR 6.401 ........ 14

## I. STATEMENT OF ISSUES

1. Whether the United States Army Corps of Engineers' ("Corps") use in IFB No. W912EQ-08-B-0001 ("Solicitation" or "IFB") of defective estimates that are not based on the best information available, do not do not accurately reflect the agency's needs, and deprive Plaintiff of the opportunity to compete for the work on a fair and equal basis violates federal procurement laws and regulations.

2. Whether the Corps' use in the IFB of bid schedules and a price evaluation scheme that do not consider a significant portion of the work required by the IFB, do not assure that award of a contract to the low bidder will result in the lowest cost to the government for the work actually performed, and deprive Plaintiff of the opportunity to compete for the work on a fair and equal basis violates federal procurement laws and regulations.

## II. STATEMENT OF FACTS/STATEMENT OF THE CASE

This is a pre-award bid protest challenging the actions of the Memphis District of the United States Army Corps of Engineers ("Memphis District" or "Corps"). The Memphis District issued Solicitation Number W912EQ-08-B-0001 ("Solicitation" or "IFB") on January 17, 2008. The IFB seeks offers to perform maintenance dredging at various harbors in the Mississippi River and to perform construction, or new work, dredging at Northwest Harbor, Tennessee. Bids are currently scheduled to be opened on April 18, 2008.

The Memphis District has awarded an annual contract to perform dredging in the Mississippi River and in harbors along the river for many years. These contracts have been structured as a lease of a cutter suction dredge (also called a cutterhead hydraulic pipeline dredge), under which the Corps pays for use of the dredge based on an hourly price bid by prospective contractors. During the last ten years (1998-2007), these Memphis District cutter suction dredge rental contracts have been awarded to two companies, Plaintiff Great Lakes Dredge & Dock Company LLC ("GLDD") and Weeks Marine, Inc. ("Weeks"). During this

decade, the work has been performed by two dredges -- GLDD's dredge Pontchartrain and Week's dredge Venture.

The original 2008 IFB, like the previous contracts, was structured as a rental contract and sought rental hourly prices for both the maintenance dredging and construction dredging portions of the work. Unlike prior contracts, however, the original IFB's bid schedule was broken down into two Lots. Lot 1 sought prices for a 27-inch pump discharge dredge, such as the Pontchartrain, while Lot 2 sought prices for a 29-inch pump discharge dredge, which GLDD believes will be used by the Venture. The contracts for each of the previous ten years were awarded based on a single bid schedule relating to a 27-inch pump discharge dredge. The IFB provided no explanation for this change.

Under the original 2008 IFB, bidders were invited to provide hourly prices for performing both the maintenance dredging and construction dredging portions of the work.[1] For evaluation purposes in determining the low bidder, the bidder's hourly prices would be multiplied by an estimated number of dredging hours provided on the bidding schedule. The estimated number of hours was different for Lots 1 and 2 as follows:

| | Maintenance Dredging | Construction Dredging |
|---|---|---|
| Lot 1 (27-inch dredge) | 2,076.5 | 2,076.5 |
| Lot 2 (29-inch dredge) | 1,800 | 1,800 |

Thus, the original IFB assumed that it would take a 27-inch pump discharge dredge 15.4% hours more than a 29-inch pump discharge dredge to perform the same work (2,076.5 ÷ 1,800).

[1] The IFB also contained contract line items for mobilization of equipment to the job site and for towing equipment upstream and downstream to work sites along the river. These line items are not at issue in this protest.

The original IFB further assumed that a 29-inch pump discharge dredge would have a 15.4% production advantage over a 27-inch pump discharge dredge. Paragraph 2.1.1 of Section 02482 of the original IFB stated that a 29-inch pump discharge dredge had an estimated minimum production of 1,321 cubic yards ("cy") per pumping hour, while a 27-inch pump discharge dredge had an estimated minimum production of 1,145 cy per pumping hour. Paragraph 2.1.1 also stated that these production estimates would be used to evaluate bids. Prior Memphis District cutter suction dredge rental solicitations had used a single estimated minimum production of 1,100 cy per pumping hour for all dredges.

The original IFB did not provide any basis or justification for these estimated minimum production rates. However, the ratio of these estimated minimum production rates (and the Lot 1 and Lot 2 estimated hours) are the same as the ratio of the pump discharge area of two dredges:

| Dredge | Pump Discharge Area (Diameter Squared) | IFB Est. Production (cy/hour) | IFB Estimated Hours (Maintenance and New Work) |
|---|---|---|---|
| Venture (assumed 29-inch) | 841 sq. in. | 1,321 | 1,800 |
| Pontchartrain (27-inch) | 729 sq. in. | 1,145 | 2,076.5 |
| Ratio | 1.1536 | 1.1537 | 1.1536 |

The Corps, therefore, assigned a 15.4% production advantage to the Venture based solely on a mechanical comparison of the pump discharge areas of the Venture and the Pontchartrain.

Paragraph 2.1.1 of Section 02482 of the original IFB also stated that "[d]uring all times the dredge will be required to meet the specified minimum output" set forth in the estimated minimum production rates. Paragraph 2.1.1 further stated that failure to maintain this production rate will result in a reduction in payment in accordance with paragraph 00800 - SP

6.c unless the Contracting Officer determined that circumstances beyond the control and without the fault or negligence of the contractor caused the reduction in output. Section 00800 paragraph 6.c provided that the rate of payment would be "reduced in the ratio that the output falls short of that specified in" Section 02482.

These price adjustment provisions were modified by Amendment 0001 of the IFB (dated January 28, 2008). Paragraph 2.1.1 was modified to provide for a reduction in payments in accordance with a new paragraph 00800-SP. 18g, which stated that if dredging output fell short of that specified in Section 02482 "the total dredging hours for that location will be reduced by the percentage that the output falls short of the minimum. Payment for dredging operations, which fail to meet the specified minimum output, will be made by multiplying this reduced number of hours by the contract unit price per hour." Prior Memphis District rental contracts, including the contracts performed by Weeks and the Venture in 2004 and 2007, contained similar provisions relating to reduction of payment for failure to achieve the estimated minimum production rates.

The IFB's payment provision (Section 00800 paragraph SP 18) provides that the contractor will be paid for 100% of its effective hours, which the IFB defines as actual time the dredge is under operation (with the cutterhead moving material and material being passed through the pipeline) and time lost due to river traffic. The IFB provides that the contractor will be paid for 70% of its non effective hours (at the contract hourly price), with non effective hours defined to include time spent moving from one assignment to another (but not in excess of eight hours), time lost to move anchors and add pipe due to the progress of the work, time lost due to the failure of retaining dikes and spill boxes or fall outs through no fault of the contractor, and time lost due to certain other identified delays and repairs.

In three pre-bid letters dated February 8, February 14 and February 25, 2008, GLDD challenged the original IFB's use of a different bid schedule, different estimated dredging hours, and different minimum estimated productions for the Venture and the 27-inch pump discharge dredge (Pontchartrain). In these letters, GLDD provided the Memphis District with actual production data for the last ten years of performance under the Memphis District's Mississippi River and harbors cutter suction dredge rental contracts. This data was set forth in the table that is attached as Exhibit 1 to this memorandum (Appendix page 3).

As Exhibit 1 demonstrates, GLDD and the Pontchartrain have performed the rental contract during eight of the last ten years, while Weeks and the Venture performed the rental contract in 2004 and 2007. The Venture averaged 1,062 cy per effective hour (excluding traffic) in 2004.[2] In 2007, Weeks reported two dredging quantities for the Venture, a required, or dredging template, quantity and a gross quantity (including overdredging). The Venture's average cy gross per effective hour (excluding traffic) production in 2007 was 1,207. Its cy required production in 2007 was 1,044 cy per effective hour (excluding traffic) In neither year did the Venture come even close to the 1,321 cy per pumping hour estimated minimum production rate set forth in the original 2008 IFB for a 29-inch pump discharge dredge. On average, in 2004 and 2007, Weeks at best achieved a production rate of 1,116 cy per pumping hour, which is only 84.5% (1,116 ÷ 1,321) of the 2008 IFB estimated minimum production rate for a 29-inch pump discharge dredge.

---

[2] Although the IFB and the predecessor Memphis District rental contracts define lost time due to river traffic as "effective time," the estimated minimum production rates in the IFB are defined in terms of pumping hours, and lost hours due to traffic are not pumping hours. Therefore, in calculating these productions per effective hour, GLDD has excluded traffic hours so that the production figures reflect pumping hours. The deletion of the traffic hours has the impact of slightly raising the Venture's hourly production figures because the denominator of the calculation includes only pumping hours, not pumping hours and traffic delay hours.

As shown in Exhibit 1, during the eight years that GLDD performed the predecessor Memphis District rental contracts, the Pontchartrain achieved an average production rate of 1,111 cy per effective hour (excluding traffic) compared to a minimum estimated production rate of 1,100 per pumping hour. During this decade of work, the production rates actually achieved per pumping hour by the Pontchartrain and Venture while performing the predecessor contracts were virtually identical. Appendix at 3.

GLDD's February 2008 letters also pointed out that the Venture had considerably more non effective time during the years in which it performed the predecessor contracts than did GLDD. As shown in Exhibit 1, the Pontchartrain's non effective hours averaged approximately 8.5% of effective hours (1,729 non effective hours compared to 20,411 effective hours), while the Venture's non effective hours averaged almost 25% of its effective hours (621 hours ÷ 2,552 hours). Appendix at 3. Thus, on the predecessor Memphis District rental contracts, the Corps paid GLDD for a significantly smaller proportion of non effective hours than it paid Weeks.

From 1998-2007, the Corps paid for 80% of non effective time at the contract hourly rental rate. Thus, as shown in Exhibit 1, when non effective pay hours are taken into account on the ten predecessor Memphis District rental contracts, the Pontchartrain actually was more productive than the Venture and had an almost 12% production advantage. (1,025 cy per effective and non effective pay hour compared to the Venture's 916 cy per effective and non effective pay hour). Id.

Based on this actual, historical data regarding the productive capacity of the Pontchartrain and the Venture performing work under predecessor Memphis District rental contracts, GLDD asserted in its February 2008 letters that the IFB's estimated hours and

estimated minimum production rates were defective and that the IFB was defective because Lots 1 and 2 did not fairly reflect the proven production capability of the dredges. GLDD asserted that the IFB prevented GLDD from competing for the work on a fair and equal basis because the IFB required GLDD to multiply the Pontchartrain's hourly rental rate by significantly more hours than the Venture, even though the Pontchartrain's actual, historical production performance has equaled or exceeded the Venture's production performance on the predecessor rental contracts.

On February 29, 2008, after receipt of GLDD's letters, the Memphis District issued Amendment 0003 to the IFB. This amendment deleted the Lot 2 bid schedule (based on a 29-inch pump discharge dredge) and provided for all bidders to submit bids using the same bid schedule, same estimated hours and same estimated minimum production per pumping hour. This was the same approach used on the preceding ten rental contracts. As a result of these changes to the IFB, GLDD did not file a bid protest.

On March 4, 2008, however, Weeks filed a 2-page agency protest. Weeks asserted that the Venture is a 29-inch cutter suction dredge and stated that "[o]bviously, a larger dredge will be more productive than a smaller dredge and the bid schedule for the large dredge should include less hours than the smaller dredge." Weeks asked the Corps to reconsider its decision to eliminate the multiple equipment bidding schedule approach.

On April 7, 2008, the Corps issued Amendment 0005 to the IFB.[3] This amendment changed the construction dredging portion of the IFB from a rental basis to a payment per cubic yard dredged basis. GLDD does not object to this change in this protest. However, Amendment 0005 reverted back to the approach taken in the original IFB for the

---

[3] A copy of Amendment 0005, which contains the current version of the bid schedules and clauses at issue in this protest, is attached at Exhibit 2 (Appendix pages 5-51).

maintenance dredging portion of the project. Amendment 0005 added the Lot 2 (29-inch pump discharge) bid schedule back into the IFB for the maintenance portion of the work and once again provides the Venture with a 15.4% advantage over the Pontchartrain in estimated hours (2,076.5 for the Pontchartrain versus 1,800 for the Venture) and minimum estimated production rates (1,321 cy per hour for the Venture versus 1,145 cy per hour for the Pontchartrain). Appendix at pages 7-10; 49.

## III. ARGUMENT

### A. Jurisdiction And Standard Of Review In Bid Protest Cases

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1491(b), which gives the Court jurisdiction over both pre-award and post-award bid protests. In bid protest cases such as this, the Court may award any relief it considers proper, including injunctive and declaratory relief, except that any monetary relief is limited to bid preparation and proposal costs. Id. at 1491(b)(2).

Section 1491(b)(4) provides that the Court must review agency action in a bid protest case using the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), under which agency action should be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. The Federal Circuit has held that a protest should be granted if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).

In reviewing agency action, the Court must consider whether the agency's decision was based on consideration of all relevant factors and whether there has been a clear

error of judgment. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 358 (2004). If the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made, its decision will be set aside as arbitrary and capricious. Id.; Antarctic Support Assocs. v. United States, 46 Fed. Cl. 145, 154 (2000).

Although the arbitrary and capricious standard is deferential, it does not shield agency decisions from a "thorough, probing, in-depth review." Overton Park, 401 U.S. at 415. In order for this Court to achieve meaningful judicial review, the agency must "present a full and reasoned explanation of its decision . . . as supported by the agency record, and explain its application of the law to the found facts." In re Sang-Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

**B. The IFB Is Based On Defective Estimates That Do Not Accurately Represent the Government's Actual Needs And That Deprive GLDD Of The Opportunity To Fairly Compete For The Work**

It is well-established in federal procurement law that when the government solicits offers on the basis of estimated quantities, those estimates must be compiled from the best information available and must be a reasonably accurate representation of the agency's needs. L.K. Comstock, Inc. and Liebert Federal Sys., Inc., B-261711.5 et al., 96-1 C.P.D. ¶ 4 (Dec. 14, 1995); News Printing, Inc., B-274773.2 et al., 97-1 C.P.D. ¶ 68 (Feb. 11, 1997).[4] As noted in News Printing, "accurate estimates are essential to enable bidders to prepare reasonable, intelligent bids, and, often, to ensure the lowest cost to the government." 97-1 C.P.D ¶ 68 at 2-3.

[4] GLDD recognizes that GAO decisions are not binding on this Court, but notes that the Court has accorded "deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions." Bean Stuyvesant LLC v. United States, 48 Fed. Cl. 303, 326 n.13 (2000) (citing cases).

As a result, award of a federal contract

> is not proper if the estimates misrepresented the government's needs such that the inaccurate estimates likely made a difference in the ***relative competitive positions*** of firms participating in the procurement ... ***or skewed the determination of which offer would result in the lowest cost to the government in terms of actual performance.***

L.K. Comstock, 96-1 C.P.D. ¶ 4 at 4 (emphasis added) (citations deleted). See News Printing, 97-1 C.P.D. ¶ 68 at 4 (defective estimate was a "fundamental flaw" in an IFB that would have resulted in a "competition rooted in other than [the agency's] actual requirements, contrary to the fundamental obligation to obtain full and open competition"). See also C-Cubed Corp., B-289867, 2002 C.P.D. ¶ 72 at 3 (April 26, 2002) (cancellation of IFB due to defective estimated quantities was proper where estimates did not reflect the actual work to be performed on the contract and where using correct estimates could have changed the outcome of the competition).

This Court has recognized the importance of accurate estimates in ensuring the integrity of the procurement process. It has not hesitated to overturn attempts to cancel IFBs on the grounds that the prices offered were unreasonably high compared to a government estimate where the government estimate itself was flawed. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 734 (2000); Bean Dredging Co. v. United States, 19 Cl. Ct. 561, 568-69 (1990).

The estimated hours (1,800) and estimated minimum production rate (1,321 cy per pumping hour) used in the maintenance dredging portions of the 2008 Memphis District IFB for a 29-inch pump discharge dredge are defective because they are not based on the best information available. These estimates also do not accurately reflect the government's needs or the work that actually will be required, and they skew the determination of the putative low bidder.

As set forth in the Statement of Facts, the 15.4% estimated minimum production rate and estimated hours differential between the 27-inch and 29-inch dredges reflected in the original IFB and the maintenance dredging sections of the current IFB appear to be premised solely on a mechanical calculation based on the area of the discharge pump opening of the dredges. This is ***not*** the best information available for estimating dredging production and resulting estimated hours. The best information is the actual production history of the same two dredges that have performed the same work called for by the IFB on the last ten predecessor Memphis District rental contracts – precisely the information relied upon by GLDD here.

Use of this "best information available" (see Exhibit 1, Appendix at 3) demonstrates that the actual production per effective hour (excluding time lost due to river traffic) achieved by the Pontchartrain (1,111 cy) and the Venture (1,116 cy gross per effective hour) on the ten predecessor Memphis District rental contracts was virtually identical and that the Venture has never come close to averaging the 1,321 cy per pumping hour minimum estimated production for a 29-inch pump discharge dredge set forth in the IFB. Indeed, the current IFB improperly gives the Venture a 15.4% advantage over the 27-inch Pontchartrain despite the fact that the Venture's 2004 production (1,062 cy per pumping hour) and the Venture's 2007 production for cy required per pumping hour (1,044 cy per pumping hour) were both ***less than*** the estimated minimum production under those contracts for ***a 27-inch*** pump discharge dredge. Therefore, the estimated minimum production in the IFB for the 29-inch pump discharge dredge is substantially overstated, the Lot 2 estimated hours for this dredge are substantially understated, and these estimated hours do not accurately reflect the government's needs or the amount of work that actually will be required for a 29-inch pump discharge dredge under the contract.

There also is no doubt that the Corps' failure to use the best available information to develop accurate production and hours estimates will unfairly and improperly skew the determination of the putative low bidder. The IFB assigns the Venture a 15.4% production advantage -- and therefore assigns the Pontchartrain 15.4% more estimated hours for the maintenance dredging work -- even though the best available information demonstrates that the two dredges achieved essentially equivalent cy per effective hour production rates on the predecessor contracts. Moreover, this unjustified 15.4% preference for the Venture ignores the fact that under the IFB, the contractor receives payment for 70% of its non effective time. When non effective hours are taken into account on the ten predecessor rental contracts, the Pontchartrain actually has a significant (almost 12%) production per effective and non effective hour ***advantage*** over the Venture (1,025 cy for the Pontchartrain versus 916 cy for the Venture). See Exhibit 1 (Appendix at 3).

Thus, despite extensive historical production data establishing that the Pontchartrain is as productive, or more productive, than the Venture and can complete the work under the rental contract in the same, or lesser, number of pay hours, the IFB requires GLDD to multiply its hourly price for the Pontchartrain by 15.4% more hours to determine the low bidder. This unwarranted 15.4% bidding penalty imposed on GLDD by the IFB deprives GLDD of the right to compete for the IFB maintenance dredging work on a fair and equal basis and gives Weeks and the Venture an unfair competitive advantage.[5]

---

[5] In Mike Hooks, Inc. v United States, 39 Fed. Cl. 147 (1997), the court denied a protest challenging the terms of a Corps dredge rental solicitation. In that case, however, the Corps relied upon actual, historical dredge production information for the dredge in question in setting the estimated production rate and estimated hours for that dredge, not a mechanical comparison of discharge pump area. In addition, the protester in that case, unlike GLDD here, did not provide the Corps and the court with historical dredge production information from predecessor

It "is a fundamental principle of government procurement that competition must be conducted on an equal basis." System Mgmt., Inc.; Qualimetrics, Inc., B-287032.3 et al., 2001 C.P.D. ¶ 85 at 8 (April 16, 2001). See OccuHealth, Inc., B-270228 et al., 96-1 C.P.D. ¶ 196 at 4 (April 3, 1996) ("[i]t is also a fundamental requirement that the government apprise offerors of its actual needs in a manner designed to achieve full and open competition and so that offerors may fairly compete on an equal basis").

Indeed, this Court has recognized many times that a bid protestor suffers irreparable injury "when deprived [of] the opportunity to compete fairly for a contract." Axiom Res. Mgmt., Inc. v. United States, 80 Fed. Cl. 530, 536 (2008) (citations omitted); see Superior Helicopter LLC v. United States, 78 Fed. Cl. 181, 195 (2007) (lost opportunity to compete on a level playing field is irreparable harm).

Here, the defective minimum production and hours estimates unfairly put GLDD at a 15.4% disadvantage in determining the low price for the maintenance dredging portion of the work even though GLDD has the more efficient and productive dredge. Starting with an unjustified 15.4% penalty is ***not*** competing on a level playing field and violates both the fundamental principles set forth above and the Competition in Contracting Act's requirement that the Corps provide for "full and open competition." 10 U.S.C. § 2304(a)(1); see Federal Acquisition Regulation ("FAR") 6.101(b).

The IFB's minimum production estimates and hours estimates are not based on the best information available, do not accurately reflect the Corps' actual needs, and unfairly deprive GLDD of the chance to compete for the maintenance dredging portion of the work on a fair and equal basis. As such, they violate fundamental principles of federal procurement law

---

rental contracts for the same work that demonstrated that the dredge at issue had failed to come close to achieving the estimated production rate included in the solicitation.

and the Competition in Contracting Act. In addition, the Corps' use of these defective estimates lacks a rational basis and is arbitrary and capricious and an abuse of discretion. See Impresa Construzioni, 238 F.3d at 1332.

### C. The IFB's Price Evaluation Scheme For Maintenance Dredging Also Is Irrational And Defective Because It Does Not Consider The Full Scope Of the Work Being Completed And Does Not Assure That Award To The Low Bidder Will Result In the Lowest Cost To The Government

Award of a contract under an invitation for bids, where price is the only evaluation factor (see FAR 6.401), must be rational and "must be based on the most favorable cost to the government measured by the actual and full scope of work to be awarded." Associated Healthcare Sys., Inc., B-222532, 86-2 C.P.D. ¶ 246 at 2 (Sept. 2, 1986); see Professional Carpet Service, B-220913, 86-1 C.P.D. ¶ 158 at 2-3 (Feb. 13, 1986). Therefore, "an evaluation method that incorporates more or less work than the agency expects to be needed does not obtain the benefits of full and open competition as required by procurement statues" and is invalid. Exclusive Temporaries of Georgia, Inc., B-220397 et al., 86-1 C.P.D. ¶ 232 at 3 (March 10, 1986). See 10 U.S.C. § 2304(a)(1); FAR 6.101(b). In addition, if an "IFB's evaluation scheme does not assure that an award to the lowest evaluated bidder will result in the lowest cost to the government in terms of actual performance, the IFB is defective per se and no bid can be evaluated properly." Robinson Mills & Williams, B-236956.3, 90-1 C.P.D. ¶ 156 at 3 (Feb. 7, 1990); Associated Healthcare Sys., 86-2 C.P.D. ¶ 246 at 2.

It is readily apparent in this case that after Amendment 0005, the IFB's maintenance dredging bid schedules (both Lots 1 and 2) consider only effective hours that will be paid by government and do not include any consideration of non effective hours, 70% of which will be paid for by the government at the hourly rental rate. The estimated hours

contained in Lots 1 and 2 are based on (and are in the same ratio as) the estimated minimum production rates set forth in paragraph 2.1.1 of Section 02482A of the IFB (Amendment 0005). See Exhibit 2 (Appendix at 7-10, 49). These estimated minimum production rates are stated in cubic yard per "pumping hour," and pumping hours are "effective time" under the definitions in paragraph SP 18c in section 00800A of the IFB. Id. (Appendix at 19-21).

Therefore, the IFB bid schedules and price evaluation scheme for the maintenance dredging part of the project do not take into account the non effective hours that the Corps will pay under the contract. This omission is important because non effective hours historically have constituted a significant number of the total hours under the predecessor rental contracts, especially when the Venture has performed the work. As shown in Exhibit 1 (Appendix at 3) during the two years that the Venture performed the predecessor contracts, non effective hours were almost 25% of the total effective hours (621 non effective hours compared to 2,552 effective hours). Thus, these bid schedules and the IFB's price evaluation scheme are defective because they ignore a significant part of the actual work to be performed and paid for under the contract.

This omission is especially significant in the present case because it further deprives GLDD of the opportunity to compete for the maintenance dredging work on a fair and equal basis. As shown in Exhibit 1 (Appendix at 3), GLDD has a historically proven advantage over Weeks with respect to non effective hours incurred during the predecessor rental contracts. While the Venture's non effective time has averaged almost 25% of effective time, the Pontchartrain's non effective hours on the eight predecessor rental contracts it performed averaged only 8.5% of effective hours (1,729 non effective hours compared to 20,411 effective hours). Because the Pontchartrain has been a more efficient tool, the Corps paid GLDD for a

significantly smaller proportion of non effective hours than it paid Weeks on the predecessor Memphis District rental contracts, but this GLDD price advantage is ignored in the IFB's price evaluation.

Indeed, as previously discussed, if the actual production rates achieved by the Pontchartrain and the Venture on the predecessor rental contracts are measured by cubic yards per hour paid for both effective and non effective time (i.e., 100% of effective time hours and 80% of non effective hours under those contracts), then the Pontchartrain has an 11.9% production ***advantage*** over the Venture:

| **Dredge** | **Cubic Yards** | **Pay Hours (100% Effective)** | **Cubic Yards/Hour** |
|---|---|---|---|
| Pontchartrain (8 years) | 22,335,933 | 21,974.59 | 1,025 |
| Venture (2 years) | 2,793,872 | 3,048.72 | 916 |

See Exhibit 1 (Appendix at 3). Yet this production ***advantage*** is not reflected anywhere in the bid schedules or price evaluation scheme, which instead assign the Pontchartrain a 15.4% estimated hours ***disadvantage***.

As a result, it is quite possible that the IFB's evaluation scheme could result in award of a contract to Weeks even though GLDD, due to its lower non effective time, could actually perform the work at a lower cost to the government. Robinson Mills & Williams, 90-1 C.P.D. ¶ 156 at 3 (Feb. 7, 1990); Associated Healthcare Sys., 86-2 C.P.D. ¶ 246 at 2. The IFB here is per se defective for this very reason – its price evaluation scheme does not include a significant component of the actual work to be performed and therefore does not assure that the evaluated low bidder will be able to perform the actual work at the lowest cost to the government.

### D. GLDD Is Entitled To Injunctive Relief

To obtain a temporary restraining order ("TRO") or a preliminary injunction, a plaintiff must demonstrate that: (1) it has a likelihood of success on the merits; (2) that it will suffer irreparable harm if an injunction is not granted; (3) that the harm to the plaintiff if an injunction is not granted outweighs the harm to the government if an injunction is granted; and (4) that granting the injunction is in the public interest. See, e.g., Bean Stuyvesant, 48 Fed. Cl. at 320-21 (citations omitted); A&D Fire Prot., Inc. v United States, 72 Fed. Cl. 126, 132 (2006) (citation omitted). No one factor is dispositive as the "weakness of the showing regarding one factor may be overborne by the strength of the others." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 709 (2006) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)).

GLDD has demonstrated above that it has a high likelihood of success on the merits and satisfies the first prong of this test. GLDD also will be irreparably harmed if an injunction is not issued here. This Court has held that a bid protester suffers irreparable injury when it has been deprived of the opportunity to compete fairly for a contract. See United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 333 (2003) ("[L]ost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.") (citations omitted); see also Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 571 (2000) (concluding that "a lost opportunity to compete on a level playing field for a contract . . . has been found sufficient to prove irreparable harm").

In addition, this Court repeatedly has held that the denial of the right of a contractor to have an offer fully and ***lawfully*** considered for award also constitutes irreparable injury. Great Lakes, 60 Fed. Cl. at 370; Overstreet Elec. Co., 47 Fed. Cl. at 744 n.25; Ellsworth

Assocs., Inc. v. United States, 45 Fed. Cl. 388, 398 (1999). GLDD also has no adequate remedy in the absence of an injunction because if it waited until it lost the competition, its protest would be untimely. Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 36 (2007).

The balance of hardships also weighs heavily in favor of granting injunctive relief to GLDD. If no relief is granted, GLDD will suffer the hardship of being forced to participate in an unlawful procurement and will be denied the opportunity to compete on a fair and equal basis for the work subject to the IFB. See Weeks Marine, 79 Fed. Cl. at 36 (contractor's interest in seeing that the Corps complies with the law in soliciting and awarding contracts outweighs the government "hardship" of following procurement rules). Moreover, the Government will suffer no harm at all if a TRO or preliminary injunction is granted, as GLDD is agreeable to an expedited schedule that will promptly resolve this case on the merits.

Finally, issuing a TRO or preliminary injunction in this case will serve the public interest. It is well-established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring procurement officials to follow procurement laws, statutes and regulations. Id.; Great Lakes, 60 Fed. Cl. at 370; United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998). Here, the IFB's use of defective estimates, defective bid schedules and a defective price evaluation scheme violates numerous procurement laws statutes and regulations and prevents GLDD from competing fairly for the work. Therefore, issuance of an injunction prohibiting the Corps from proceeding on this basis will serve the public interest.

## IV. CONCLUSION

For all of the reasons set forth above, plaintiff GLDD respectfully requests that the Court grant GLDD's motion and issue a TRO and/or a preliminary injunction to maintain the status quo until the Court reaches a decision on the merits.

Respectfully submitted,

Daniel C. Sauls
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902

Attorney of Record for Plaintiff
Great Lakes Dredge & Dock Company LLC

Dated: April 16, 2008

# APPENDIX

# EXHIBIT 1

**Table 1.Memphis District Mississippi River Rental**
**Actual Achieved Production History**
**1998 to 2007**

| IFB No. | Year | Dredge | Dredged Quantity (CY) | 100% Pay Hours Effective | Traffic | Total | 80% Pay Hours | Total Pay Hours | Production Per Eff Hr (cy / eff hr) | Production Per Total Pay Hr (cy / pay hour) | Production Per Total Pay Hr (excluding traffic) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| W912EQ-07-B-0010 | 2007 | Venture | 1,120,599 | 928 | 23 | 951 | 358 | 1,238 | 1,207 | 905 | 922 |
| W912EQI-06-B-0009 | 2006 | Ponchartrain | 1,249,686 | 1,229 | 37 | 1,266 | 135 | 1,373 | 1,017 | 910 | 935 |
| W912EQ-05-B-0014 | 2005 | Ponchartrain | 1,800,141 | 1,690 | 35 | 1,725 | 182 | 1,871 | 1,065 | 962 | 980 |
| W912EQ-04-B-0019 | 2004 | Venture | 1,673,273 | 1,575 | 26 | 1,601 | 262 | 1,811 | 1,062 | 924 | 938 |
| DACW66-03-B-0005 | 2003 | Ponchartrain | 3,524,728 | 3,058 | 44 | 3,102 | 175 | 3,241 | 1,153 | 1,087 | 1,102 |
| DACW66-02-B-0014 | 2002 | Ponchartrain | 3,061,639 | 2,609 | 25 | 2,634 | 229 | 2,817 | 1,174 | 1,087 | 1,097 |
| DACW66-01-B-0005 | 2001 | Ponchartrain | 4,083,426 | 3,591 | 27 | 3,618 | 298 | 3,856 | 1,137 | 1,059 | 1,066 |
| DACW66-00-B-0017 | 2000 | Ponchartrain | 3,449,720 | 3,351 | 53 | 3,405 | 357 | 3,690 | 1,029 | 935 | 948 |
| DACW66-99-B-0006 | 1999 | Ponchartrain | 3,565,291 | 3,186 | 69 | 3,255 | 255 | 3,460 | 1,119 | 1,031 | 1,051 |
| DACW66-98-B-0014 | 1998 | Ponchartrain | 1,600,802 | 1,395 | 13 | 1,407 | 98 | 1,485 | 1,148 | 1,078 | 1,087 |

**"Ponchartrain" Actual Production Summary**
**1998 to 2007**

| IFB No. | Year | Dredge | Dredged Quantity (CY) | 100% Pay Hours Effective | Traffic | Total | 80% Pay Hours | Total Pay Hours | Production Per Eff Hr (cy / eff hr) | Production Per Total Pay Hr (cy / pay hour) | Production Per Total Pay Hr (excluding traffic) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL | ALL | Ponchartrain | 22,335,433 | 20,108 | 303 | 20,411 | 1,729 | 21,795 | 1,111 | 1,025 | 1,039 |

**"Venture" Actual Production Summary**
**1998 to 2007**

| IFB No. | Year | Dredge | Dredged Quantity (CY) | 100% Pay Hours Effective | Traffic | Total | 80% Pay Hours | Total Pay Hours | Production Per Eff Hr (cy / eff hr) | Production Per Total Pay Hr (cy / pay hour) | Production Per Total Pay Hr (excluding traffic) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALL | ALL | Venture | 2,793,872 | 2,503 | 49 | 2,552 | 621 | 3,049 | 1,116 | 916 | 931 |

# EXHIBIT 2

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES |
|---|---|
| J | 1 / 57 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO.(If applicable) |
|---|---|---|---|
| 0005 | 07-Apr-2008 | W38XGR73303790 | |

| 6. ISSUED BY CODE W912EQ | 7. ADMINISTERED BY (If other than item 6) CODE |
|---|---|
| US ARMY ENGINEER DISTRICT, MEMPHIS<br>167 N MAIN STREET B202<br>MEMPHIS TN 38103-1894 | See Item 6 |

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)

| | |
|---|---|
| X | 9A. AMENDMENT OF SOLICITATION NO. W912EQ-08-B-0001 |
| X | 9B. DATED (SEE ITEM 11) 17-Jan-2008 |
| | 10A. MOD. OF CONTRACT/ORDER NO. |
| | 10B. DATED (SEE ITEM 13) |

CODE FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer [X] is extended, [ ] is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [ ] is not, [ ] is required to sign this document and return ____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This solicitation W912EQ-08-B-0001 is for Lease of one Cutterhead Hydraulic Pipeline Dredge, fully operated with attendant plant for Dredging of the Mississippi River, existing harbors and new construction of North West Tennessee Harbor in the Memphis District scheduled to open 11 March 2008 at 2:00 PM, is amended as follows.

This amendment No. 0005 re-establishes the solicitation and new bid opening to 18 April 2008 at 2:00 PM and includes the attached Summary of Changes.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>TEL: EMAIL: | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY<br>(Signature of Contracting Officer) | 16C. DATE SIGNED |

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

**SUMMARY OF CHANGES**

SECTION 00010 - SOLICITATION CONTRACT FORM

The following have been added by full text:

This solicitation W912EQ-08-B-0001 is for Lease of one Cutterhead Hydraulic Pipeline Dredge, fully operated with attendant plant for Dredging of the Mississippi River, existing harbors and new construction of North West Tennessee Harbor in the Memphis District scheduled to open 11 March 2008 at 2:00 PM, is amended as follows:

This amendant No. 0005 re-establishes the solicitation and new bid opening to 18 April 2008 at 2:00 PM and includes the following attached Summary of Changes.

1. Section 00010 - The portion of work for new construction of the North West Tennessee Harbor Bid Item 0001 or 0006 at river mile LMR 899.0 has been changed from an hourly basis to a cubic yard basis.

2. Section 00800 – Has been deleted in it's entirety and replaced with two sections - Section 00800A for the Maintenance Dredging (Hourly) and Section 00800B for New Construction Dredging (Yardage)

3. Section 00900 – Wage Determinations KY080050, and MS080034 are deleted and replaced with determinations KY080048 and MS080024.

4. Section 02482 – Has been deleted in it's entirety and replaced with two sections – Section 02482A for the Maintenance Dredging (Hourly) and Section 02482B for New Construction Dredging (Yardage)

5. The drawings issued with the original solicitation for construction of the North West Tennessee harbor are deleted and replaced with drawings issued with Amendment 0005 dated 4-7-08. The drawings that changed are Maps and Index 001A, Dredge Cut & Pipe Row 003A, Dredge Cut Centerline Coordinates 004A, Dredging Options 005A, Construction Cross Sections 006A, and replaced as part of Amendment 0005 show the work areas for line items 0001AA, 0006AA from station 00+00 to station 80+00; 0001AB, 0006AB from station 80+00 to 85+00; 0001AC, 0006AC from station 85+00 to end of Harbor.

End of Summary of Changes

Section 00010 - SOLICITATION CONTRACT FORM

**LOT 1 27-INCH DREDGE**
**BID ITEMS 0001 THRU 0005**

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | New construction dredging of the Northwest Tenn. Harbor at mile LMR 899.0. Yardage contract for one fully operated hydraulic dredge with 27-inch ID pump discharge, booster pump if needed and attendant dredge plant including pipeline | | | | |
| 0001AA | First 669,551 Yards | 669,551 | Cubic Yard | ________ | ________ |
| 0001AB | 146,140 Yards | 146,140 | Cubic Yard | ________ | ________ |
| 0001AC | Next 131,529 Yards | 131,529 | Cubic Yard | ________ | ________ |
| 0001AD | Stand by time for dredge and attendant plant | 75 | Hours | ________ | ________ |
| 0002 | Maintenance Dredging Rental of one fully operated hydraulic dredge with 27-inch ID pump discharge and attendant dredge plant including pipeline | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 0002AA | First 1,384.5 hours | 1,384.50 | Hours | ________ | ________ |
| 0002AB | All over 1384.5 hours | 692 | Hours | ________ | ________ |
| 0003 | Upstream Towing of Dredge and attendant plant. | | | | |
| 0003AA | First 200 miles | 200 | Miles | ________ | ________ |
| 0003AB | All over 200 miles | 200 | Miles | ________ | ________ |
| 0004 | Downstream Towing of dredge and plant | | | | |
| 0004AA | First 200 miles | 200 | Miles | ________ | ________ |
| 0004AB | All over 200 miles | 200 | Miles | ________ | ________ |
| 0005 | Mobilization and demobilization | 1 | Lump Sum | | ________ |

**LOT 1 27-INCH DREDGE TOTAL BID ITEMS 0001 THRU 0005** ________

**LOT 2 29-INCH DREDGE**
**BID ITEMS 0006 THRU 0010**

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0006 | New Construction dredging of the Northwest Tenn. Harbor at mile LMR 899.0. Yardage contract for one fully operated hydraulic dredge with 29-inch ID pump discharge, booster pump if needed and attendant dredge plant including pipeline | | | | |
| 0006AA | First 669,551 Yards | 669,551 | Cubic Yard | ________ | ________ |
| 0006AB | Next 146,140 Yards | 146,140 | Cubic Yard | ________ | ________ |
| 0006AC | Next 131,529 Yards | 131,529 | Cubic Yard | ________ | ________ |
| 0006AD | Stand by time for dredge and attendant plant | 75 | Hours | ________ | ________ |
| 0007 | Maintenance Dredging Rental of one fully operated hydraulic dredge with 29-inch ID pump discharge and attendant dredge plant including pipeline. | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 0007AA | First 1,200 hours | 1,200 | Hours | ________ | ________ |
| 0007AB | All over 1,200 hours | 600 | Hours | ________ | ________ |
| 0008 | Upstream Towing of dredge and attendant plant | | | | |
| 0008AA | First 200 Miles | 200 | Miles | ________ | ________ |
| 0008AB | All over 200 miles | 200 | Miles | ________ | ________ |
| 0009 | Downstream Towing of dredge and attendant plant | | | | |
| 0009AA | First 200 miles | 200 | Miles | ________ | ________ |
| 0009AB | All over 200 miles | 200 | Miles | ________ | ________ |
| 0010 | Mobilization and Demobilization | 1 | Lump Sum | | ________ |

**LOT 2 29-INCH DREDGE TOTAL BID ITEMS 0006 THRU 0010** ____________

SECTION 00800A

MAINTENANCE (HOURLY)

SPECIAL CONTRACT REQUIREMENTS

TABLE OF CONTENTS


| Paragraph No. | Paragraph Title |
|---|---|
| SP.1 | Delivery, Prosecution and Completion of Work |
| SP.2 | Physical Data |
| SP.3 | Inspection |
| SP.4 | Misplaced Material |
| SP.5 | Signal Lights |
| SP.6 | Plant |
| SP.7 | Crew |
| SP.8 | Office Accommodations |
| SP.9 | Meals for Inspectors |
| SP.10 | Layout of Work |
| SP.11 | General Safety Requirements |
| SP.12 | Working in the Vicinity of Structures And Utility Crossings |
| SP.13 | Outboard Boats |
| SP.14 | Fuel Consumption Reporting Requirements |
| SP.15 | Performance Evaluation of the Contractor |
| SP.16 | Project and Daily Production Reports |
| SP.17 | Continuity of Work |
| SP.18 | Payments – Designated Billing Office |
| SP.19 | Contracting Officer Signature |

SECTION 00800A
MAINTENANCE (HOURLY)

NON-REGULATED SPECIAL CONTRACT REQUIREMENTS

**SP.1 DELIVERY, PROSECUTION AND COMPLETION OF WORK**

a. The Contractor is required to commence work under this contract within **10** calendar days after receipt of Notice to Proceed, to prosecute the work diligently, and to complete all work not later than 31 December 2008. The contract work period is expected to run from April through December. At the option of the Government, this contract, with all its terms and provisions, may be extended for such period and as often as the Government may elect, to permit continuous use of said plant or equipment, not extending beyond 31 December 2008. After that date the contract may be extended only by mutual agreement of the Contractor and the Government, not extending beyond May 31, 2009.

b. The Contractor shall deliver the dredge and attendant plant ready for operation in the vicinity of McKellar Lake Harbor, Memphis, TN (Mile 725 AHP), or to any other work site as may be directed. If delivery is required to a point that requires further towing from the location of the dredge just prior to beginning work under this contract, the Contractor will be paid for the distance between the first work site and Mile 725 AHP at the applicable contract unit price for towing. If delivery is required to a point that requires less towing, the distance between the first work site and Mile 725 AHP will be multiplied by the applicable contract unit price for towing and this amount will be deducted from the Contractor's earnings. The plant will be inspected and the Contractor notified of acceptance or rejection of the plant within 24 hours after delivery of plant to the Contracting Officer.

c. A pre-work conference will be held prior to commencement of work. The time and place of conference will be determined by mutual agreement between the Contracting Officer or his designated representative and the Contractor.

d. The Contractor shall prosecute the work assigned him to meet the schedule of dredging operations as determined by the Contracting Officer. The work will be conducted on a 7 days per week, 24 hours per day basis.

e. Upon completion of the contract, the dredge and attendant plant will be released to the Contractor at McKellar Lake Harbor, Memphis, TN.

**SP.2 PHYSICAL DATA**

a. Floating plant can reach the sites of work via the Mississippi River. Obtaining access through private lands to landings near the sites of work for land transportation is the responsibility of the Contractor.

b. The material to be dredged will consist of sand, gravel, silt, mud and clay; and in certain locations, stumps, roots, logs, riprap and/or pile or stone dikes and miscellaneous debris may be encountered. The dredge must be equipped with suitable pump impellers and cutters to efficiently handle these varying materials.

c. The work required consists of making or enlarging dredge cuts, construction of fills, construction of new harbor channels and dredging in various channels and harbors. The currents may vary from zero to fifteen feet per second.

d. The dredging operations contemplated are not all in or near cities. Floating plant may be necessary for the housing or boarding of the labor employed by the Contractor.

e. During the contract period, the Contractor may receive requests for dredging from private interests and local governments. Provided the work can be accomplished without detriment to the work for which the dredge is being leased, and subject to the prior approval of the Contracting Officer in each instance, the Contractor, upon request, may be temporarily released from this contract to perform dredging for others. In temporarily releasing the Contractor to perform work for others, the Government does not assume any responsibility for the work performed, or for the collection of any amounts earned by the Contractor.

d. Disposal areas will be furnished by the Government. Material shall be discharged into the river or be retained in disposal areas by retaining dikes and box-type spillways as directed. The Contractor shall use normal caution in pipeline operations when discharging in dike areas to prevent washing and failure of retaining dikes, and shall maintain a watch on the spillways and keep the spill boxes free of debris. Polyethylene may be required on dike slopes during dredging operations to protect the retaining dikes. If so, the polyethylene will be furnished by others. The Contractor shall place the polyethylene on the dikes, when needed.

## SP.3 INSPECTION

The presence of inspectors shall not relieve Contractor of responsibility for the proper execution of the work in accordance with the specifications. The Contractor shall furnish the use of boats, crew, and material forming a part of the ordinary and usual equipment and crew of the dredge plant, as may be reasonably necessary in inspecting and supervising the work. The Contractor shall furnish suitable transportation to and from the various pieces of plant, and to and from the disposal areas from all points on shore in the vicinity of the work. If the Contractor refuses, neglects, or delays compliance with these requirements, the specific facilities may be furnished by the Government, and the cost thereof will be deducted from the Contractor's earnings.

## SP.4 MISPLACED MATERIAL

Should the Contractor, during the progress of the work, lose, dump, throw overboard, sink, or misplace any material, plant, machinery, or appliance, which in the opinion of the Contracting Officer may be dangerous to or obstruct navigation, the Contractor shall recover and remove the same with the utmost dispatch. The Contractor shall give immediate notice, with

description and location of such obstructions, to the Contracting Officer or inspector, and when required shall mark or buoy such obstructions until the same are removed. Should the Contractor refuse, neglect, or delay compliance with the above requirements, such obstructions may be removed by the Contracting Officer, and the cost of such removal may be deducted from any money due or to become due the Contractor, or may be recovered under his bond. The liability of the Contractor for the removal of a vessel wrecked or sunk without fault or negligence shall be that provided in Sections 15, 19 and 20 of the River and Harbor Act of March 3, 1899. (33 U.S.C. 410 et seq.).

**SP.5 SIGNAL LIGHTS**

The Contractor shall display signal lights and conduct his operations in accordance with the General Regulations of the Department of the Army and of the Coast Guard governing lights and day signals as approved by the Secretary of the Army (33 C.F.R. 201.1 - 201.16 and the Commandant, U.S. Coast Guard per Instruction M16672.2, Navigation Rules: International - Inland (COMDTINST M16672.2), or 33 CFR 81 Appendix A (International) and 33 CFR 84 through 33 CFR 89 (Inland) as applicable.

**SP.6 PLANT**

a. General. The Contractor agrees to place plant on the job meeting the requirements herein specified. The plant shall be in satisfactory operating condition and capable of safely and efficiently performing the work specified. The plant shall be subject to inspection of the Contracting Officer at all times. Award of this contract shall not be construed as an agreement on the part of the Government that plant listed by the Contractor in his bid is adequate for the performance of the work. The measure of the "capacity of the plant" shall be its actual performance on the work to which these specifications apply.

b. Performance of Plant. By submitting a bid, the Contractor is giving assurance that the dredging plant furnished shall perform efficiently under the conditions described in these specifications. Government inspectors shall verify that the specified minimum requirements are met during performance of the contract by the contractor's before and after surveys and automated production reports.

c. Unserviceable Plant. If, at any time during the life of the contract, the Contracting Officer determines that any item of plant, or part thereof, is inadequate for the service required, is not being operated at full capacity, has become unserviceable or unsafe, is incapable of efficient work, or is not being efficiently operated because of reduced or incompetent crew; he will notify the Contractor in writing of his decision. The Contracting Officer will either suspend operations or direct that the item of plant, or part thereof, be removed from the work until the defects are corrected; and after giving such notice, the rate of payment for the entire plant will be reduced in the ratio that the output falls short of that specified in the Technical Specifications, with allowances for changes in dredging conditions, until the defects are corrected or incompetent crew is replaced, or crew is increased to the satisfaction of the Contracting Officer. The Contractor may substitute plant of similar capacity and power, satisfactory to the Contracting Officer, for any item of plant, or part thereof, condemned or ordered removed from

the work.

d. Control. (1) The plant and its crew will work under the actual direct supervision of the Contractor. The Contracting Officer or his representative shall direct the time and location of the work to be accomplished under the contract.

(2) The Contractor, or a representative with full authority to act for him with reference to care and operation of the plant, shall be on the site of the work at all times.

e. Movement of Plant. All moving and towing of the dredge and attendant plant will be done by the Contractor. The Contractor will be notified as early as possible in advance of movement of the dredge plant to permit assembly of the tow.

f. Operation and Repair. The Contractor shall furnish all labor, fuel, equipment for transportation of fuel to dredge, appliances, appurtenances, equipment, materials, subsistence, and supplies, and bear all expenses incident to the efficient operation of his plant in connection with the work of dredging under the contract. The Contractor shall also bear all direct overhead and collateral expenses incident to the operation, upkeep, and repair of all items of plant. He shall maintain the plant in a good state of repair; shall arrange for a supply of renewal parts to be on hand when needed for the dredge and each item of attendant plant; and shall provide and maintain the crews for each item of plant employed in connection with the work. All pipelines must be kept in good condition at all times, and any pipeline leaks, broken pipeline, and/or broken connections must be promptly and properly repaired.

**SP.7 Crew**

a. The Contractor shall furnish and pay all necessary crew and supervisory personnel required for safe and efficient 24 hour operation of the dredge and attendant plant and to handle floating and shore pipeline. If the Contracting Officer determines that staffing levels are such that there is a breach of the contract or a danger, all remedies under the contract are available, including, but not limited to suspension of work and termination for default.

b. Crew on the dredge shall be able to perform operations such as clearing pump and suction and adding or removing floating line simultaneously. Each crewmember shall be relieved by qualified personnel on his days off. The Contractor will remove from work under this contract any employee who, in the opinion of the Contracting Officer, is objectionable or incompetent. This requirement shall not be the basis of any claim for compensation or damages against the United States or any of its officers or agents.

c. Boat Operators. When operating in a towing status, all boat operators of boats 26 feet or longer shall possess a current operator's license issued by the U.S. Coast Guard. Vessels used at the jobsite for handling pontoon line, moving spill barges, etc., do not require a licensed operator.

d. Civil Engineering Technician. The Contractor's Civil Engineering Technician shall be capable of performing all survey work related to this dredging contract, which includes making

reconnaissance surveys, preparing dredge layouts, setting gauges, computing yardage, and operating all electronic survey equipment, including the Differential Global Positioning System (DGPS) on the dredge and survey boat.

## SP.8 OFFICE ACCOMMODATIONS

The Contractor shall provide an office for the dredge inspectors. The office shall be not less than 150 sq ft and shall be properly lighted, ventilated, heated, and cooled. The office shall be sound insulated such that the maximum sound level inside the office will not exceed 85 dB. All costs for office accommodations shall be included in the contract hourly rate. The office shall contain the following:

| | |
|---|---|
| 1 lockable desk | 1 3-drawer file cabinet |
| 2 chairs | 1 lockable equipment cabinet |

A photocopier, capable of making an 8-1/2" X 14" duplex copy on plain paper, and a plain paper fax machine shall be provided on the dredge or floating plant and shall be available for official use by Government inspectors.

## SP.9 MEALS FOR INSPECTORS

If the Contractor maintains facilities on the dredge or attendant plant for the subsistence of his own employees, he shall furnish meals to Government inspectors assigned to the dredge, and to all Government agents who may visit the dredge on official business. All costs for meals shall be included in the contract hourly rate; no separate payment will be made.

## SP.10 LAYOUT OF WORK

The Contractor shall furnish, operate and maintain a complete Differential Global Positioning System (DGPS) to provide dredge positioning and alignment in the various dredging assignments of this contract. The system shall utilize DGPS equipment in conjunction with the U.S. Coast Guard Radio Beacon DGPS Network, to provide real time positioning using UTM Zone 15 or 16 coordinates. The Contractor will be provided a diskette containing a Hypack file of the dredging cut layout for each individual assignment, containing stationing, baseline information, and coordinates.

## SP.11 GENERAL SAFETY REQUIREMENTS

a. Accident Prevention Program. Refer to Contract Clause entitled "Accident Prevention (Nov 1991)--Alternate I (Nov 1991)". Prior to the prework conference, the Contractor shall prepare an accident prevention plan and submit four copies to the Contracting Officer for review and approval. The program shall include as a minimum the following:

(1) An executed LMV Form 358R, Administrative Plan.

(2) Executed LMV Form(s) 359R, Activity Hazard Analysis.

(3) A job specific safety plan per paragraph 01.A.07 and Appendix A of EM 385-1-1.

b. DCA/USACE Dredging Safety Management Plan. If the Contractor is a currently accepted participant in the Dredging Contractors of America (DCA)/United States Army Corps of Engineers (USACE) Dredging Safety Management Program (DSMP), as determined by the DA/USACE Joint Committee, and holds a valid Certificate of Compliance for both the Contractor Program and the Dredge to be used to perform the work under this contract, the Contractor may, in lieu of the submission of an Accident Prevention Plan (APP):

(1) Make available for review, upon request, the Contractor's current Safety Management System (SMS) documentation,

(2) Submit to the Contracting Officer the current valid Company Certificate of Compliance for its SMS.

(3) Submit the current dredge Certificate of Compliance based on third party audit.

(4) Submit for review and acceptance, site-specific addenda to the SMS as specified in the solicitation.

c. Daily Inspections. The Contractor shall institute a daily inspection program to assure all safety requirements are being met. Daily safety inspections shall be reported on the Contractor's daily Quality Control report. Each report will include, as a minimum, the following:

(1) Phase(s) of construction underway during inspection.

(2) Locations or areas inspections were made.

(3) Results of inspection, including nature of deficiencies observed and corrective actions taken, or to be taken, date, and signature of the person responsible for the report's contents.

d. Floating Plant. Floating plant and its operation shall comply with Section 19 of EM385-1-1.

e. Emergency Alarms and Signals. General alarm systems shall be installed and maintained in accordance with EM 385-1-1, 19.A.05.

f. Machinery and Mechanized Equipment. Machinery and mechanized equipment used under this contract shall comply with Section 16 of EM 385-1-1. When a rubber-tired front-end loader, bulldozer, etc., is operated on floating plant, either a bumper or curb with minimum height of one-third of the outside diameter of the largest tire on the equipment, a barge tied alongside, or other means approved in writing by the Contracting Officer shall be used to prevent equipment from moving or falling into the water.

g. Payment. No separate payment will be made for compliance with the safety requirements and all costs thereof shall be considered incidental to the various bid items of the contract.

h. Accident Investigations and Reporting. Refer to EM 385-1-1, paragraph 01.D. Accidents shall be investigated by the immediate supervisor of the employee(s) involved and reported to the Contracting Officer or his representative within one working day after the accident occurs.

## SP.12 WORKING IN THE VICINITY OF STRUCTURES AND UTILITY CROSSINGS

Where dredging to the required dimensions might endanger any Structure, the Contracting Officer may reduce the required excavation in the vicinity of such structure. The Contractor shall submit for approval by the Contracting Officer, a detailed plan of operation at each pipeline or utility crossing where construction surveys indicate project channel does not exist. The plan shall contain emergency measures to be taken in the event of an accident. The Contractor shall notify the owners of pipelines or utilities at least 3 days prior to operating within 150 feet of a pipeline or utility. The Government will not be responsible for any damage to structures or utilities due to the Contractor's deviation from the approved plan.

## SP.13 OUTBOARD BOATS

All boats less than 26 feet in length shall meet either BIA Standards for minimum flotation and capacity, or the certification requirements of the U.S. Coast Guard. The Contractor shall be required to provide satisfactory evidence of compliance. Such evidence shall be a certification by the boat manufacturer, combined with an inspection, to insure that the boat had not been altered in a manner that reduced the safety features; or sufficient tests that indicate compliance with the BIA Standards.

## SP.14 FUEL CONSUMPTION REPORTING REQUIREMENTS

The Contractor shall furnish to the Government a monthly report of the quantities of fuel consumed in execution of the work of the contract. The quantities reported shall include fuel consumed by the Contractor and all of his subcontractors, for the main plant and all support plant during the preceding month.

## SP.15 PERFORMANCE EVALUATION OF THE CONTRACTOR

At a minimum, the Contractor's performance will be evaluated upon final acceptance of the work. However, interim evaluations may be prepared at any time during contract performance when determined to be in the best interest of the Government. The format for the evaluation will be SF 1420, and the Contractor will be rated outstanding, satisfactory, or unsatisfactory in the areas of Contractor Quality Control, Timely Performance, Effectiveness of Management, Compliance with Labor Standards, and Compliance with Safety Standards. The Contractor will be advised of any unsatisfactory rating, either in an individual element or in the overall rating, prior to completing the evaluation, and all Contractor comments will be made a

part of the official record. Performance Evaluation Reports will be available to all DOD Contracting offices for their use in determining Contractor responsibility.

## SP.16 PROJECT AND DAILY PRODUCTION REPORTS

The Contractor shall furnish computer-generated LMM-316a (electronic) July 91 daily reports complete. The Contractor shall also furnish a summary report for the total contract, broken down by project, monthly and fiscal year in spreadsheet form.

## SP.17 CONTINUITY OF WORK

No payment will be made for work done in an area until the required depth is secured in the whole area, unless prevented by ledge rock. No payment will be made for dredging performed outside the directed dredging cut layout, except by decision of the Contracting Officer or his representative.

## SP.18 PAYMENTS - DESIGNATED BILLING OFFICE.

a. The unit price or lump sum price or prices stated in the contract will be used in determining the amounts to be paid for work performed by the Contractor. The designated billing office for this contract is as follows:

Wade Channell
U.S. Army Corps of Engineers, Memphis District
Ensley Engineer Yard
2915 Riverport Rd
Memphis TN 38125-5026

b. Pay time shall begin on the date and hour of acceptance of the dredge and attendant plant by the Contracting Officer as provided in paragraph SP1. and shall end when the dredge and attendant plant are returned to the Contractor, as provided in paragraph SP1e. Pay time will be calculated to the nearest one-sixtieth (1/60) hour for payment.

c. The following will be considered effective time and will be paid for at the applicable contract unit price per hour:

(1) Actual time dredging when the dredge is under operation, with the cutterhead moving material, and such material is being passed through the pipeline.

(2) Time lost in making such openings in floating discharge pipelines or in swinging to one side of channel and slacking off of the swinging wires as may be necessary for the passage of vessels. The Contractor will be responsible for making such opening upon signal of any vessel or craft desiring to pass.

d. All cumulative non-effective hours will be reduced by 30 percent and the reduced cumulative hours paid for at the applicable contract unit price per hour. The following will be

considered non-effective time:

(1) Actual time lost, but not in excess of eight hours, for each of the following; preparing to move from one job to another, preparing the dredge for pumping upon arrival at a new job.

(2) Actual time lost due to moving swing anchors; changing swinging wires to previously prepared pendants; making changes in discharge lines, such as adding pontoons or shore pipe, as may be necessary due to the progress of the work; and actual lost time due to failure of retaining dikes, spillboxes, or outfalls through no fault of the Contractor. In the latter case, the Contractor will be required to furnish all available equipment and personnel to assist in making repairs.

(3) Actual time lost due to removal of logs, driftwood, etc., from the pump, pipeline and cutterhead; removal of drift from the pontoon line; washing out pipeline before handling. Actual time lost, but not in excess of eight hours, due to dredge shutdowns authorized by the Contracting Officer for the purpose of replacing the pump impeller with either different diameter impeller or an impeller of different number of vanes than that of the impeller being used. Actual time lost, but not in excess of one hour, due to dredge shutdowns authorized by the Contracting Officer for the purpose of changing dredge cutterhead to cutter-head of a different type. The intent of payment for delays authorized by the Contracting Officer to permit the Contractor to change pump impellers and dredge cutterhead is to obtain the greatest efficiency of operations under changing conditions, such as varying material, length of line, etc. Payment will not be made under this subparagraph for replacing worn-out impellers and/or dredge cutterhead, or cutterhead that have lost their efficiency because of wear.

(4) Actual time lost due to inclement weather on an assignment or while en route between assignments.

e. When river conditions are such that dredging operations become impractical or uneconomical, as determined by the Contracting Officer, he may place the dredge in an idle standby status by giving 24 hours oral or written notice to the Contractor. When the dredge plant is placed in an idle standby status, the Contractor will cease dredging operations and shall secure the dredge plant in a location approved by the Contracting officer. During the idle standby period, the Contractor shall retain a crew that will enable the dredge plant to be returned to operation within 24 hours of receiving notice to resume dredging. While in an idle standby status, neither the dredge plant nor any attendant plant shall be moved from the standby location without approval from the contracting officer. Idle standby may be directed on more than one occasion, but will not exceed a cumulative total of 504 hours. All idle standby hours shall be reduced by 65 percent and the reduced cumulative standby hours paid for at the contract hourly unit price for dredging. When the Contractor begins preparations to resume operations at the site as directed by the Contracting Officer, the usual pay provisions of the specifications will be applicable.

f. Payment will not be made for: (1) Lay time on an assignment or when all necessary equipment is not available or in operating condition at the new assignment.

(2) Time lost due to shutdowns for the repair or the replacement of worn out or unserviceable equipment and time lost due to pulling a line together when the joints open up, replacing damaged shore pipe or pontoons, except when shore pipe is damaged by caving bank or pontoons are damaged by drift through no fault or negligence of the Contractor.

(3) Time during which the dredge is engaged in removing misplaced material and dredging time lost due to removal of obstructions as required in paragraph SP4.

(4) Time during which the dredge is engaged in dredging for others, time being computed from time the dredge shuts down until the dredge is back in position and material is being passed through the pipeline.

(5) Time lost due to shutdowns ordered by the Contracting Officer's representative due to nonconformance to Safety and Health Requirements Manual EM 385-1-1 (See Clause entitled "Accident Prevention" of the Contract Clauses) and safety requirements of these specifications.

(6) Time lost due to insufficient crew size and the inability to perform efficiently simultaneous dredging operations and on-shore disposal operations as determined by the Contracting Officer or his representative.

(7) When the dredge is shut down for any reason or purpose that applies under paragraph 4f(1-6), the ensuing time shall remain under that classification until the cause of the shutdown shall have been removed and no claim shall be allowed for other work performed during that time except if it be the case that the Contracting Officer orders the dredge and attendant plant be moved to a new location.

g. Reduction in Payment for Failure to Meet Output Requirements: If the dredging output falls short of that specified in Section 02482, subparagraph 2.1.1, as measured by Section 00800, subparagraph SP6.b, the total dredging hours for that location will be reduced by the percentage that the output falls short of that specified. Payment for dredging operations, which fail to meet the specified minimum output, will be made by multiplying this reduced number of hours by the contract unit price per hour.

**SP.20 CONTRACTING OFFICER SIGNATURE**

The Contracting Officer signing this contract is the primary Contracting Officer on this contract. However, any Contracting Officer assigned to the Memphis District and Acting within its authority may take formal action on this contract when a contract action needs to be taken and the primary Contracting Officer is away from the office.

SECTION 00800B

NORTH WEST TENNESSEE HARBOR

NEW CONSTRUCTION (YARDAGE)

SPECIAL CONTRACT REQUIREMENTS

TABLE OF CONTENTS


| Paragraph No. | Paragraph Title |
|---|---|
| SP.1 | Scope of Work |
| SP.2 | Delivery, Prosecution and Completion of Work |
| SP.3 | Work for Others |
| SP.4 | Physical Data |
| SP.5 | Misplaced Material |
| SP.6 | Signal Lights |
| SP.7 | Plant (Dredge and Attendant Plant) |
| SP.8 | Crew |
| SP.9 | Inspection |
| SP.10 | Office Accommodations |
| SP.11 | Meals for Inspectors |
| SP.12 | Layout of Work |
| SP.13 | General Safety Requirements |
| SP.14 | Equipment Ownership and Operating Expense Schedule |
| SP.15 | Outboard Boats |
| SP.16 | Fuel Consumption Reporting Requirements |
| SP.17 | Performance Evaluation of the Contractor |
| SP.18 | Basis for Settlement of Proposals |
| SP.19 | Obstruction of Navigable Waterways |
| SP.20 | Rights of Way |
| SP.21 | Control of Operations |
| SP.22 | Obstruction of Channel |
| SP.23 | Cooperation with Others |
| SP.24 | Seaworthiness Certification |
| SP.25 | Project and Daily Production Reports |
| SP.26 | Continuity of Work |
| SP.27 | Quantity Surveys |
| SP.28 | Payments – Designated Billing Office |
| SP.29 | Contracting Officer Signature |
| SP.30 | Working in the Vicinity of Structures And Utility Crossings |

SECTION 00800B

NORTH WEST TENNESSEE HARBOR

NEW CONSTRUCTION (YARDAGE)

NON-REGULATED SPECIAL CONTRACT REQUIREMENTS

## SP.1 SCOPE OF WORK

a. The work to be performed under the contract consists of furnishing all plant, materials, equipment, supplies, labor, per diem, and transportation, including fuel, power, water (except any materials, equipment, transportation, utility or service, if any specified herein to be furnished by the Government), and performing all work in strict accordance with the specifications and schedules. All work, materials, and services not expressly called for in these specifications which may be necessary for complete and proper operations to carry out the contract shall be performed, furnished, and installed by the Contractor at no increase in cost to the Government.

b. The Contractor's dredge and attendant plant shall be used to perform the new construction dredging of North West Tennessee Harbor at LMR mile 899.0.

c. The work shall consist of removing material from the proposed new channel as shown on attached plans and satisfactorily disposing of the dredged material in disposal area A and/or disposal area B as directed by the Contracting Officer. The Contractor shall use normal caution in pipeline operations when discharging in dike areas to prevent washing and failure of retaining dikes, and shall maintain a watch on the spillways and keep the spill boxes free of debris. Polyethylene may be required on dike slopes during dredging operations to protect the retaining dikes. If so, the polyethylene will be furnished by others. The Contractor shall place the polyethylene on the dikes, when needed. The materials to be dredged may consist of concrete, riprap, boulders, gravel, sand, silt, mud, or clay. Debris and obstructions may also be encountered in the course of dredging operations and could include trash, roots, logs, stumps, rope, chain, various sized metal objects, cable and other miscellaneous items. The dredge must be equipped with suitable pump impellers and cutters to efficiently handle these varying materials.

d. The Contractor shall be responsible for detecting and reporting to the Government's Quality Assurance Representative (QAR) all materials or obstructions that might cause damage, or have the potential to cause damage to the dredge and attendant plant. The Government's QAR will evaluate the evidence of the obstruction(s) and based on this data may notify the Contracting Officer for additional instructions concerning the obstruction. The Government will not be responsible for damage to the Contractor's dredge or attendant plant due to its contact with

materials or obstruction(s) that could cause such damage, or have the potential to cause such damage.

e. The Contractor shall mobilize the dredge and attendant plant only once to Mckellar Lake ( Mile 725 AHP). Mileage item (0003, 0004 or 0008, 0009) of Lot One or Lot Two will be paid to move dredge and attendant plant to North West Tennessee Harbor. The Government will not pay a separate mobilization and demobilization cost to move the dredge and attendant plant

to North West Tennessee Harbor. The work at NWTH might not be continuous. The contractor could be sent to other harbors before NWTH is completed.

f. The dredging operations contemplated are not all in or near cities. Camps or floating plant may be necessary for the housing or boarding of the labor employed by the Contractor.

g. The floating plant can reach the sites of work via the Mississippi River. Obtaining access through private lands to landings near the sites of work for land transportation is the responsibility of the Contractor.

h. The Contractor will be directed to perform dredging assignments by issuance of verbal orders from the Contracting Officer's Representative.

## SP.2 DELIVERY, PROSECUTION AND COMPLETION OF WORK

a. The Contract Officer's representative (COR) will give notice to the contractor when the new harbor construction shall begin. The contract work period is expected to start in August, and the contractor will have 60 days to complete the work.

b. At the direction of the COR the contractor shall deliver the dredge and attendant plant ready for operation in the vicinity of North West Tennessee Harbor (Mile 899 LMR).

c. A pre-work conference will be held prior to commencement of work. The time and place of conference will be determined by mutual agreement between the Contracting Officer or his designated representative and the Contractor.

d. The Contractor shall prosecute the work assigned him to meet the schedule of dredging operations as determined by the Contracting Officer. The work will be conducted on a 7 days per week, 24 hours per day basis.

**SP.3 WORK FOR OTHERS**

a. During the contract period, the Contractor may receive requests for dredging from private interests and local governments. Provided the work can be accomplished without detriment to the work for which the dredge is being leased, and subject to the prior approval of the Contracting Officer in each instance, the Contractor, upon request, may be temporarily released from this contract to perform dredging for others. In temporarily releasing the Contractor to perform work for others, the Government does not assume any responsibility for the work performed, or for the collection of any amounts earned by the Contractor.

**SP.4 PHYSICAL DATA**

Data and information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor.

a. WEATHER CONDITIONS. Data on weather conditions may be obtained from the National Weather Service.

b. CHANNEL TRAFFIC. Mississippi River traffic, in general, consists of ships, tow boats and barges, passenger vessels, and small boats.

c. CHANNEL CONDITIONS. Data on current channel conditions may be obtained from the U.S. Coast Guard.

d. STAGE HYDROGRAPHS. River stage hydrographs may be obtained from the Map Files Section of the Memphis District of the U.S. Army Corps of Engineers.

**SP.5 MISPLACED MATERIAL**

Should the Contractor, during the progress of the work, lose, dump, throw overboard, sink, or misplace any material, plant, machinery, or appliance, which in the opinion of the Contracting Officer may be dangerous to or obstruct navigation, the Contractor shall recover and remove the same with the utmost dispatch. The Contractor shall give immediate notice, with description and location of such obstructions, to the Contracting Officer or inspector, and when required shall mark or buoy such obstructions until the same are removed. Should the Contractor refuse, neglect, or delay compliance with the above requirements, such obstructions may be removed by the Contracting Officer, and the cost of such removal may be deducted from any money due or to become due the Contractor, or may be recovered under his bond. The liability of the Contractor for the removal of a vessel wrecked or sunk without fault or negligence shall be that provided in Sections 15, 19 and 20 of the River and Harbor Act of March 3, 1899. (33 U.S.C. 410 et seq.).

**SP.6 SIGNAL LIGHTS**

The Contractor shall display signal lights and conduct his operations in accordance with the General Regulations of the Department of the Army and of the Coast Guard governing lights and day signals as approved by the Secretary of the Army (33 C.F.R. 201.1 - 201.16 and the Commandant, U.S. Coast Guard per Instruction M16672.2, Navigation Rules: International - Inland (COMDTINST M16672.2), or 33 CFR 81 Appendix A (International) and 33 CFR 84 through 33 CFR 89 (Inland) as applicable.

**SP.7 PLANT**

a. General. The Contractor agrees to place plant on the job meeting the requirements herein specified. The plant shall be in satisfactory operating condition and capable of safely and efficiently performing the work specified. The plant shall be subject to inspection of the Contracting Officer at all times. Award of this contract shall not be construed as an agreement on the part of the Government that plant listed by the Contractor in his bid is adequate for the performance of the work. The measure of the "capacity of the plant" shall be its actual performance on the work to which these specifications apply.

b. Performance of Plant. By submitting a bid, the Contractor is giving assurance that the dredging plant furnished shall perform efficiently under the conditions described in these specifications. Government inspectors shall verify that the specified minimum requirements are met during performance of the contract by the contractor's before and after surveys and automated production reports.

c. Unserviceable Plant. If, at any time during the life of the contract, the Contracting Officer determines that any item of plant, or part thereof, is inadequate for the service required, is not being operated at full capacity, has become unserviceable or unsafe, is incapable of efficient work, or is not being efficiently operated because of reduced or incompetent crew; he will notify the Contractor in writing of his decision. The Contracting Officer will either suspend operations or direct that the item of plant, or part thereof, be removed from the work until the defects are corrected. However, the Contractor may substitute plant of similar capacity and power for any item of plant, or part there of ordered removed from the work upon approval from the Contracting Officer. After the receipt of the Contracting Officer's notice, the Contractor shall expeditiously correct such defects, replace incompetent crew, or increase the size of the crew to the satisfaction of the Contracting Officer.

d. Control. (1) The plant and its crew will work under the actual direct supervision of the Contractor. The Contracting Officer or his representative shall direct the time and location of the work to be accomplished under the contract.

(2) The Contractor, or a representative with full authority to act for him with reference to care and operation of the plant, shall be on the site of the work at all times.

e. Movement of Plant. All moving and towing of the dredge and attendant plant will be done by the Contractor. The Contractor will be notified as early as possible in advance of movement of the dredge plant to permit assembly of the tow.

f. Operation and Repair. The Contractor shall furnish all labor, fuel, equipment for transportation of fuel to dredge, appliances, appurtenances, equipment, materials, subsistence, and supplies, and bear all expenses incident to the efficient operation of his plant in connection with the work of dredging under the contract. The Contractor shall also bear all direct overhead and collateral expenses incident to the operation, upkeep, and repair of all items of plant. He shall maintain the plant in a good state of repair; shall arrange for a supply of renewal parts to be on hand when needed for the dredge and each item of attendant plant; and shall provide and maintain the crews for each item of plant employed in connection with the work. All pipelines must be kept in good condition at all times, and any pipeline leaks, broken pipeline, and/or broken connections must be promptly and properly repaired.

**SP.8 Crew**

a. The Contractor shall furnish and pay all necessary crew and supervisory personnel required for safe and efficient 24 hour operation of the dredge and attendant plant and to handle floating and shore pipeline. If the Contracting Officer determines that staffing levels are such that there is a breach of the contract or a danger, all remedies under the contract are available, including, but not limited to suspension of work and termination for default.

b. Crew on the dredge shall be able to perform operations such as clearing pump and suction and adding or removing floating line simultaneously. Each crewmember shall be relieved by qualified personnel on his days off. The Contractor will remove from work under this contract any employee who, in the opinion of the Contracting Officer, is objectionable or incompetent. This requirement shall not be the basis of any claim for compensation or damages against the United States or any of its officers or agents.

c. Boat Operators. When operating in a towing status, all boat operators of boats 26 feet or longer shall possess a current operator's license issued by the U.S. Coast Guard. Vessels used at the jobsite for handling pontoon line, moving spill barges, etc., do not require a licensed operator.

d. Civil Engineering Technician. The Contractor's Civil Engineering Technician shall be capable of performing all survey work related to this dredging contract, which includes making reconnaissance surveys, preparing dredge layouts, setting gauges, computing yardage, and operating all electronic survey equipment, including the Differential Global Positioning System (DGPS) on the dredge and survey boat.

**SP.9 INSPECTION**

The presence of inspectors shall not relieve Contractor of responsibility for the proper execution of the work in accordance with the specifications. The Contractor shall furnish the use of boats, crew, and material forming a part of the ordinary and usual equipment and crew of the dredge plant, as may be reasonably necessary in inspecting and supervising the work. The Contractor shall furnish suitable transportation to and from the various pieces of plant, and to and from the disposal areas from all points on shore in the vicinity of the work. If the Contractor refuses, neglects, or delays compliance with these requirements, the specific facilities may be furnished by the Government, and the cost thereof will be deducted from the Contractor's earnings.

**SP.10 OFFICE ACCOMMODATIONS**

The Contractor shall provide an office for the dredge inspectors. The office shall be not less than 150 sq ft and shall be properly lighted, ventilated, heated, and cooled. The office shall be sound insulated such that the maximum sound level inside the office will not exceed 85 dB. All costs for office accommodations shall be included in the contract yardage rate. The office shall contain the following:

| | |
|---|---|
| 1 lockable desk | 1 3-drawer file cabinet |
| 2 chairs | 1 lockable equipment cabinet |

A photocopier, capable of making an 8-1/2" X 14" duplex copy on plain paper, and a plain paper fax machine shall be provided on the dredge or floating plant and shall be available for official use by Government inspectors.

**SP.11 MEALS FOR INSPECTORS**

If the Contractor maintains facilities on the dredge or attendant plant for the subsistence of his own employees, he shall furnish meals to Government inspectors assigned to the dredge, and to all Government agents who may visit the dredge on official business. All costs for meals shall be included in the contract yardage rate; no separate payment will be made.

## SP.12 LAYOUT OF WORK

The Contractor shall furnish, operate and maintain a complete Differential Global Positioning System (DGPS) to provide dredge positioning and alignment in the various dredging assignments of this contract. The system shall utilize DGPS equipment in conjunction with the U.S. Coast Guard Radio Beacon DGPS Network, to provide real time positioning using UTM Zone 15 or 16 coordinates. The Contractor will be provided a diskette containing a Hypack file of the dredging cut layout for each individual assignment, containing stationing, baseline information, and coordinates.

## SP.13 GENERAL SAFETY REQUIREMENTS

ALL WORK UNDER THIS CONTRACT SHALL COMPLY WITH THE LATEST VERSION OF U.S. ARMY CORPS OF ENGINEERS SAFETY AND HEALTH REQUIREMENTS MANUAL, EM 385-1-1 AND OCCUPATIONAL SAFETY AND HEALTH ACT (OSHA) STANDARDS, IN EFFECT ON THE DATE OF THE SOLICITATION. NO SEPARATE PAYMENT WILL BE MADE FOR COMPLIANCE WITH EM 385-1-1, NOR FOR COMPLIANCE WITH ANY OF THE OTHER SAFETY-RELATED SPECIAL REQUIREMENTS.

a. Accident Investigations and Reporting. Refer to EM 385-1-1, Section 1. Accidents shall be investigated and reports completed by the immediate supervisor of the employee(s) involved and reported to the Contracting Officer or his representative immediately after the accident occurs. A report of all mishaps occurring on the project shall be submitted to the Contracting Officer on ENG Form 3394 within 2 working days following the incident. All data reported must be complete, timely and accurate. A follow-up report shall be submitted when the estimated lost time days differ from actual lost time days. When a job related injury occurs which requires medical treatment, a supervisor of the injured employee shall accompany the injured employee to the treatment facility and explain the employees regular duties and the availability of "Light Duty" so the injured employee can return to work as soon as possible.

b. Accident Prevention Program. Refer to the Contract Clause entitled "Accident Prevention (Alt.I)." Within 21 calendar days after receipt of Notice of Award of the contract, four copies of the Accident Prevention Program shall be submitted to the Contracting Officer for review and approval. The accident prevention program is to conform to Appendix A (Minimum Basic Outline for Accident Prevention Plan) of the U.S. Army, Corps of Engineers, Safety And Health Requirements Manual, EM 385-1-1. The program shall be prepared in the following format:

(1) An executed LMV Form 358R, Accident Prevention Program - Administrative Plan (available upon request).

(2) An executed LMV Form 359R, Activity Hazard Analysis (available upon request).

(3) A copy of company policy statement regarding accident prevention.

(4) When marine plant and equipment are in use under a contract, the method of fuel oil transfer shall be submitted on LMV Form 414R, Fuel Oil Transfer (available upon request). (Refer to 33 CFR 156).

The Contractor shall not commence physical work at the site until the program has been approved by the Contracting Officer, or his authorized representative. At the Contracting Officer's discretion, the Contractor may submit his Activity Hazard Analysis for only the first phase of construction provided that it is accompanied by an outline of the remaining phases of construction. All remaining phases shall be submitted and accepted prior to the beginning of work in each phase. Also, refer to Section 1 of EM 385-1-1.

c. Daily Inspections. The Contractor shall perform daily safety inspections and record them on the forms approved by the Contracting Officer. Reports of daily inspections shall be maintained at the jobsite. The reports shall be records of the daily inspections and resulting actions. Each report will include, as a minimum, the following:

(1) Phase(s) of construction underway during the inspection.

(2) Locations or areas inspections were made.

(3) Results of inspection, including nature of deficiencies observed and corrective actions taken, or to be taken, date, and signature of the person responsible for its contents.

d. Machinery and Mechanized Equipment. All equipment shall be inspected prior to use on this contract. All equipment shall be re-inspected prior to use any time it is removed and subsequently returned to the contract site for use. Documentation of equipment inspections shall

be made available to the Contracting Officer upon request. Tractors, in addition to trucks, shall be equipped with a first aid kit. Machinery and mechanized equipment used under this contract shall comply with the following:

(1) All equipment shall be properly guarded.

(2) When mechanized equipment is operated on floating plant, the Contractor shall provide positive and acceptable means of preventing this equipment from moving or falling in to the water. The type of equipment addressed by this clause includes front-end loaders, bulldozers, trucks (both on- and off-road), backhoes, track hoes, and similar equipment. If the Contractor plans to use such equipment on floating plant, an activity hazard analysis must be developed for this feature of work. The plan must include a detailed explanation of the type or types of physical barriers, curbs, structures, etc., which will be incorporated to protect the operator and prevent the equipment from entering the water. Nonstructural warning devices may

be considered for situations where the use of structural barriers is determined to be impractical. The activity hazard analysis must thoroughly address the procedure and be submitted to the Corps for review and acceptance prior to start of this feature of work.

(3) The stability of crawler, truck, and wheel-mounted cranes shall be assured.

(i) The manufacturer's load-rating chart may be used to determine the maximum allowable working load for each particular crane's boom angle provided a test load, with a boom angle of 20 degrees, confirms the manufacturer's load-rating table.

(ii) Stability tests are required if: (a) there is no manufacturer's load-rating chart securely fixed to the operator's cab; (b) there has been a change in the boom or other structural members; or (c) there has been a change in the counterweight. The test shall consist of lifting a load with the boom in the least stable undercarriage position and at an angle of 20 degrees above the horizontal. The test shall be conducted under close supervision on a firm, level surface. The load that tilts the machine shall be identified as the test load. The test load moment (in ft.-lbs.) shall then be calculated by multiplying the horizontal distance (in ft.) from the center of rotation of the machine to the test load, times test load (in lbs.). Three-fourths of this test-load moment shall then be used to compute the maximum allowable operating loads for the boom at 20, 40, 60, and 80 degrees above horizontal. From these maximum allowable operating loads, a curve shall be plotted and posted in the cab of the machine in sight of the operator. These values shall not be exceeded except in the performance test described below. The test load shall never exceed 110 percent of the manufacturer's maximum rated capacity.

(iii) In lieu of the test and computations above, the crane may be load tested for stability at each of the four boom positions listed above.

(4) Performance tests shall be performed in accordance with Section 16 of EM 385-1-1. Performance tests shall be conducted after each stability test, when the crane is placed in service on a project, and at least every 12 months.

(5) Inspections shall be made which will ensure a safe and economical operation of both cranes and draglines. Specific inspections and their frequencies are listed on the appropriate checklists noted below. Results of inspections and tests for cranes shall be recorded on the Safety Inspection Check List,

LMV Form 326R (available upon request) and inspection results for draglines shall be recorded on LMV Form 373R (available upon request). Copies of the inspections and tests shall be available at the jobsite for review. All stability and performance tests on cranes and all complete dragline inspections shall be witnessed by the Contracting Officer or his authorized representative.

(6) A complete dragline inspection shall be made: (a) at least annually; (b) prior to the dragline being placed in operation; and (c) after the dragline has been out of service for more than six months.

e. Crane Documentation and Equipment.

(1) Crane Documentation. Every crane shall have the following documentation at the time of operation:

(i) a copy of the operating manual developed by the manufacturer for the specific make and model of the crane;

(ii) a copy of the operating manual for any crane operator aids with which the crane is equipped;

(iii) the load rating chart for the crane which include: (a) the crane make and model, serial number, and year of manufacture, (b) load ratings for all crane operating configurations including optional equipment, (c) recommended reeving for the hoist line, and (d) operating limits in windy or cold weather conditions;

(iv) the crane's log book which shall be used to record operating hours and all crane inspections, tests, maintenance and repair.

(2) Crane Equipment. Every crane shall have the following equipment at the time of operation:

(i) a boom angle indicator and a load indicating device, or a load moment indicator/rated capacity indicator (exempt are articulating boom cranes and those cranes used for duty cycle operations);

(ii) a means for the crane operator visually to determine the levelness of the crane;

(iii) drum rotation indicators to afford sensing by the operator (exempt articulating boom cranes);

(iv) a boom angle or radius indicator located within the operator's view (exempt articulating boom cranes);

(v) anti-two block devices (exempt articulating boom cranes and those cranes used for duty cycle operations).

f. First Aid/CPR Requirements. Two employees per shift/per site shall be certified in first aid and CPR.

g. Safety Sign. The Contractor shall furnish, erect, and maintain a safety sign at the site, as located by the Contracting Officer. The sign shall conform to the requirements of this paragraph and the drawing entitled "Safety Sign," included at the end of these Special Contract Requirements. The lettering shall be black, the castle red, and the background white. When

placed on floating plant, the sign may be half size. Upon request, the Government will furnish a decal of the engineer castle. The sign shall be erected as soon as practicable, but not later than fifteen calendar days after the date established for commencement of work. The data required shall be current.

h. Means of Escape for Personnel Quartered or Working on Floating Plant. Two means of escape shall be provided for assembly, sleeping, and messing areas on floating plants. For areas involving 10 or more persons, both means of egress shall be through standard size doors opening to different exit routes. Where nine or fewer persons are involved, one of the means of escape may be a window (minimum dimensions 24" x 36") which leads to a different exit route. Refer to Section 19 of EM 385-1-1.

i. Emergency Alarms and Signals.

(1) Alarms. Emergency alarms shall be installed and maintained on all floating plant requiring a crew where it is possible for either a passenger or crewman to be out of sight or hearing from any other person. The alarm system shall be operated from the primary electrical system with standby batteries on trickle charge that will automatically furnish the required energy during an electrical-system failure. A sufficient number of signaling devices shall be placed on each deck so that the sound can be heard distinctly at any point above the usual background noise. All signaling devices shall be so interconnected that actuation can occur from at least one strategic point on each deck.

(2) Signals.

(i) Fire Alarm Signals. The general fire alarm signal shall be in accordance with paragraph 97.13-15b of the Coast Guard Rules and Regulations for Cargo and Miscellaneous Vessels, Subchapter I,Part 97,1 OCT 92 (CG 257).

(ii) Abandon Ship Signals. The signal for abandon ship shall be in accordance with paragraph 97.13-15(c through e) of the reference cited in (a) above.

(iii)Ma n-Overboard Signal. Hail and pass the word to the bridge. All personnel and vessels capable of rendering assistance shall respond.

**SP.14 <u>EQUIPMENT OWNERSHIP AND OPERATING EXPENSE SCHEDULE</u>**

a. This clause does not apply to terminations. See Basis for Settlement of Proposals of this section, and FAR Part 49.

b. Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a Contractor or subcontractor at any tier shall be

based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the Contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the Contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region III or V. Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the Contracting Officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule. For forward pricing, the schedule in effect at the time of negotiations shall apply. For retroactive pricing, the schedule in effect at the time the work was performed shall apply.

c. Equipment rental costs are allowable, subject to the provisions of FAR 31.105(d)(ii) and FAR 31.205-36. Rates for equipment rented from an organization under common control, lease-purchase arrangements, and sale-leaseback arrangements, will be determined using the schedule, except that actual rates will be used for equipment leased from an organization under common control that has an established practice of leasing the same or similar equipment to unaffiliated lessees.

d. When actual equipment costs are proposed and the total amount of the pricing action exceeds the small purchase threshold, the Contracting Officer shall request the Contractor to submit either certified cost or pricing data, or partial/limited data, as appropriate.

NOTE: A copy of the manual can be obtained from the Government Printing Office (GPO) by calling telephone number (202) 512-1800. Collect calls will not be accepted.

## SP.15 OUTBOARD BOATS

All boats less than 26 feet in length shall meet either BIA Standards for minimum flotation and capacity, or the certification requirements of the U.S. Coast Guard. The Contractor shall be required to provide satisfactory evidence of compliance. Such evidence shall be a certification by the boat manufacturer, combined with an inspection, to insure that the boat had not been altered in a manner that reduced the safety features; or sufficient tests that indicate compliance with the BIA Standards.

## SP.16 FUEL CONSUMPTION REPORTING REQUIREMENTS

The Contractor shall furnish to the Government a monthly report of the quantities of fuel consumed in execution of the work of the contract. The quantities reported shall include fuel consumed by the Contractor and all of his subcontractors, for the main plant and all support plant during the preceding month.

## SP.17 PERFORMANCE EVALUATION OF THE CONTRACTOR

At a minimum, the Contractor's performance will be evaluated upon final acceptance of the work. However, interim evaluations may be prepared at any time during contract performance when determined to be in the best interest of the Government. The format for the evaluation will be SF 1420, and the Contractor will be rated outstanding, satisfactory, or unsatisfactory in the areas of Contractor Quality Control, Timely Performance, Effectiveness of Management, Compliance with Labor Standards, and Compliance with Safety Standards. The Contractor will be advised of any unsatisfactory rating, either in an individual element or in the overall rating, prior to completing the evaluation, and all Contractor comments will be made a part of the official record. Performance Evaluation Reports will be available to all DOD Contracting offices for their use in determining Contractor responsibility.

## SP.18 BASIS FOR SETTLEMENT OF PROPOSALS

Actual costs will be used to determine equipment costs for a settlement proposal submitted on the total cost basis under FAR 49.206-2(b). In evaluating a termination settlement proposal using the total cost basis, the following principles will be applied to determine allowable equipment costs:

a. Actual costs for each piece of equipment, or groups of similar serial or series equipment, need not be available in the contractor's accounting records to determine total actual equipment costs.

b. If equipment costs have been allocated to a contract using predetermined rates, those charges will be adjusted to actual costs.

c. Recorded job costs adjusted for unallowable expenses will be used to determine equipment operating expenses.

d. Ownership costs (depreciation) will be determined using the contractor's depreciation schedule (subject to the provisions of FAR 31.205-11).

e. License, taxes, storage, and insurance costs are normally recovered as an indirect expense and unless the contractor charges these costs directly to contracts, they will be recovered through the indirect expense rate. EFARS 52.249-5000

## SP.19 OBSTRUCTION OF NAVIGABLE WATERWAYS

a. The Contractor shall:

(1) Promptly recover and remove any material, plant, machinery, or appliance which the Contractor loses, dumps, throws overboard, sinks, or misplaces, and which, in the opinion of the Contracting Officer, may be dangerous to or obstruct navigation;

(2) Give immediate notice, with description and locations of any such obstructions, to the Contracting Officer; and

(3) When required by the Contracting Officer, mark or buoy such obstructions until the same are removed.

b. The Contracting Officer may:

(1) Remove the obstruction(s) by contract or otherwise should the Contractor refuse, neglect, or delay compliance with Paragraph (a) of this Clause; and

(2) Deduct the cost of removal from any monies due or to become due the Contractor, or

(3) Recover the cost of removal under the Contractor's bond.

c. The Contractor's liability for the removal of a vessel wrecked or sunk without fault or negligence is limited to that provided in Sections 15, 19, and 20 of the River and Harbor Act of March 3, 1899 (33 U.S.C. 410 et.seq.).

## SP.20 <u>RIGHTS OF WAYS</u>

a. The dredging assignments identified in these specifications are all within the navigable waters of the United States, and no additional right-of-way areas are required to perform the work.

b. The Contractor shall procure, at no cost to the Government, all additional lands, access roads, or rights-of-way desired for its convenience in the performance of the work. Any agreements or permits with levee boards, parishes, counties, or political subdivisions for moving material and equipment will also be the responsibility of the Contractor. Any delays to the Contractor resulting from procuring such additional lands, access roads, rights-of-way, or permits for moving material and equipment for the Contractor's own use will not be made the basis of any claim for increase in the contract cost. The Contractor shall determine the conditions, restrictions, and difficulties that may be encountered in the transportation of material and equipment to the work site.

## SP.21 <u>CONTROL OF OPERATIONS</u>

The Contracting Officer will assign the location and scheduling of work to be performed under this contract. A Quality Assurance Representative will be present at all times during operations. The

Contractor is responsible for the management and control of the dredge and attendant plant and supervision of all Contractor personnel.

**SP.22 OBSTRUCTION OF CHANNEL**

The Government will not undertake to keep the channel free from vessels or other obstructions, except to the extent of such regulations as may be prescribed by the Secretary of the Army, in accordance with the provision of Section 7 of the River and Harbor Act of 8 August 1917. The Contractor will be required to conduct the work in such a manner as to obstruct navigation as little as possible. If the Contractor's dredge and attendant plant obstructs the channel or endangers the passage of vessels, the dredge and attendant plant shall be promptly moved, on the approach of any vessel, to afford a practicable passage. Upon the completion of the work, the Contractor shall promptly remove it's dredge and attendant plant and equipment, including ranges, buoys, piles, and other markers placed under this contract in navigable waters or on shore.

**SP.23 COOPERATION WITH OTHERS**

a. The Government may award other contracts for additional work in the area, or undertake work with its own personnel and equipment. The Contractor shall fully cooperate with such other Contractors or Government forces, and shall neither commit nor permit any act which may interfere with the performance of work by any other Contractor or Government forces.

b. If at any time during the terms of this contract, the navigation channel deteriorates to the extent:

(1) That navigation is obstructed and/or stopped due to natural causes; or

(2) That navigation is obstructed and/or stopped due to man-made causes; or

(3) That Government channel condition projections indicate navigation will be obstructed and/or stopped based on National Weather Service river stage data and /or U.S. Coast Guard and/or Corps of Engineers channel reconnaissance; and the Contracting Officer determines that the Contractor does not have the capability to restore the channel within a reasonable period of time; the Government reserves the right to restore the channel with Government or other plant. When Government or other plant is used to restore the channel, the Contractor's plant may be reassigned in accordance with the provisions of the paragraph of the General Requirements Section entitled "Inspection, Delivery, Prosecution, and Completion". The Contractor will not be paid for the work performed by Government or other plant and will not be charged for costs incurred by the Government in the use of such plant.

The decision of the Contracting Officer to employ Government or other plant will be final and will not be subject to the Disputes Clause of this contract. The rights of the Government under this provision are not exclusive, but are in addition to all other rights reserved to the Government by the terms of this contract.

**SP.24 SEAWORTHINESS CERTIFICATION**

The dredge and attendant plant used on this contract and not subject to U.S. Coast Guard inspection and certification must be inspected and certified seaworthy by a reputable marine surveyor who is recognized in the trade. The certificate must be applicable for the intended use,

must be less than one year old, and must be submitted to the Contracting Officer before the start of work. Reference the latest version of the U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, for additional regulations concerning Floating Plant and Marine Activities.

**SP.25 PROJECT AND DAILY PRODUCTION REPORTS**

The Contractor shall furnish computer-generated LMM-316a (electronic) July 91 daily reports complete. The Contractor shall also furnish a summary report for the total contract, broken down by project, monthly and fiscal year in spreadsheet form.

**SP.26 CONTINUITY OF WORK**

No payment will be made for work done in an area until the required depth is secured in the whole area, unless prevented by ledge rock. No payment will be made for dredging performed outside the directed dredging cut layout, except by decision of the Contracting Officer or his representative.

**SP.27 QUANITITY SURVEYS.**

a. Quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and in place.

b. The Contractor shall conduct the original and final surveys for any periods for which progress payments are requested. All these surveys shall be conducted under the direction of a representative of the Contracting Officer, unless the Contracting Officer waives this requirement in a specific instance. The Government shall make such computations as are necessary to determine the quantities of work performed or finally in place. The Contractor shall make the computations based on the surveys for any periods for which progress payments are requested.

c. Promptly upon completing a survey, the Contractor shall furnish the originals of all field notes and all other records relating to the survey or to the layout of the work to the Contracting Officer, who shall use them as necessary to determine the amount of progress payments. The Contractor shall retain copies of all such material furnished to the Contracting Officer. (FAR 52.236-16)

## SP.28 PAYMENTS - DESIGNATED BILLING OFFICE.

Payment ( PAYMENT ITEMS 0001AA, 0001AB, and 0001AC or 0006AA, 0006AB and 0006AC as applicable.)

a. Payments will be made based on before and after surveys done by the contractor. The government has the right to do these before and after surveys to verify the quantity of yardage is correct. Line item (0001AA or 0006AA) is the estimated quantity of dredge material to be removed from the new harbor channel from station 00+00 to station 80+00. Line item (0001AB

or 0006AB) is estimated quantity to be removed from station 80+00 to 85+00. Line item (0001AC or 0006AC) is estimated quantity to be removed from station 85+00 to end of Harbor. All estimated quantities do not include the 2 foot over depth that is allowed. All costs involved in the new construction of the North West Tenn. Harbor shall be included in items (0001AA, 0001AB and 0001AC or 0006AA, 0006AB and 0006AC) unless otherwise noted.

b. Mobilization and Demobilization The Government will pay the mobilization and demobilization for both the Maintenance dredging (Lot One) or (Lot Two) and the New Construction dredging Line item 0001 or 0006 in line item 0005 or 00010 of Lot One or Lot Two. There will be no additional payment for the new construction of North West Tenn. Harbor. When the dredge and attendant plant is delivered to North West Tenn. Harbor the Contractor will be paid unit price for towing item (0003 or 0004) or (0008 or 0009) of Lot One or Lot Two for the distance from last work site to (Mile 899.0 LMR).

c. Preparation for Dredging The cost of assembly and disassembly of all shore pipe, floating pontoon pipe, booster pump, making or breaking tow, etc. will be included in the yardage price items (0001AA, 0001AB, and 0001AC or 0006AA, 0006AB, and 0006AC). There will be no additional payment for assembly and disassembly of pipeline, making or breaking tow, etc. unless the contractor is directed to move to another location before the new harbor is complete. See SP.28 e.

d. Stand by Time If any time during the dredging of the new harbor a delay caused by the Government's levees, spillways or water quality of discharge prevents the contractor from dredging the contractor will be paid an hourly rate of line item (0001AD) or (0006AD) of Lot 1 or Lot 2. The contractor will be paid this until problem is resolved or directed to move to another location. See SP.28 e. Note: This time would only be paid if both Disposal Area A and Disposal Area B were non functional.

e. Moving to Another Location If any time during the dredging of the new harbor, the government COR directs the contractor to move to another location before the new harbor is complete. The following applies: The Contractor will be paid up to 24 hrs. of non effective time 70% of line item (0002 or 0007) of Lot One or Lot Two for preparing to move. The government has the right to direct the contractor to return to the North West Tenn. Harbor to complete the construction. If the decision is made to return to the new harbor to complete the construction the contractor will be paid mileage from existing location back to North West Tenn. Harbor line item (0003, 0004 or 0008, 0009) of Lot One or Lot Two and up to 24 hrs. of non effective time 70% of line item (0002 or 0007) of Lot One or Lot Two for preparing to dredge.

f. Delays caused by Natural Elements When river conditions are such that dredging operations become impractical or uneconomical, as determined by the Contracting Officer, he may place the dredge in an idle standby status by giving 24 hours oral or written notice to the Contractor. When the dredge plant is placed in an idle standby status, the Contractor will cease dredging operations and shall secure the dredge plant in a location approved by the Contracting officer. During the idle standby period, the Contractor shall retain a crew that will enable the dredge plant to be returned to operation within 24 hours of receiving notice to resume dredging. While in an idle standby status, neither the dredge plant nor any attendant plant shall be moved from the standby location without approval from the contracting officer. Idle standby may be directed on more than one occasion, but will not exceed a cumulative total of 504 hours. The contractor will be paid 35% of line item (0002 or 0007) of Lot One or Lot Two if these condi

tions occur. When the Contractor begins preparations to resume operations at the site as directed by the Contracting Officer, the usual pay provisions of the specifications will be applicable.

g. Rate of Progress and Performance: Due to the importance of meeting schedule and constructing a new channel at North West Tenn. Harbor, it is essential that the Contractor maintain a satisfactory rate of progress. A minimum of 22,900 cubic yards of material shall be removed per 24 hour day. If the contractor falls short of these requirements, the contractor will be subject to liquidated damages.

The designated billing office for this contract is as follows:

Wade Channell
U.S. Army Corps of Engineers, Memphis District
Ensley Engineer Yard
2915 Riverport Rd
Memphis TN 38125-5026

**SP.29 CONTRACTING OFFICER SIGNATURE**

The Contracting Officer signing this contract is the primary Contracting Officer on this contract. However, any Contracting Officer assigned to the Memphis District and Acting within its authority may take formal action on this contract when a contract action needs to be taken and the primary Contracting Officer is away from the office.

## SP.30 WORKING IN THE VICINITY OF STRUCTURES AND UTILITY CROSSINGS

Where dredging to the required dimensions might endanger any Structure, the Contracting Officer may reduce the required excavation in the vicinity of such structure. The Contractor shall submit for approval by the Contracting Officer, a detailed plan of operation at each pipeline or utility crossing where construction surveys indicate project channel does not exist. The plan shall contain emergency measures to be taken in the event of an accident. The Contractor shall notify the owners of pipelines or utilities at least 3 days prior to operating within 150 feet of a pipeline or utility. The Government will not be responsible for any damage to structures or utilities due to the Contractor's deviation from the approved plan.

General Decision Number: KY080048 02/08/2008 KY48

Superseded General Decision Number: KY20070050

State: Kentucky

Construction Type: Heavy Dredging

Counties: Kentucky Statewide.

DREDGING PROJECTS ALONG THE GULF COAST AREA INCLUDING THE MISSISSIPPI RIVER AND ITS TRIBUTARIES TO THE OHIO RIVER

| Modification Number | Publication Date |
| --- | --- |
| 0 | 02/08/2008 |

* SUKY1994-002 04/01/1994

| | Rates | Fringes |
| --- | --- | --- |
| Derrick Operator.................$ | 5.85 | |
| Dozer Operator...................$ | 5.85 | |
| Dredge 16" and Over | | |
| Deckhand....................$ | 5.85 | |
| Dredge Tender Operator......$ | 5.85 | |
| Fireman.....................$ | 5.85 | |
| First Assistant Engineer....$ | 6.06 | |
| Leverman....................$ | 6.10 | |
| Oiler.......................$ | 5.85 | |
| Second Assistant Engineer...$ | 5.85 | |
| Shoreman....................$ | 5.85 | |
| Third Assistant Engineer....$ | 5.85 | |
| Truck Driver................$ | 5.85 | |
| Welder......................$ | 5.85 | |
| Dredge Under 16" | | |
| Deckhand....................$ | 5.85 | |
| Dredge tender Operator......$ | 5.85 | |
| Leverman....................$ | 5.85 | |
| Oiler.......................$ | 5.85 | |
| Welder......................$ | 5.85 | |
| Hydraulic Dredging | | |
| First Cook..................$ | 5.85 | |
| Handyman....................$ | 5.85 | |
| Janitor - Cabin Person......$ | 5.85 | |
| Second Cook.................$ | 5.85 | |
| Marsh Buggy Dragline | | |
| Oiler.......................$ | 6.33 | |
| Operator....................$ | 6.70 | |

```
Self-Propelled Hopper Dredge
     Drag Tender.................$  9.70           3.45+a
```

FOOTNOTE:

a. Fourteen paid vacation days and eight paid holidays: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day & Christmas Day provided the employee has one year of service

----------------------------------------------------------------

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

================================================================

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29CFR 5.5 (a) (1) (ii)).

----------------------------------------------------------------

In the listing above, the "SU" designation means that rates listed under the identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

----------------------------------------------------------------

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W.

Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

================================================================

END OF GENERAL DECISION

General Decision Number: MS080024 02/08/2008 MS24

Superseded General Decision Number: MS20070034

State: Mississippi

Construction Type: Heavy Dredging

Counties: Mississippi Statewide.

DREDGING PROJECTDS ALONG THE MISSISSIPPI RIVER AND ITS TRIBUTARIES

| Modification Number | Publication Date |
|---|---|
| 0 | 02/08/2008 |

* SUMS1990-015 02/15/1990

| | Rates | Fringes |
|---|---|---|
| Derrick Operator | $ 5.85 | |
| Dozer Operator | $ 5.85 | |
| Dredge 16" and Over | | |
| Deckhand | $ 5.85 | |
| Dredge tender operator | $ 5.85 | |
| Fireman | $ 5.85 | |
| First assistant engineer | $ 6.06 | |
| Leverman | $ 6.10 | |
| Oiler | $ 5.85 | |
| Second assistant engineer | $ 5.85 | |
| Shoreman | $ 5.85 | |
| Third assistant engineer | $ 5.85 | |
| Truck driver | $ 5.85 | |
| Welder | $ 5.85 | |
| Dredge Under 16" | | |
| Deckhand | $ 5.85 | |
| Dredge tender operator | $ 5.85 | |
| Leverman | $ 5.85 | |
| Oiler | $ 5.85 | |
| Welder | $ 5.85 | |
| Hydraulic Dredging | | |
| First cook | $ 5.85 | |
| Handyman | $ 5.85 | |
| Janitor, cabin person | $ 5.85 | |
| Second cook | $ 5.85 | |
| Marsh Buggy Dragline | | |
| Oiler | $ 6.33 | |
| Operator | $ 6.70 | |

---

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

================================================================

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29CFR 5.5 (a) (1) (ii)).

----------------------------------------------------------------

In the listing above, the "SU" designation means that rates listed under the identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

----------------------------------------------------------------

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator
U.S. Department of Labor
200 Constitution Avenue, N.W.

Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

================================================================

END OF GENERAL DECISION

SECTION 02482A

MAINTENANCE DREDGING (HOURLY)

TABLE OF CONTENTS

PART 1 GENERAL
1.1 SCOPE OF DREDGING

PART 2 PRODUCTS
2.1 DREDGE
2.1.1 Size of Dredge
2.1.2 Spare Cutters and Impellers
2.2 ATTENDANT PLANT
2.2.1 General
2.2.2 Anchor Barge
2.2.3 Barge Mounted Crane
2.2.4 Fuel Barge
2.2.5 Landing Barge
2.2.6 Pipelines
2.2.7 Spill Barge
2.2.8 Tenders
2.2.9 Survey/Crew Boat
2.2.10 Dozers
2.3 TECHNICAL EQUIPMENT
2.3.1 Production Recording Equipment
2.3.2 Differential Global Positioning System (DGPS)
2.3.3 Depth Sounding Devices
2.3.4 Hydrographic Survey Equipment
2.3.5 Gyro Compass

PART 3 EXECUTION (Not Applicable)

-End of Section Table of Contents-

SECTION 02482A

MAINTENANCE DREDGING (HOURLY)

PART 1 GENERAL

1.1 SCOPE OF DREDGING

The work consists of the maintenance dredging of the following harbors: Hickman, KY; New Madrid, MO; Caruthersville, MO; Osceola, AR; Memphis, TN; Wolf River, TN; Helena, AR; Phillips County, AR; or at any point on the Mississippi River between Cape Girardeau MO (Mile 48 UMR) and Greenville, Mississippi (Mile 537 AHP). Material dredged from the maintenance harbors shall be discharged into the river or be retained in disposal areas by retaining dikes and box-type spillways as directed.

PART 2 PRODUCTS

2.1 DREDGE

2.1.1 Size of Dredge

The dredge shall be not less than 27 inch I.D. discharge. The dredge shall have a minimum manufacturer's horsepower rating for continuous operation as specified in the table below. The dredge inspectors will monitor the actual dredge output, as determined by before and after dredging surveys performed by the Government, against the applicable quantity shown. Failure to maintain that quantity will result in a reduction in payments in accordance with paragraph 00800-SP.18.g, unless the Contracting Officer determines that circumstances beyond the control and without the fault or negligence of the Contractor caused the reduction in output. Dredging performed at some locations will require approximately 15,000 ft. of discharge line with a 50 ft. lift; during this time the dredge shall not be required to meet the specified minimum output. The discharge size will be considered to be the minimum diameter of either the pump discharge or discharge line, which-ever is less. Dredges larger than 29 inches will be considered but, the estimate output will be based on quantity shown for 29 inch dredge.

| Size of Dredge Pump Discharge (I.D.) | Minimum Continuous BHP Connected to Dredge Pump | Estimated Minimum Output Per Pumping Hour Cubic Yards |
|---|---|---|
| 27 inches | 3,900 | 1145 |
| 29 inches | 6,000 | 1321 |

The dredge ladder and spuds shall be of such construction and configuration that the dredge will

dig material to a depth of 50 ft below the water surface without exceeding a ladder angle of 45 degrees from horizontal, and will make a 250-ft bottom width cut at a depth of 50 ft without exceeding a swing angle of 45 degrees to either side of the cut centerline. Spuds shall be capable of holding the dredge in place under the dredging conditions above in currents up to 12 ft per second. The dredge shall be capable of starting work and working efficiently at a depth of 12 ft.

The draft of the dredge shall not exceed 9 ft. The dredge shall be of such design as to work efficiently and permit passage of other vessels while working in a 250-ft wide channel. A check (flap) valve will be located on the dredge near the discharge side of the pump. A flow meter and density meter shall be located on the dredge on the discharge side of the pump for the purpose of determining velocity and cubic yardage. The suction pipe shall have a device that will degas the dredged material. The sound level in the lever room shall not exceed 90 dB.

2.1.2 Spare Cutters and Impellers

The Contractor shall have available for use at all times, a minimum of three interchangeable pump impellers in the sizes that can be accommodated by the pump to permit the dredge to work under varying conditions of length of discharge line and lift. The Contractor shall have available at all times a minimum of two extra cutter heads compatible to dredging conditions.

2.2 ATTENDANT PLANT

2.2.1 General

Attendant plant shall include the following as minimum requirements and shall be composed of such fuel barges, tenders, floating discharge pipe, shore pipe, spill barge, derrick or anchor barges, landing barge, water barges, and other attendant or auxiliary plant as may be required for operations under these specifications, whether or not items are specifically mentioned. The auxiliary and attendant plant shall be in good condition and of sufficient size and capacity to efficiently serve the dredge. The dredge tenders and other attendant plant requiring internal combustion engines for propulsion or auxiliary power requirements, except outboard motors, shall not be equipped with a type of engine requiring gasoline or other highly volatile fuels for operations. No division in pay will be made for attendant plant. It will be considered as part of the dredging plant and shall be kept in operating condition at all times regardless of pay status of the dredge.

2.2.2 Anchor Barge

One derrick barge with not less than 30-ft boom length for moving and shifting anchors.

2.2.3 Barge Mounted Crane

One (1) barge mounted crane having a lifting capacity of at least 50 tons, with not less than 80-ft boom length.

2.2.4 Fuel Barge

One (1) fuel barge capable of servicing the dredge for 7 days.

2.2.5 Landing Barge

One (1) shallow draft barge with sufficient walkway and handrails shall be required for use as a landing barge.

2.2.6 Pipelines

The work involved will require pipelines ranging from 600 ft to 15,000 ft in length. The following minimum pipeline equipment shall be furnished: 8,500 ft of pontoon discharge line of not less than 27 in ID (1,000 ft of the line shall be in lengths of not more than 50 ft), two (2) stiff pontoon elbows and two (2) swivels, equipped with winches or skidder barge with power winch and adequate fairleads or chocks; and 6,500 ft of shore pipe with two sets of valves including wye branches. The pontoon line shall be equipped with satisfactory pontoons, winches, and anchors to operate the pontoon line in 12 ft per second current. The contractor may be required to submerge short lengths of the pontoon line in harbors to allow for passage of small vessels.

2.2.7 Spill Barge

One (1) shallow draft spill barge (2 ft. maximum draft) designed to discharge 75 ft. from waters edge, equipped with power winches to be available if needed.

2.2.8 Tenders

Two (2) tenders for 24 hours operation per day of such size and design that either can adequately serve the dredge and attendant plant under any conditions to be encountered. The tenders shall be not less than 500 intermittent shaft horsepower and shall work in as little as 5 ft of water. In addition to the two tenders required above, one (1) additional tender of not less than 1,000 intermittent shaft horsepower is required for 24 Hr. operation. Each of the tenders shall be of steel construction, twin screw, with conventional shallow draft river workboat design and equipped with depth finder with transducer installed in hull. The minimum crew for each tender shall consist of one operator and one deckhand per shift.

2.2.9 Survey/Crew Boat

One (1) workboat, similar or equal to a 21-ft SeaArk Marine Utility Series Little Giant Model, with front and rear door, shall be required for crew transport, layout work, sounding, general inspection, and quality control surveying. Workboat shall be equipped with the following: three outboard motors, not less than 100 horsepower each (one will be used as a spare); complete hydraulic steering system including wheel; cables, throttle controls, and electric starter for dual

motors; and single-beam DGPS hydrographic surveying equipment.

2.2.10 Dozers

Two (2) wide track bulldozers, one D-5 and one D-6 Caterpillar or equivalent, shall be furnished for work in and around upland disposal areas.

2.3 TECHNICAL EQUIPMENT

2.3.1 Production Recording Equipment

The dredge shall be equipped with automated production recording equipment, to continually record slurry density, slurry velocity, pipeline pressure, pump vacuum, pump RPM, and engine RPM. Data must be recorded electronically. Data shall be furnished to the Government upon request, and at completion of the contract.

2.3.2 Differential Global Positioning System (DGPS)

The contractor shall furnish, operate and maintain a complete Differential Global Positioning System (DGPS) to provide dredge positioning and alignment in the various dredging assignments of this contract. The system shall utilize DGPS equipment in conjunction with Hypack Surveying Software and the U.S. Coast Guard Radio Beacon DGPS Network, to provide real time positioning using UTM Zone 15 or 16 coordinates. The contractor will be provided a diskette containing a Hypack file of the dredging cut layout for each individual assignment containing stationing, baseline information, and coordinates. The complete positioning system shall provide at a minimum the following features: (1) Complete real time display of the dredge in relation to the dredging cut, centerline ranges, and current 100-ft stationing shall be displayed on a VGA monitor located in the lever room of the dredge, so that the inspector can determine the current and previous location of the dredge as it advances. (2) Data logging and recording to diskette of positioning information during the dredging assignment, to be turned in to the Corps inspector at the end of each assignment. (3) Printouts of screen data for any time interval, reflecting the advance of the dredge and the arc of the swing within the channel, shall be available upon request.

2.3.3 Depth Sounding Devices

The Contractor shall provide a depth-sounding device capable of obtaining continuous depth-sounding measurements in the area of the forward hull of the dredge. The depth shall be displayed in the lever room of the dredge.

2.3.4 Hydrographic Survey Equipment

The survey/crew boat shall be equipped with single-beam DGPS hydrographic survey equipment. Contractor must be able to print small-scale cross-sections but not full surveys (large scale plotter not required); printer may be located on survey boat or dredge.

2.3.5 Gyro Compass

As a back-up for the DGPS system, the dredge shall be equipped with a gyro compass of such precision that dredging can be conducted using compass bearings if necessary.

PART 3 EXECUTION (Not Used)

-- End of Section --

DIVISION 2 - SITE WORK

SECTION 02482B

NORTH WEST TENNESSEE HARBOR

NEW CONSTRUCTION DREDGING (YARDAGE)

TABLE OF CONTENTS

PART 1 GENERAL
1.1 SCOPE OF DREDGING

PART 2 PRODUCTS
2.1 DREDGE
2.1.1 Size of Dredge
2.1.2 Spare Cutters and Impellers
2.2 ATTENDANT PLANT
2.2.1 General
2.2.2 Anchor Barge
2.2.3 Barge Mounted Crane
2.2.4 Fuel Barge
2.2.5 Landing Barge
2.2.6 Pipelines
2.2.7 Spill Barge
2.2.8 Tenders
2.2.9 Survey/Crew Boat
2.2.10 Dozers
2.2.11 Excavator
2.2.12 All Terrain Vehicle
2.3 TECHNICAL EQUIPMENT
2.3.1 Production Recording Equipment
2.3.2 Differential Global Positioning System (DGPS)
2.3.3 Depth Sounding Devices
2.3.4 Hydrographic Survey Equipment
2.4 SURVEY REQUIREMENTS
2.4.1 Scope
2.4.2 Survey Equipment
2.4.3 Surveying
2.5 OVER DEPTH DREDGING
2.6 DREDGING DATA PROVIDED

PART 3 EXECUTION (Not Applicable)

-End of Section Table of Contents-

SECTION 02482B

NEW CONSTRUCTION DREDGING (YARDAGE)

PART 1 GENERAL

1.2 SCOPE OF DREDGING

The work consists of the new construction dredging of North West Tennessee Harbor at LMR mile 899. The details of the North West Tennessee Harbor can be seen on the attached plans. Material dredged from the North West Tennessee Harbor shall be discharged in Disposal A and/or Disposal B shown on the plans. At any time during the dredging of this harbor the contractor may be required to discharge in either of the disposal areas A or B. The assembly and disassembly of shore lines, pontoon lines, booster pump, etc. to both disposal areas and all attendant plant should be included in yardage price item (0001AA, 0001AB and 0001AC or 0006AA, 0006AB and 0006AC) of Lot 1 or Lot 2.

PART 2 PRODUCTS

2.1 DREDGE

2.1.1 Size of Dredge

The dredge shall be not less than 27 inch I.D. discharge. The dredge shall be adequately powered and geared and properly equipped for the pump size and horsepower. The dredge shall be required to maintain a minimum production rate of 1,145 cubic yards per pumping hour. Dredging performed at Northwest Tenn. Harbor will require approximately 8000 ft of discharge line with 53 ft. of static head. The suction head, head from friction of pipe, elbows and any other factors that effect pump production is not included in the 53 ft. of static head. Plans with sections showing all elevations, borings and right of ways are provided. It will be the responsibility of the contractor to provide extra horsepower such as booster pump, larger horsepower dredge etc. if needed. If any of the above are needed the price should be included in bid item 0001's or 0006's cost per yard. The discharge size will be considered to be the minimum diameter of either the pump discharge or discharge line, which-ever is less. Dredges larger than 29 inches will be considered but, must meet size constraints of the new harbor dimensions.

The dredge ladder and spuds shall be of such construction and configuration that the dredge will dig material to a depth of 50 ft below the water surface without exceeding a ladder angle of 45 degrees from horizontal, and will make a 250-ft bottom width cut at a depth of 50 ft without exceeding a swing angle of 45 degrees to either side of the cut centerline. Spuds shall be capable of holding the dredge in place under the dredging conditions above in currents up to 12 ft per second. The dredge shall be capable of starting work and working efficiently at a depth of 12 ft.

The draft of the dredge shall not exceed 9 ft. The dredge shall be of such design as to work

efficiently and permit passage of other vessels while working in a 250-ft wide channel. Note: The North West Tenn. Harbor has a 130 ft. bottom width. See Plans. A check (flap) valve will be located on the dredge near the discharge side of the pump. A flow meter and density meter shall be located on the dredge on the discharge side of the pump for the purpose of determining velocity and cubic yardage. The suction pipe shall have a device that will degas the dredged material. The sound level in the lever room shall not exceed 90 dB.

2.1.2 Spare Cutters and Impellers

The Contractor shall have available for use at all times, a minimum of three interchangeable pump impellers in the sizes that can be accommodated by the pump to permit the dredge to work under varying conditions of length of discharge line and lift. The Contractor shall have available at all times a minimum of two extra cutter heads compatible to dredging conditions.

2.2 ATTENDANT PLANT

2.2.1 General

Attendant plant shall include the following as minimum requirements and shall be composed of such fuel barges, tenders, floating discharge pipe, shore pipe, spill barge, derrick or anchor barges, landing barge, water barges, and other attendant or auxiliary plant as may be required for operations under these specifications, whether or not items are specifically mentioned. The auxiliary and attendant plant shall be in good condition and of sufficient size and capacity to efficiently serve the dredge. The dredge tenders and other attendant plant requiring internal combustion engines for propulsion or auxiliary power requirements, except outboard motors, shall not be equipped with a type of engine requiring gasoline or other highly volatile fuels for operations. No division in pay will be made for attendant plant. It will be considered as part of the dredging plant and shall be kept in operating condition at all times regardless of pay status of the dredge.

2.2.2 Anchor Barge

One derrick barge with not less than 30-ft boom length for moving and shifting anchors.

2.2.3 Barge Mounted Crane

One (1) barge mounted crane having a lifting capacity of at least 50 tons, with not less than 80-ft boom length.

2.2.4 Fuel Barge

One (1) fuel barge capable of servicing the dredge for 7 days.

2.2.5 Landing Barge

One (1) shallow draft barge with sufficient walkway and handrails shall be required for use as a landing barge.

2.2.6 Pipelines

The work involved will require pipelines ranging from 600 ft to 15,500 ft in length. The following minimum pipeline equipment shall be furnished: 8,500 ft of pontoon discharge line of not less than 27 in ID (1,000 ft of the line shall be in lengths of not more than 50 ft), two (2) stiff pontoon elbows and two (2) swivels, equipped with winches or skidder barge with power winch and adequate fairleads or chocks; and 7,000 ft of shore pipe with two sets of valves including wye branches. If needed 1500ft. of polyethylene pipe will be required to cross disposal area A to reach disposal area B. The pontoon line shall be equipped with satisfactory pontoons, winches, and anchors to operate the pontoon line in 12 ft per second current.

2.2.7 Spill Barge

One (1) shallow draft spill barge (2 ft. maximum draft) designed to discharge 75 ft. from waters edge, equipped with power winches to be available if needed.

2.2.8 Tenders

Two (2) tenders for 24 hours operation per day of such size and design that either can adequately serve the dredge and attendant plant under any conditions to be encountered. The tenders shall be not less than 500 intermittent shaft horsepower and shall work in as little as 5 ft of water. In addition to the two tenders required above, one (1) additional tender of not less than 1,000 intermittent shaft horsepower is required for 24 Hr. operation. Each of the tenders shall be of steel construction, twin screw, with conventional shallow draft river workboat design and equipped with depth finder with transducer installed in hull. The minimum crew for each tender shall consist of one operator and one deckhand per shift.

2.2.9 Survey/Crew Boat

See 2.4.2 Survey Equipment

2.2.10 Dozers

Two (2) wide track bulldozers, one D-5 and one D-6 Caterpillar or equivalent, shall be furnished for work in and around upland disposal areas.

2.2.11 Excavator

One (1) excavator with amphibious under carriage equivalent to a 325 Caterpillar.

2.2.12 All Terrain Vehicle

One (1) ATV with two passenger capacity.

## 2.3 TECHNICAL EQUIPMENT

### 2.3.1 Production Recording Equipment

The dredge shall be equipped with automated production recording equipment, to continually record slurry density, slurry velocity, pipeline pressure, pump vacuum, pump RPM, and engine RPM. Data must be recorded electronically. Data shall be furnished to the Government upon request, and at completion of the contract.

### 2.3.2 Differential Global Positioning System (DGPS)

The contractor shall furnish, operate and maintain a complete Differential Global Positioning System (DGPS) to provide dredge positioning and alignment in the various dredging assignments of this contract. The system shall utilize DGPS equipment in conjunction with Hypack Surveying Software and the U.S. Coast Guard Radio Beacon DGPS Network, to provide real time positioning using UTM Zone 15 or 16 coordinates. The contractor will be provided a diskette containing a Hypack file of the dredging cut layout for each individual assignment containing stationing, baseline information, and coordinates. The complete positioning system shall provide at a minimum the following features: (1) Complete real time display of the dredge in relation to the dredging cut, centerline ranges, and current 100-ft stationing shall be displayed on a VGA monitor located in the lever room of the dredge, so that the inspector can determine the current and previous location of the dredge as it advances. (2) Data logging and recording to diskette of positioning information during the dredging assignment, to be turned in to the Corps inspector at the end of each assignment. (3) Printouts of screen data for any time interval, reflecting the advance of the dredge and the arc of the swing within the channel, shall be available upon request.

### 2.3.3 Depth Sounding Devices

The Contractor shall provide a depth-sounding device capable of obtaining continuous depth-sounding measurements in the area of the forward hull of the dredge. The depth shall be displayed in the lever room of the dredge.

### 2.3.4 Hydrographic Survey Equipment

The survey/crew boat shall be equipped with single-beam DGPS hydrographic survey equipment. Contractor must be able to print small-scale cross-sections but not full surveys (large scale plotter not required); printer may be located on survey boat or dredge.

## 2.4 SURVEY REQUIREMENTS

### 2.4.1 Scope

Surveying requirements consist of furnishing all plant, labor, equipment, materials, and supplies, and performing all operations necessary for the required surveys as specified herein.

2.4.2 Survey Equipment

(1) SURVEY BOAT. One (1) workboat, similar or equal to a 21-ft SeaArk Marine Utility Series Little Giant Model, with front and rear door, shall be required for crew transport, layout work, sounding, general inspection, and quality control surveying. Workboat shall be equipped with the following: three outboard motors, not less than 100 horsepower each (one will be used as a spare); complete hydraulic steering system including wheel; cables, throttle controls, and electric starter for dual motors; and single-beam DGPS hydrographic surveying equipment. Survey boat shall have sufficient enclosed space for the survey crew and shall meet all applicable US Coast Guard Regulations. The minimum full-time crew for the survey boat shall be one operator for the day shift, plus any survey personnel required to operate the equipment. Refer to

the latest version of the Safety and Health Requirements Manual, EM 385-1-1, paragraph 19.c., for additional crew and equipment requirements. The survey boat shall bear a plate of certifica tion for minimum boat flotation by the Boating Industry Association (BIA). The survey boat shall be equipped with:

(i) A DGPS electronic positioning system, as described in the paragraph entitled, DGPS Electronic Positioning Equipment, of this Section;

(ii) Air conditioning for the enclosed cabin;

(iii) VHF radio for ship-to-ship communications, as described in the paragraph entitled, Communications Equipment, of this Section;

(iv) A recording depthsounder as described in this Section.

(2) DEPTHSOUNDERS.

(i) SYSTEM CHARACTERISTICS. The survey vessel shall be equipped with a depthsounder. It shall be capable of recording depths from a minimum depth of 4 feet. below the transducer to a maximum depth of at least 100 ft. The depthsounder shall be accurate to + 0.1ft. The transducer shall be mounted within the vessel so as to insure optimal depthsounder performance. The transducer transmit frequency shall be within the range of 200 kHz and the unit shall be capable of a pulse power output of up to 500 watts. The depthsounder shall have a sounding rate of at least 15 soundings/sec. It shall be capable of automatic time varied gain (TVG) adjustments. The unit shall also have manual controls that allow vessel draft, water level (+) and speed of sound adjustments. Analog depthsounder recordings shall be made on a dry thermal or electrostatic paper medium. Chart paper operational speeds shall be within a range of 1-8 in./min. The vertical scaling shall be at minimum 1 in. per 10 ft. of water depth. Draft, tide and speed of sound settings must be automatically annotated on the chart. The depthsounder must be capable of manual event marking. A remote digital depth display shall be provided to

the dredge helmsman or survey boat operator. If the depthsounder is electronically interfaced with a positioning survey system, all recorded digitized depth soundings must be annotated on the analog paper chart with an event mark and its event designation. The operational chart paper speed utilized shall not cause any event mark/event designation overwrites.

(ii) CALIBRATION. The QAR will be present at all depthsounder calibrations. The speed of sound calibration method will be approved by the COR. A calibration shall be performed at the start of each day, when the vessel moves to another survey locale and after any maintenance is performed on the depthsounder (to include chart paper replacement). Once the calibration is complete, no speed of sound adjustment shall be made until the next calibration. The depthsounder shall be calibrated at a depth equal to 80% of the maximum expected survey depth or at a depth of 40-ft. (whichever is less). The analog chart paper recording of the calibration shall be provided to the COR.

(3) DGPS ELECTRONIC POSITIONING EQUIPMENT. The Contractor shall furnish and maintain DGPS electronic positioning systems, capable of providing 24-hour real-time latitude, longitude, and horizontal positioning, within a tolerance of + or - 5 feet, for the dredge and survey boat. Each system shall each be equipped with a track indicator, magnetic media recorder (Floppy or CD-ROM disk, IBM-compatible ASCII format), and a 750-C Hewlett Packard Ink-Jet plotter or equal. The systems must be capable of accepting programmed waypoints, and giving a course between waypoints. The track indicators must show deviations from programmed course. The magnetic media recorders shall record position fixes in Universal Transverse Mercator (UTM) X and Y coordinates and associated depths from the depth sounders. The plotter shall show courses steered, in real time, and must also be capable of plotting digitized depth data from the depth sounders. The position-indicating instrument consoles and track indicators shall be installed in the pilothouse of the dredge in plain view of the helmsman. This same equipment shall also be installed on the Survey Boat in plain sight of the survey boat operator.

(i) CALIBRATION OF DGPS EQUIPMENT. Prior to initiating positioning surveys using DGPS electronic survey equipment, a calibration test of the electronic measuring device shall be performed verifying that channel center line as indicated by center line ranges and DGPS electronic positioning coincide. This shall be done in the presence of the Contracting Officer's Representative. Calibration checks shall be run at the beginning of each survey or portion thereof. Should the electronic measuring device fail to indicate the channel centerline within the factory-defined error range for the device, the device shall not be used for determining survey positions.

2.4.3 Surveying

(1) GENERAL. All record surveys shall be performed in the presence of the Government's QAR. All surveys will be performed under the direction of a qualified survey technician.

(2) GOVERNMENT FURNISHED SURVEY DATA. The Government may or may not perform a survey of the dredging assignment depending upon availability of survey personnel and equipment. If a survey is performed, the Government will provide a plotted hydro survey

sheet and/or a diskette containing a Hypack file for the dredging assignment. The Government survey is for reference only, and does not relieve the Contractor of performing before, interim, and after dredging surveys as specified below. Bench Mark/Elevation within the dredging assignment area will be provided if requested.

(3) FIELD SURVEYS. Before commencing dredging operations, the Contractor shall make a DGPS before construction survey within the immediate specified dredging assignment. The data from this survey shall be plotted by the Contractor on a layout sheet. This survey shall be made available to the QAR prior to start of dredging operations. The before and final after dredging surveys will be used as the basis for all pay yardage computations, unless otherwise authorized by the QAR. This information shall be recorded in Universal Transverse Mercator (UTM), X and Y coordinates with corresponding depths. These depths shall be made to the nearest 0.1-foot. The depths from these surveys shall be converted to the applicable Vertical Datum, or recorded as actual depths as referenced to the nearest benchmark, and contoured to the desired project depth. These surveys shall be labeled with the applicable date, time, water surface, and scale to which the survey is plotted and the name of the surveyor performing the survey. These surveys shall be made on intervals of 100 feet (cross sectional areas). These intervals shall cover the entire channel dredging assignment area, unless otherwise authorized by the QAR. All soundings shall be made at no more than 20-foot intervals. During the progress of the work, interim surveys shall be made of the completed dredge cut(s) to ensure they have been made to the specified grades/elevations and material is not moving back into the previously made cut(s). This interim survey data shall be made a matter of daily records to be utilized if additional dredging is required. If additional dredging is required, due to filling, these interim surveys will be the basis for additional dredging payment purposes. In addition to channel surveys some land surveys in disposal areas will be required as directed by the QAR.

(4) SURVEY DATA. Plotted surveys and other applicable data shall be kept at each dredging location at all times and made available to the QAR upon request.

2.5 OVERDEPTH DREDGING

Two foot over-dredging will be allowed, and the quantities within this two-foot over depth tolerance will be measured and paid for at the contract unit price per cubic yard. Dredging in excess of this two-foot over depth tolerance will not be paid for.

If shoaling occurs in any reach previously accepted, re-dredging at the contract price shall be performed by the Contractor, if so directed by the Contracting Officer.

2.6 DREDGING DATA PROVIDED

All dredging cross sections, borings, limits of dredging, etc. for North West Tennessee Regional Harbor are provided in attached plans.

PART 3 EXECUTION (Not Used)

(End of Summary of Changes)

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Great Lakes Dredge & Dock Company LLC's Complaint for A Temporary Restraining Order and Preliminary and Permanent Injunctive Relief, Cover Sheet, Motion for A Temporary Restraining Order, Motion For Preliminary Injunction, Memorandum In Support of Its Motions for a Temporary Restraining Order and Motion for a Preliminary Injunction, Notice of Appearance, Plaintiff Great Lakes Dredge & Dock Company LLC's Rule 7.1 Statement, and Statement of Plaintiff's Counsel were served, this 16th day of April, 2008 by email on the following:

Wendall N. Norman
Contracting Officer
Attn: CEMVM-CT-Rm. 681
U.S. Army, Engineer District, Memphis
167 North Main Street, B202
Memphis, TN 38103-1894
Wendall.N.Norman@usace.army.mil

Robert C. Bigler
Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W., Room 12066
Washington, D.C. 20530
Robert.Bigler@usdoj.gov

Daniel C. Sauls