**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **GREAT LAKES DREDGE & DOCK COMPANY LLC,** Plaintiff, | **Electronically Filed On May 5, 2008** |
| v. | **Civil Action No. 08-cv-282 (Judge Braden)** |
| **UNITED STATES,** Defendant. | |

**PLAINTIFF GREAT LAKES DREDGE & DOCK COMPANY LLC'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to RCFC 52.1, Plaintiff Great Lakes Dredge & Dock Company LLC ("GLDD") moves for judgment on the Administrative Record. The record demonstrates that U.S. Army Corps of Engineers' Solicitation Number W912EQ-08-B-0001 is defective. The solicitation's bid schedules and price evaluation scheme unfairly penalize GLDD, fail to evaluate the full scope of the work being competed, and prevent GLDD from competing for the work on a fair and equal basis. As such, they are irrational, arbitrary and capricious, an abuse of discretion, and a clear and prejudicial violation of applicable procurement laws, statutes and regulations.

The grounds supporting this motion are set forth in the accompanying Memorandum In Support of GLDD's Motion for Judgment on the Administrative Record.

Respectfully submitted,

s/Daniel C. Sauls

Daniel C. Sauls
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902
dsauls@steptoe.com

**Attorney of Record for Great Lakes Dredge & Dock Company LLC**

Dated: May 5, 2008

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **GREAT LAKES DREDGE & DOCK COMPANY LLC,** | **Electronically Filed On May 5, 2008** |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 08-cv-282 (Judge Braden)** |
| **UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFF GREAT LAKES DREDGE & DOCK COMPANY LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR <u>JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Daniel C. Sauls
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902
dsauls@steptoe.com

Attorney of Record for Plaintiff
Great Lakes Dredge & Dock Company LLC

Dated: May 5, 2008

# TABLE OF CONTENTS

Page


I. STATEMENT OF ISSUES ........ 1

II. STATEMENT OF FACTS/STATEMENT OF THE CASE ........ 1

A. The Original IFB ........ 2

B. GLDD Challenges The Terms Of The Original IFB ........ 6

C. The Corps Revises The IFB As Requested By GLDD ........ 8

D. The Corps Reverts Back To The Original IFB For The Maintenance Dredging Portion Of The Work ........ 10

III. ARGUMENT ........ 12

A. This Court Has Jurisdiction Over This Case ........ 12

B. GLDD Has Standing To Bring This Protest ........ 13

C. Standards Of Review In A Bid Protest Case ........ 14

D. The IFB Is Based On Defective Estimates That Do Not Accurately Represent the Government's Actual Needs And That Deprive GLDD Of The Opportunity To Fairly Compete For The Work ........ 16

1. The IFB's Defective Estimates Are Not Based On The Best Information Available And Do Not Reflect The Hours That Will Be Required To Perform The Work ........ 17

2. The IFB's Defective Estimates Unfairly Penalize GLDD's Dredge And Prevent GLDD From Competing Fairly For The Maintenance Dredging Work ........ 20

E. The IFB's Price Evaluation Scheme For Maintenance Dredging Also Is Irrational And Defective Because It Does Not Consider The Full Scope Of the Work Being Competed And Does Not Assure That Award To The Low Bidder Will Result In the Lowest Cost To The Government ........ 24

F. GLDD Is Entitled To Injunctive Relief ........ 27

IV. CONCLUSION ........ 29

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL COURT CASES**

A&D Fire Prot., Inc. v United States,
72 Fed. Cl. 126 (2006) ....... 27

Alfa Laval Separation, Inc. v. United States,
175 F.3d 1365 (Fed. Cir. 1999) ....... 13, 14

Antarctic Support Assocs. v. United States,
46 Fed. Cl. 145 (2000) ....... 14

Axiom Res. Mgmt., Inc. v. United States,
80 Fed. Cl. 530 (2008) ....... 22, 27, 29

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) ....... 15, 16

Bean Dredging Co. v. United States,
19 Cl. Ct. 561 (1990) ....... 17

Bean Stuyvesant LLC v. United States,
48 Fed. Cl. 303 (2000) ....... 16, 27

Cardinal Maint. Serv., Inc. v. United States,
63 Fed. Cl. 98 (2004) ....... 27, 28

Citizens to Preserve Overton Park v. Volpe,
401 U.S. 402 (1971) ....... 14, 15

Comprehensive Health Servs., Inc. v. United States,
70 Fed. Cl. 700 (2006) ....... 22

Ellsworth Assocs., Inc. v. United States,
45 Fed. Cl. 388 (1999) ....... 28

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) ....... 27

Great Lakes Dredge & Dock Co. v. United States,
60 Fed. Cl. 350 (2004) ....... 14, 28, 29

Grunley Walsh Int'l v. United States,
78 Fed. Cl. 35 (2007) ....... 16

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001)....14

Information Sciences Corp. v. United States,
73 Fed. Cl. 70 (2006)....12, 13, 14, 15, 27, 28

In re Sang-Su Lee,
277 F.3d 1338 (Fed. Cir. 2002)....15

Mike Hooks, Inc. v United States,
39 Fed. Cl. 147 (1997)....21

Motor Vehicle Mfrs. Ass'n v. State Farm Ins. Co.,
463 U.S. 29 (1983)....14, 21

Northern Va. Van Co., Inc. v. United States,
3 Cl. Ct. 237 (1983)....22

Overstreet Elec. Co. v. United States,
47 Fed. Cl. 728 (2000)....17, 28

PGBA, LLC v. United States,
60 Fed. Cl. 196 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004)....22

Reilly's Wholesale Produce v. United States,
73 Fed. Cl. 705 (2006)....27

Red River Serv. Corp. v. United States,
60 Fed. Cl. 532 (2004)....13, 14, 28

Rex Serv. Corp. v. United States,
448 F.3d 1305 (Fed. Cir. 2006)....13

SAI Indus. v. United States,
60 Fed. Cl. 731 (2004)....29

Statistica Corp. v. Christopher,
102 F.3d 1577 (Fed. Cir. 1996)....14

Superior Helicopter LLC v. United States,
78 Fed. Cl. 181 (2007)....22

United Int'l Investigative Servs., Inc. v United States,
41 Fed. Cl. 312 (1998)....29

United Payors & United Providers Health Servs., Inc. v. United States,
55 Fed. Cl. 323 (2003)....27-28

Weeks Marine, Inc. v United States,
79 Fed. Cl. 22 (2007) ........................................................................................ 14-15, 21, 28

## COMPTROLLER GENERAL CASES

Associated Healthcare Sys., Inc.,
B-222532, 86-2 C.P.D. ¶ 246 (Sept. 2, 1986)..........................................................24, 26

C-Cubed Corp.,
B-289867, 2002 C.P.D. ¶ 72 (April 26, 2002)...........................................................17

Exclusive Temporaries of Georgia, Inc.,
B-220397 et al., 86-1 C.P.D. ¶ 232 (Mar. 10, 1986)...................................................24

L.K. Comstock, Inc. and Liebert Federal Sys., Inc.,
B-261711.5 et al., 96-1 C.P.D. ¶ 4 (Dec. 14, 1995).....................................................16

News Printing, Inc.,
B-274773.2 et al., 97-1 C.P.D. ¶ 68 (Feb. 11, 1997) ............................................ 16-17

OccuHealth, Inc.,
B-270228 et al., 96-1 C.P.D. ¶ 196 (Apr. 3, 1996) ......................................................22

Professional Carpet Service,
B-220913, 86-1 C.P.D. ¶ 158 (Feb. 13, 1986) ..............................................................24

Robinson Mills & Williams,
B-236956.3, 90-1 C.P.D. ¶ 156 (Feb. 7, 1990)........................................................24, 26

System Mgmt., Inc.; Qualimetrics, Inc.,
B-287032.3 et al., 2001 C.P.D. ¶ 85 (Apr. 16, 2001) ...................................................22

## STATUTES

Administrative Procedure Act, 5 U.S.C. § 706(2)(A)........................................................14

Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)...........................................12, 23, 24

28 U.S.C. § 1491(b)(1) ..................................................................................................12, 13

28 U.S.C. § 1491(b)(2) ......................................................................................................12

28 U.S.C. § 1491(b)(4) ......................................................................................................14

## FEDERAL ACQUISITION REGULATIONS

FAR 6.101 ....................................................................................................................29

FAR 6.101(a) and (b) ..................................................................................................12, 24

FAR 6.401 ....................................................................................................................24

## I. STATEMENT OF ISSUES

1. Whether Plaintiff is entitled to judgment on the Administrative Record because the United States Army Corps of Engineers ("Corps"), in IFB No. W912EQ-08-B-0001 ("Solicitation" or "IFB"), used defective estimates that are not based on the best information available, do not do not accurately reflect the agency's needs, and deprive Plaintiff of the opportunity to compete for the work on a fair and equal basis.

2. Whether Plaintiff is entitled to judgment on the Administrative Record because the Corps used bid schedules and a price evaluation scheme in the IFB that do not consider a significant portion of the work required by the IFB, do not assure that award of a contract to the low bidder will result in the lowest cost to the government for the work actually performed, and deprive Plaintiff of the opportunity to compete for the work on a fair and equal basis.

## II. STATEMENT OF FACTS/STATEMENT OF THE CASE

This is a pre-award bid protest challenging the actions of the Memphis District of the United States Army Corps of Engineers ("Memphis District" or "Corps"). The Memphis District issued Solicitation Number W912EQ-08-B-0001 on January 17, 2008. Administrative Record ("AR") at 7. The IFB seeks offers to perform maintenance dredging at various harbors on the Mississippi River between Cape Girardeau, Missouri and Greenville, Mississippi, which includes harbors at Hickman, Kentucky, New Madrid, Missouri, Caruthersville, Mo., Osceola, Arkansas, Memphis, Tennessee, and Helena, Arkansas. Id. The IFB also requires construction, or new work, dredging at Northwest Harbor, Tennessee. Id. This protest is limited to the portions of the IFB relating to maintenance dredging.

The IFB requires the contractor to supply a cutterhead hydraulic pipeline dredge (also called a cutter suction dredge) having an interior pump discharge diameter of at least 27

inches. AR at 7. The IFB indicates that this will be a substantial contract. It provides that the estimated cost range of the work is between $5 million and $10 million. Id.

The Memphis District has awarded an annual contract to perform maintenance dredging of the same six harbors along the Mississippi River for many years. See AR at 839-853 (excerpts from 1999 solicitation calling for maintenance dredging of the same harbors as the 2008 IFB); 911-968 (2004-2007 solicitations involve the same harbors). These contracts have been structured as a lease of a cutter suction dredge, under which the Corps pays for use of the dredge based on an hourly price bid by prospective contractors. AR at 228-234 (current IFB); 839-853, 911-968 (earlier IFBs). During the last ten years (1998-2007), these Memphis District cutter suction dredge rental contracts have been performed by two dredges -- the dredge Pontchartrain, now owned by Plaintiff Great Lakes Dredge & Dock Company LLC ("GLDD"), and the dredge Venture, owned by Weeks Marine, Inc ("Weeks").[1] AR at 639.

**A. The Original IFB**

The original 2008 IFB, like the previous contracts, was structured as a rental contract and sought rental hourly prices for both the maintenance dredging and construction dredging portions of the work. AR at 9-13. Unlike prior contracts, however, the original 2008 IFB contained separate bid schedules, or "Lots," for a 27-inch pump discharge dredge, like the Pontchartrain, and a 29-inch pump discharge dredge, which will be used by Weeks. Id. This is the first time, to GLDD's knowledge, that a separate Lot was provided for a 29-inch discharge dredge. The IFB provided no explanation for this change. AR at 1-196.

[1] In 1998, the Pontchartrain was owned by TL James & Co. GLDD purchased the Pontchartrain from TL James in August 1998.

Under the original 2008 IFB, bidders were invited to provide hourly prices for performing both the maintenance dredging and construction dredging portions of the work.[2] AR at 9-13. For evaluation purposes in determining the low bidder, the bidder's hourly prices would be multiplied by an estimated number of dredging hours provided on the bidding schedule. The estimated number of hours was different for Lots 1 and 2, as follows:

| | Maintenance Dredging | Construction Dredging |
|---|---|---|
| Lot 1 (27-inch dredge) | 2,076.5 | 2,076.5 |
| Lot 2 (29-inch dredge) | 1,800 | 1,800 |

Id. Thus, the original IFB assumed that it would take a 27-inch pump discharge dredge 15.4% more hours than a 29-inch pump discharge dredge to perform the same work (2,076.5 ÷ 1,800). Id.

The original IFB further assumed that a 29-inch pump discharge dredge would have a 15.4% production advantage over a 27-inch pump discharge dredge. Paragraph 2.1.1 of Section 02482 of the original IFB stated that a 29-inch pump discharge dredge had an estimated minimum production rate of 1,321 cubic yards ("cy") per pumping hour, while a 27-inch pump discharge dredge had an estimated minimum production rate of 1,145 cy per pumping hour. AR at 182. The IFB's use of different estimated minimum production rates and estimated hours for a 29-inch and a 27-inch dredge differed from at least the four most recent Memphis District cutter suction dredge rental solicitations involving work in the Mississippi River harbors. Each of those solicitations included a single bid Lot, a single estimated minimum production rate of

[2] The IFB also contains contract line items for mobilization of equipment to the job site and for towing equipment upstream and downstream to work sites along the river. AR at 9-13 (original IFB), 230-233 (Amendment 0005). These line items are not at issue in this protest.

1,100 cy per pumping hour, and a single number of estimated hours to be used by all dredges. AR at 914-915, 920, 927-28, 934, 941, 950, 956, 964.

The original IFB did not provide any basis or justification for its estimated hours or estimated minimum production rates. The AR reveals, however, that in developing these estimated production rates and hours, the Corps gave no consideration whatsoever to either the historical production rates actually achieved by the Pontchartrain and the Venture while performing the same work for the past 10 years under the predecessor contracts or to particular conditions that might affect the specific work required by the IFB. Instead, the Corps, in a set of undated calculations, apparently relied upon mathematical formulas and tables from textbooks to calculate theoretical dredge productions. AR at 832-38.

Moreover, the Corps' simplistic, mathematical calculations focused solely on three criteria to estimate dredge production -- the velocity of the dredge slurry (the soil/water mixture pumped through the dredge), the area of the dredge pump, and the average percent solids in the dredge slurry. Id. at 837-38. However, even in those calculations, the Corps held two of three variables (average velocity and average percent solids) constant. Thus, not surprisingly, the ratio of the estimated production rates (and therefore estimated hours) contained in the original IFB are the same as the ratio of the area of discharge pumps (measured by the inside diameter of the pump squared):

| Dredge | Pump Discharge Area (Diameter Squared) | IFB Est. Production (cy/hour) | IFB Estimated Hours (Maintenance and New Work) |
|---|---|---|---|
| Venture (assumed 29-inch) | $29^2$ = 841 sq. in. | 1,321 | 1,800 |
| Pontchartrain (27-inch) | $27^2$ = 729 sq. in. | 1,145 | 2,076.5 |
| Ratio | 1.1536 | 1.1537 | 1.1536 |

AR at 9-13, 182. The Corps, therefore, assigned a 15.4% production rate advantage to the Venture based on a mechanical comparison of the pump discharge areas of the Venture and the Pontchartrain. AR at 837-38.

Paragraph 2.1.1 of Section 02482 of the original IFB also stated that "[d]uring all times the dredge will be required to meet the specified minimum output" set forth in the estimated minimum production rates. AR at 182. Paragraph 2.1.1 further stated that failure to maintain this production rate will result in a reduction in payment in accordance with paragraph 00800 - SP 6.c unless the Contracting Officer determined that circumstances beyond the control and without the fault or negligence of the contractor caused the reduction in output. Id. Section 00800 paragraph 6.c provided that the rate of payment would be "reduced in the ratio that the output falls short of that specified in" Section 02482. AR at 155.[3]

The IFB's payment provision (Section 00800 paragraph SP 18) provides that the contractor will be paid for 100% of its effective hours, which the IFB defines as actual time the dredge is under operation (with the cutterhead moving material and material being passed through the pipeline) and time lost due to river traffic. AR at 158-159 (original IFB); 242-243 (Amendment 0005). The IFB provides that the contractor will be paid for 70% of its non effective hours (at the contract hourly price), with non effective hours defined to include things such as time spent moving from one assignment to another (but not in excess of eight hours), time lost to move anchors and add pipe due to the progress of the work, time lost due to the

[3] These price adjustment provisions were modified by Amendment 0001 of the IFB (dated January 28, 2008). AR at 197-198. Paragraph 2.1.1 was modified to provide for a reduction in payments in accordance with a new paragraph 00800-SP. 18g, which stated that if dredging output fell short of that specified in Section 02482 "the total dredging hours for that location will be reduced by the percentage that the output falls short of that specified. Payment for dredging operations, which fail to meet the specified minimum output, will be made by multiplying this reduced number of hours by the contract unit price per hour." AR at 198.

failure of retaining dikes and spill boxes or fall outs through no fault of the contractor, and time lost due to certain other identified delays and repairs. AR at 158-159 (original IFB); 242-243 (Amendment 0005).

**B. GLDD Challenges The Terms Of The Original IFB**

On February 8, 2008, GLDD submitted its Pre-Bid Letter No. 2 to the Corps. AR at 969-971. GLDD attached to this letter a table that set forth detailed, actual production data and the production rates actually achieved by the dredges Pontchartrain and Venture during the previous ten Memphis District Mississippi River harbors cutter suction rental contracts. Id. at 971. This data demonstrates that the Pontchartrain has performed the predecessor rental contract during eight of the last ten years, while Weeks and the Venture performed the predecessor rental contract in 2004 and 2007. Id. During these years, the Pontchartrain averaged 1,111 cubic yards ("cy") per effective hour (excluding traffic).[4] Id. During the two years that the Venture performed the work, which included more than 2,500 hours of dredging time and almost 3 million cy of material, it averaged 1,116 cy per effective hour (excluding traffic). Id.

GLDD asserted in its February 8 letter that the IFB was defective because it provided Weeks and the Venture with a significant advantage in estimated hours despite the fact that the Venture and the Pontchartrain historically had achieved the same production rate per effective hour (excluding traffic). AR at 969-970. GLDD stated that although the two dredges had achieved equal productions, the IFB's bid schedules required GLDD to multiply the

[4] Although the IFB and the predecessor Memphis District rental contracts define lost time due to river traffic as "effective time," the estimated minimum production rates in the IFB are defined in terms of pumping hours, and lost hours due to traffic are not pumping hours. Therefore, in calculating these productions per effective hour, GLDD has excluded traffic hours so that the production figures reflect pumping hours. The deletion of the traffic hours has the impact of slightly raising the dredges' hourly production figures because the denominator of the calculation includes only pumping hours, not pumping hours and traffic delay hours.

Pontchartrain's bid price by significantly more hours, thereby preventing GLDD from competing for the work on a fair and equal basis. Id. at 970.

GLDD followed up this letter with its Pre-Bid Letter No. 3 on February 14, 2008. AR at 614-615. In that letter, GLDD pointed out that when non effective pay time (paid to contractors under the ten predecessor contracts at 80% of non effective hours and paid at 70% of non effective time under the IFB) was taken into account, the Pontchartrain actually had more than a 10% historical production ***advantage*** over the Venture that was not reflected in the IFB. Id.

On February 15, 2008, the Corps issued Amendment 0002, which postponed the bid opening date indefinitely. AR at 199-200. Then, on February 25, 2008, in Pre-Bid Letter No. 5, GLDD provided more information in support of its challenge to the original IFB. AR at 635-639. GLDD pointed out that the original IFB's estimated minimum production rates and estimated hours, which gave Weeks and the Venture a substantial bidding advantage, were defective because:

- The actual production per effective hour (excluding traffic) achieved on the same work by the Pontchartrain and the Venture over the last ten years had been essentially identical (id. at 636);

- The Venture had never come anywhere near achieving the 1,321 cy per hour estimated production rate set forth in the IFB while performing the same work in 2004 and 2007, having achieved average production rates of 1,062 cy per hour and 1,207 cy per hour (excluding traffic) respectively in those years under the predecessor contracts (id. at 637-639); and

- When 80% non effective pay hours were taken into account under the ten predecessor contracts, the Pontchartrain's average production rate per effective and non effective pay hour was actually ***12% higher*** than the Venture's production rate (id. at 637, 639) (1,025 cy per hour v. 916 cy per hour) because the Venture had a substantially higher percentage of non effective time compared to the Pontchartrain (id. at 637, 639).

Based on this actual, historical data regarding the productive capacity of the Pontchartrain and the Venture performing the same work under the predecessor Memphis District rental contracts, GLDD asserted in its February 2008 letters that the IFB's estimated hours and estimated minimum production rates were defective because Lots 1 and 2 did not fairly reflect the proven production capability of the dredges. AR at 636, 969. GLDD asserted that the IFB prevented GLDD from competing for the work on a fair and equal basis because the IFB required GLDD to multiply the Pontchartrain's hourly rental rate by significantly more hours than the Venture, even though the Pontchartrain's actual, historical production performance has equaled or exceeded the Venture's production performance on the predecessor rental contracts. AR at 614-615, 636-639, 969-971.

### C. <u>The Corps Revises The IFB As Requested By GLDD</u>

GLDD's letters had an impact on the Corps. Stephen W. Channell, who works in the Memphis District's Navigation Branch, prepared a memorandum dated February 25, 2008 in which he recommended that the IFB "be revised to eliminate Lot 2 and require all prospective bidders (27-inch I.D. discharge dredges and larger) to bid on Lot 1." AR at 641. Mr. Channell then provided an extensive justification for this proposed change in the solicitation.

With respect to the maintenance dredging portion of the work (the only part that is at issue in this protest), Mr. Channell noted that "[u]nder normal conditions, a 29-inch dredge will have higher production rates than a 27-inch dredge." <u>Id.</u> He then stated however, that ***"there are conditions present in this work which are expected to mitigate the production advantage of a larger dredge."*** <u>Id.</u> (emphasis added). He explained:

> During maintenance dredging of the harbors the limiting factor will be the depth of material to be removed from the cut. If there is a limited amount of material in the cut (less than full bank), the limiting factor becomes the speed with which the dredge can swing through the cut, not pump capacity. The swing rates for 27-inch

> and 29-inch dredges are practically equal. For the past several years, 27-inch and 29-inch dredges have competitively bid on an equal amount of hours for this work, based on the estimated production of a 27-inch dredge.

Id.[5]

Thus, Mr. Channell recognized that because of the limited "bank height" (thickness of the material to be dredged) in the harbors, both dredges would be loading the same quantity of material as they cut through the work area and that the limiting factor on production for the maintenance dredging work was swing speed -- not discharge pump area -- where the Venture has no advantage over the Pontchartrain. Mr. Channell concluded by stating that:

> ***It is reasonable to expect that we will be unable to utilize the additional production capabilities of a larger 29-inch dredge. Dredges larger than 27-inch should be considered, but the estimated production should be based on the quantity shown for a 27-inch dredge.***

Id. at 642 (emphasis added).

Four days later, on February 29, 2008, the Corps followed Mr. Channell's recommendations when it issued Amendment 0003. AR at 201-226. This amendment deleted the Lot 2 bid schedule (based on a 29-inch pump discharge dredge) and provided for all bidders to submit bids using the same bid schedule, the same estimated hours, and the same estimated minimum production per pumping hour, based on a 27-inch dredge. AR 202-203, 222. This was the same approach used on at least the preceding four rental contracts. AR at 914-915, 920, 927-28, 934, 941, 950, 956, 964.

[5] Mr. Channell also concluded that based on factors other than pump size and horsepower (such as the configuration of the harbor, rate of advance of the dredge, and constraints imposed by the type of disposal area involved) that a 29-inch dredge would not have any production advantage over a 27-inch dredge on the new work portion of the project. Id.

### D. The Corps Reverts Back To The Original IFB For The Maintenance Dredging Portion Of The Work

On March 4, 2008, however, Weeks filed a 2-page agency protest. AR at 664-665. Weeks' protest was far less detailed than GLDD's February 2008 letters. It merely asserted that "[o]bviously, a larger dredge will be more productive than a smaller dredge and the bid schedule for the large dredge should include less hours than the smaller dredge. . . ." Id. at 664. Weeks asked the Corps to reconsider its decision to eliminate the multiple equipment bidding schedule approach. Id. at 665. On March 5, 2008, the Corps issued Amendment 0004, again postponing the bid opening indefinitely. AR at 226-227.

The Administrative Record contains no substantive analysis regarding Weeks' protest. Other than Weeks' provision of a production table regarding dredge productions rates purportedly achieved by the Venture on other projects outside the Memphis District, none of which involved dredging any of the harbors to be dredged under the IFB (AR at 677-678), and an undated memorandum for the record by the Contracting Officer indicating that Weeks said that it could support the data in the table (AR at 815),[6] the AR is devoid of any analysis of Weeks' protest. There is nothing in the record relating to Weeks' protest like Mr. Channell's February 25, 2008 memorandum, which the Corps relied upon in deleting the Lot 2 bid schedule from the IFB. Nor is there anything in the record that even addresses, much less refutes, the detailed analysis in Mr. Channell's February 25 memorandum.

---

[6] In emails to the Contracting Officer submitted prior to the filing of this protest, GLDD pointed out that the data in the production table provided by Weeks did not contain production information on six other contracts performed by the Venture during the same period, that the "average" production rates provided by Weeks were overstated and calculated improperly, and that information previously obtained by GLDD under the Freedom of Information Act regarding one job included in the table indicated that Weeks had achieved a much lower production rate on that job than reported to the Corps in the table. AR at 974-976, 984-985.

Nevertheless, on April 7, 2008, the Corps issued Amendment 0005 to the IFB. AR at 228-286. This amendment changed the construction dredging portion of the IFB from a rental basis to a payment per cubic yard dredged basis. AR at 230, 232, 262. GLDD does not object to this change in this protest. However, Amendment 0005 reverted back to the approach taken in the original IFB for the maintenance dredging portion of the project. Amendment 0005 added the Lot 2 (29-inch pump discharge) bid schedule back into the IFB for the maintenance portion of the work, which once again provides the Venture with a 15.4% advantage over the Pontchartrain in estimated hours (2,076.5 for the Pontchartrain versus 1,800 for the Venture) and minimum estimated production rates (1,321 cy per hour for the Venture versus 1,145 cy per hour for the Pontchartrain). AR at 230-233; 272.

Even after Amendment 0005, GLDD and the Corps exchanged a series of emails regarding GLDD's challenges to the terms of the IFB. AR at 972-985. During an April 14, 2008 telephone conference, the Contracting Officer asked GLDD whether the IFB would be acceptable to GLDD if the maintenance dredging portion of the IFB was changed to include one bid schedule, one set of estimated hours, and one estimated minimum production rate (based on a 27-inch dredge), as well as a bonus or incentive plan under which the contractor would receive a higher hourly rental payment if it exceeded the estimated minimum production rate. AR at 981. GLDD responded on April 15 that this proposal, in principle, was a fair solution that would be acceptable to GLDD and that it should be acceptable to Weeks. Id. Later on April 15, however, the Contracting Officer responded that "[t]he incentive idea is not a dead issue; however, I do not think that incentives alone will resolve the potential protest." AR at 982.

GLDD then timely filed this bid protest on April 16, 2008, before the date then set for submission of bids. AR at 228. On April 17, 2008, the Corps issued Amendment 0006 to the IFB, which postponed the bid opening date indefinitely. AR at 296.

## III. ARGUMENT

### A. This Court Has Jurisdiction Over This Case

GLDD's Complaint alleges that the IFB contains defective estimates of minimum production rates, defective estimates of dredging hours, and a bid schedule and price evaluation scheme that lack a rational basis and are arbitrary, capricious and an abuse of discretion. GLDD's Complaint also alleges that these solicitation defects prevent GLDD from competing for the work called for by the IFB on a fair and equal basis and therefore violate the Competition in Contracting Act, 10 U.S.C. § 2304(a), and Federal Acquisition Regulation ("FAR") 6.101(a) and (b), which require the Contracting Officer to promote and provide for full and open competition in soliciting offers and awarding government contracts.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1491(b)(1), which authorizes the Court to render judgment on actions "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . ." This Court has held that § 1491(b) gives it jurisdiction over both pre-award and post-award bid protests. See, e.g., Information Sciences Corp. v United States, 73 Fed. Cl. 70, 92 (2006). In bid protest cases such as this, the Court may award any relief it considers proper, including injunctive and declaratory relief, except that any monetary relief is limited to bid preparation and proposal costs. 28 U.S.C.§ 1491(b)(2).

## B. GLDD Has Standing To Bring This Protest

This court has held that a protestor must establish, as a threshold matter, that it is an "interested party" with standing to sue. Information Sciences, 73 Fed. Cl. at 92-93. See 28 U.S.C. § 1491(b)(1). The Federal Circuit has construed the term "interested party" in § 1491(b)(1) as synonymous with "interested party" as defined in the Competition in Contracting Act. Id. Thus, a protestor must demonstrate that it is: 1) an actual or prospective offeror; and 2) that is has a direct economic interest that would be affected by the award of the contract or the failure to award the contract. See Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); Information Sciences, 73 Fed. Cl. at 93.

GLDD plainly is a prospective bidder for this procurement. It has submitted a bid on the Memphis District's annual cutter suction dredge rental solicitation every year that it has owned the dredge Pontchartrain. Moreover, it has incurred considerable resources in sending its pre-protest communications to the Corps and in pursuing this protest to ensure that it can bid on the 2008 contract on a fair and equal basis.

GLDD also has a direct economic interest in the award of a contract under the IFB. The IFB's original standard form 1442 confirms that this is a sizeable contract, stating that the "estimated cost range of the work is between $5 million and $10 million." AR at 7. GLDD has performed this contract for seven of the last nine years and, based on recent bidding history, is one of two likely bidders for this work. Therefore, GLDD has a direct economic interest in putting its dredge to work and in earning the revenue and potential profits that are available under the contract. See Red River Serv. Corp. v. United States, 60 Fed. Cl. 532, 540 (2004).[7]

[7] Some courts also have held that a protestor must show prejudice, or that absent the alleged errors by the agency, there is a "substantial chance" that the protestor would have received the contract award in order to establish standing. See, e.g., Alfa Laval Separation, Inc.

**C. Standards Of Review In A Bid Protest Case**

Section 1491(b)(4) provides that the Court must review agency action in a bid protest case using the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), under which agency action should be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. The Federal Circuit has held that a protest should be granted if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). See Information Sciences, 73 Fed. Cl. at 96.

In reviewing agency action, the Court must consider whether the agency's decision was based on consideration of all relevant factors and whether there has been a clear error of judgment. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 358 (2004). If the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made, its decision will be set aside as arbitrary and capricious. Great Lakes, 60 Fed. Cl. at 370; Antarctic Support Assocs. v. United States, 46 Fed. Cl. 145, 154 (2000). In addition, the United States Supreme Court has recognized that agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Ins. Co., 463 U.S. 29, 43 (1983). See Weeks Marine, Inc. v. United States,

---

v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Statistica Corp. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). However, as this court pointed out in Red River, all of these cases address standing in the context of a post-award bid protest, not a pre-award protest as here, and the "substantial chance" standard is not applicable in the pre-award context. Red River, 60 Fed. Cl. at 538-39. Even assuming *arguendo* that the "substantial chance" of receiving an award test applied here, GLDD satisfies this test because it was awarded a contract seven of the last nine times this work was solicited and therefore has a substantial chance of receiving an award under an IFB that provides for competition on a fair and equal basis.

79 Fed. Cl. 22, 29 (2007) (sustaining pre-award protest challenging the terms of a solicitation, in part, because there is "no mention in the Administrative Record of subjects or issues that should have been addressed").

Although the arbitrary and capricious standard is deferential, it does not shield agency decisions from a "thorough, probing, in-depth review." Overton Park, 401 U.S. at 415. In order for this Court to achieve meaningful judicial review, the agency must "present a full and reasoned explanation of its decision . . . as supported by the agency record, and explain its application of the law to the found facts." In re Sang-Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

In considering a motion for judgment on the administrative record under Rule 52.1(b), a court must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005);[8] see also Information Sciences, 73 Fed. Cl. at 97-98 ("The standard of review for a Motion for Judgment on the Administrative Record, pursuant to RCFC 52.1, is similar but not identical to a Motion for Summary Judgment . . . ."). More specifically, two principles commonly associated with summary judgment motions -- that the existence of a genuine issue of material fact precludes summary judgment and that inferences must be taken in the light most favorable to the non-moving party -- do not apply in deciding a motion for a judgment on the administrative record. Bannum, 404 F.3d at 1356-57. As such, the existence of a question of fact does not preclude the granting of a motion for judgment on the administrative record, nor does it require a court to conduct an evidentiary proceeding. Id.

[8] The decision in Bannum was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1, however, was specifically designed in light of the decision in Bannum. See RCFC 52.1, Rules Committee Note (June 20, 2006).

Instead, such questions must be resolved by reference to the administrative record, as properly supplemented, as if the Court of Federal Claims were conducting a trial on that record. Grunley Walsh Int'l, LLC v. United States, 78 Fed. Cl. 35, 38 (2007); Bannum, 404 F.3d at 1357.

**D. The IFB Is Based On Defective Estimates That Do Not Accurately Represent the Government's Actual Needs And That Deprive GLDD Of The Opportunity To Fairly Compete For The Work**

It is well-established in federal procurement law that when the government solicits offers on the basis of estimated quantities, those estimates must be compiled from the best information available and must be a reasonably accurate representation of the agency's needs. L.K. Comstock, Inc. and Liebert Federal Sys., Inc., B-261711.5 et al., 96-1 C.P.D. ¶ 4 (Dec. 14, 1995); News Printing, Inc., B-274773.2 et al., 97-1 C.P.D. ¶ 68 (Feb. 11, 1997).[9] As noted in News Printing, "accurate estimates are essential to enable bidders to prepare reasonable, intelligent bids, and, often, to ensure the lowest cost to the government." 97-1 C.P.D. ¶ 68 at 2-3.

As a result, award of a federal contract

> is not proper if the estimates misrepresented the government's needs such that the inaccurate estimates likely made a difference in the ***relative competitive positions*** of firms participating in the procurement … ***or skewed the determination of which offer would result in the lowest cost to the government in terms of actual performance.***

L.K. Comstock, 96-1 C.P.D. ¶ 4 at 4 (emphasis added) (citations deleted). See News Printing, 97-1 C.P.D. ¶ 68 at 4 (defective estimate was a "fundamental flaw" in an IFB that would have resulted in a "competition rooted in other than [the agency's] actual requirements, contrary to the

[9] GLDD recognizes that GAO decisions are not binding on this Court, but notes that the Court has accorded "deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions." Bean Stuyvesant L.L.C. v. United States, 48 Fed. Cl. 303, 326 n.13 (2000) (citing cases).

fundamental obligation to obtain full and open competition"). See also C-Cubed Corp., B-289867, 2002 C.P.D. ¶ 72 at 3 (April 26, 2002) (cancellation of IFB due to defective estimated quantities was proper where estimates did not reflect the actual work to be performed on the contract and where using correct estimates could have changed the outcome of the competition).

This Court has recognized the importance of accurate estimates in ensuring the integrity of the procurement process. It has not hesitated to overturn attempts to cancel IFBs on the grounds that the prices offered were unreasonably high compared to a government estimate where the government estimate itself was flawed. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 734 (2000); Bean Dredging Co. v. United States, 19 Cl. Ct. 561, 568-69 (1990).

### 1. The IFB's Defective Estimates Are Not Based On The Best Information Available And Do Not Reflect The Hours That Will Be Required To Perform The Work

As set forth in the Statement of Facts, the 15.4% estimated minimum production rate and estimated hours differentials between the 27-inch and 29-inch dredges reflected in the original IFB and in the maintenance dredging portion of Amendment 0005 are based on the difference in the discharge area of the two dredge pumps. This is because the Corps relied on a mechanical calculation that holds all variables in the calculation constant except for the area of the dredge discharge pump. This is ***not*** the best information available for estimating dredging production and resulting estimated hours. The best information is the actual production history of the same two dredges that have performed the same work called for by the IFB on the last ten predecessor Memphis District rental contracts – precisely the information relied upon by GLDD here.

Besides being common sense, this fact is established by the Corps' own Cost Estimating Regulation, Engineering Regulation 1110-2-1302 ("ER 1110") (excerpts attached at

pages 1-8 of the Appendix to this memorandum).[10] Moreover, the Corps' reliance here on textbooks and mechanical formulas is in direct violation of that Regulation.

ER 1110, by its terms, applies to all civil works dredging projects, like the one at issue here, and to all Corps of Engineers elements. Appendix at 2. It contains a separate Appendix (Appendix G) that applies to dredging. Appendix at 3-8. Appendix G states unequivocally that

> The simplest and most reliable approach for estimating production for all types of dredges is to rely upon dredging records for the same or similar type work performed by the same or at least a similar dredge

ER 1110 at p. G-2, Appendix at 4. ER 1110 further states that "[w]henever possible" production rates "should be based on historical data." Id. at p. G-3, Appendix at 5. It notes that production rates "may be computed using recognized commercially generated programs or industry generated programs" only "[w]hen historical data is not available." Id. at G-2, Appendix at 4.[11]

ER 1110 also recognizes that determining dredge production is far more complicated than comparing pump discharge areas, as the Corps did here. For example, ER 1110 specifically recognizes that the pumping rate for cutter suction dredges can be influenced by many factors, including "water depth, density of material, distance discharged, available horsepower, bank height, wave climate, disposal area restraints, environmental restraints and dredge configuration . . . ." Id. at p. G-3, Appendix at 5. All of these factors are taken into

---

[10] ER 1110 is an official Corps of Engineers publication that can be found at www.usace.army.mil/publications/eng-regs/er1110-2-1302/toc.htm.

[11] The language quoted in the text also is found in the Unified Facilities Criteria Manual on Construction Cost Estimates (UFC 3-700-02A). See Appendix at 12-13. This manual applies to the Corps. Id. at 9-11. (UFC 3-700-02A supersedes and incorporates Corps of Engineers' Engineering Instruction O1D010). This Manual can be found on the internet at www.wbdg.org/ccb/ccb.php (clicking on Documents Library, DoD Criteria, UFC criteria, and UFC 3-700-02A Construction Cost Estimates (03-01-05) PDF 1228KB, 124 pgs).

account by reliance on historical production data from predecessor contracts in the same harbors. None of these factors is taken into account by the calculations made by the Corps here.

Use of the "best information available" demonstrates that the actual production rates per effective hour (excluding time lost due to river traffic) achieved by the Pontchartrain (1,111 cy) and the Venture (1,116 cy per effective hour) performing the same work on the ten predecessor Memphis District rental contracts for the Mississippi River harbors dredging were virtually identical. AR at 639. This information further demonstrates that the Venture has never come close to averaging the 1,321 cy per pumping hour minimum estimated production for a 29-inch pump discharge dredge set forth in the IFB in performing the same work required under the maintenance dredging portion of the IFB. Id. Indeed, the current IFB arbitrarily gives the Venture a 15.4% advantage over the 27-inch Pontchartrain despite the fact that the Venture's actual 2004 and 2007 average production rate per effective hour (excluding traffic) -- 1,116 cy per hour) -- is ***less than*** the Amendment 0005 estimated minimum production for ***a 27-inch*** pump discharge dredge (1,145 cy per hour). Therefore, the estimated minimum production rate in the IFB for the 29-inch pump discharge dredge is substantially overstated, the Lot 2 estimated hours for this dredge are substantially understated, and these estimated hours do not accurately reflect the government's needs or the amount of work that actually will be required for a 29-inch pump discharge dredge to perform the maintenance dredging work required by the IFB.

The Corps' use of a simplistic, mechanical formula, its decision to assume that two of the three variables in that formula (velocity and percent solids) are equal, and its decision to make pump discharge area the sole determinant of estimated minimum production and estimated hours is especially arbitrary (and capricious) here because these decisions are refuted by the Corps' own internal document. Mr. Channell's February 25, 2008 memorandum correctly

concluded that ***"there are conditions present in this work which are expected to mitigate the production advantage of a larger dredge"*** and that ***"we will be unable to utilize the additional production capabilities of a larger 29-inch dredge."*** AR at 641, 642 (emphasis added). Indeed, Mr. Channell's February 25, 2008 memorandum specifically found that the limiting factor in dredge production for the maintenance dredging in the harbors was the depth of material to be removed (bank height), and that therefore the swing speeds of the dredges, (which are equal) would control production -- not the pump discharge area. AR at 641. Therefore, the Corps' own internal document demonstrates that any theoretical production advantage of a 29-inch dredge due to discharge pump size could not be utilized on this project. Id. Mr. Channell's conclusions, of course, are confirmed by the actual, historical data for the same work required under the IFB, which establishes that the Venture and the Pontchartrain have actually achieved essentially equal production rates (at least if non effective hours are not considered), just as Mr. Channell expected.

#### 2. The IFB's Defective Estimates Unfairly Penalize GLDD's Dredge And Prevent GLDD From Competing Fairly For The Maintenance Dredging Work

There also can be no doubt that the Corps' failure to use the best available information to develop accurate production and hours estimates will unfairly and improperly skew the determination of the putative low bidder. The IFB assigns the Venture a 15.4% production advantage -- and therefore assigns the Pontchartrain 15.4% more estimated hours for the maintenance dredging work -- even though the best available information demonstrates that the two dredges achieved essentially equivalent cy per effective hour production rates on the same work while performing the predecessor contracts. AR at 639.

Moreover, this unjustified 15.4% preference for the Venture ignores the fact that under the IFB, the contractor receives payment for 70% of its non effective time. When non effective hours are taken into account on the ten predecessor rental contracts, the Pontchartrain actually has a significant (almost 12%**)** production ***advantage*** over the Venture (1,025 cy for the Pontchartrain versus 916 cy for the Venture). AR at 639. Yet the Administrative Record is completely silent on this point -- it nowhere addresses the fact that the Venture historically has been paid for a significantly higher percentage of non effective hours -- even though GLDD pointed this out specifically in its February 14 and February 25 letters. AR at 615, 636-639. The failure to even address this point renders the Corps' decision making arbitrary and capricious. See Motor Vehicles Mfrs., 463 U.S. at 43; Weeks Marine, 79 Fed. Cl. at 29.

Despite extensive historical production data establishing that the Pontchartrain is as productive, or more productive, than the Venture and can complete the maintenance dredging work under the rental contract in the same, or fewer, number of pay hours, the IFB requires GLDD to multiply its hourly price for the Pontchartrain by 15.4% more hours to determine the low bidder. This unwarranted 15.4% bidding penalty imposed on GLDD by the IFB deprives GLDD of the right to compete for the IFB maintenance dredging work on a fair and equal basis and gives Weeks and the Venture an unfair competitive advantage.[12]

This Court has recognized that an agency "must treat each offeror equally" because "'[U]neven treatment goes against the standard of equality and fair-play that is a

[12] In Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147 (1997), the court denied a protest challenging the terms of a Corps dredge rental solicitation. In that case, however, the Corps relied upon actual, historical dredge production information for the dredge in question in setting the estimated production rate and estimated hours for that dredge, not a mechanical comparison of discharge pump area. In addition, the protester in that case, unlike GLDD here, did not provide the Corps and the court with historical dredge production information from predecessor rental contracts for the same work that demonstrated that the dredge at issue had failed to come close to achieving the estimated production rate included in the solicitation.

necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion.'" Comprehensive Health Servs., Inc. v. United States, 70 Fed. Cl. 700, 721 (2006) (quoting PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004)). The GAO similarly has held that it "is a fundamental principle of government procurement that competition must be conducted on an equal basis." System Mgmt., Inc.; Qualimetrics, Inc., B-287032.3 et al., 2001 C.P.D. ¶ 85 at 8 (April 16, 2001). See OccuHealth, Inc., B-270228 et al., 96-1 C.P.D. ¶ 196 at 4 (April 3, 1996) ("[i]t is also a fundamental requirement that the government apprise offerors of its actual needs in a manner designed to achieve full and open competition and so that offerors may fairly compete on an equal basis"). See also Northern Va. Van Co., Inc. v. United States, 3 Cl. Ct. 237, 241 (1983) (sustaining decision to cancel solicitation where ambiguous term placed bidders on an "unequal footing in the competitive bidding process").

Indeed, this Court has recognized many times that a bid protestor suffers irreparable injury "when deprived [of] the opportunity to compete fairly for a contract." Axiom Res. Mgmt., Inc. v. United States, 80 Fed. Cl. 530, 536 (2008) (citations omitted); see Superior Helicopter LLC v. United States, 78 Fed. Cl. 181, 195 (2007) (lost opportunity to compete on a level playing field is irreparable harm).

Here, the defective minimum production and hours estimates lack a rational basis and unfairly put GLDD at a 15.4% disadvantage in determining the low price for the maintenance dredging portion of the work even though GLDD has the more efficient and productive dredge. Starting with an unjustified 15.4% penalty is ***not*** competing on a level playing field and violates both the fundamental principles set forth above and the Competition in

Contracting Act's requirement that the Corps provide for "full and open competition." 10 U.S.C. § 2304(a)(1); see FAR 6.101 (a) and (b).

The government has included in the Administrative Record several other dredge rental solicitations that have used a similar approach to that used in Amendment 0005 here -- separate Lots or bid schedules for dredges with different pump sizes, with estimated hours proportional to the discharge areas of the dredge pumps. AR at 311-415; 688-694, 839-910. The Administrative Record contains little or no information regarding the particular conditions that might affect dredge production for these projects or whether the use of this approach to estimate dredge production is appropriate in those situations. More important, the Administrative Record here contains extensive, unrebutted evidence demonstrating that:

- Based on 10 years of actual production records for the same work on the 10 predecessor contracts, the Venture has not outperformed the Pontchartrain, let alone by a theoretical 15.4% (AR at 639); and

- The Corps itself has recognized that due to the particular conditions present in the maintenance dredging work required under the IFB "***we will be unable to utilize the additional production capabilities of a larger 29-inch dredge.***" (AR at 642) (emphasis added).

Regardless of the approach taken in other solicitations, under these circumstances, the Corps' use of estimated minimum production rates and estimated hours that give Weeks and the Venture a 15.4% advantage based solely on pump discharge area is irrational, arbitrary and capricious, and an abuse of discretion. These estimates do not accurately reflect the Corps' actual needs and unfairly deprive GLDD of the chance to compete for the maintenance dredging portion of the work on a fair and equal basis. As such, they violate fundamental principles of federal procurement law and the Competition in Contracting Act.

### E. The IFB's Price Evaluation Scheme For Maintenance Dredging Also Is Irrational And Defective Because It Does Not Consider The Full Scope Of the Work Being Competed And Does Not Assure That Award To The Low Bidder Will Result In the Lowest Cost To The Government

Award of a contract under an invitation for bids, where price is the only evaluation factor (see FAR 6.401), must be rational and "must be based on the most favorable cost to the government measured by the actual and full scope of work to be awarded." Associated Healthcare Sys., Inc., B-222532, 86-2 C.P.D. ¶ 246 at 2 (Sept. 2, 1986); see Professional Carpet Service, B-220913, 86-1 C.P.D. ¶ 158 at 2-3 (Feb. 13, 1986). Therefore, "an evaluation method that incorporates more or less work than the agency expects to be needed does not obtain the benefits of full and open competition as required by procurement statues" and is invalid. Exclusive Temporaries of Georgia, Inc., B-220397 et al., 86-1 C.P.D. ¶ 232 at 3 (March 10, 1986). See 10 U.S.C. § 2304(a)(1); FAR 6.101(b). In addition, if an "IFB's evaluation scheme does not assure that an award to the lowest evaluated bidder will result in the lowest cost to the government in terms of actual performance, the IFB is defective per se and no bid can be evaluated properly." Robinson Mills & Williams, B-236956.3, 90-1 C.P.D. ¶ 156 at 3 (Feb. 7, 1990); Associated Healthcare Sys., 86-2 C.P.D. ¶ 246 at 2.

It is readily apparent in this case that after Amendment 0005, the IFB's maintenance dredging bid schedules for maintenance dredging (both Lots 1 and 2) consider only effective hours that will be paid by the government and do not include any consideration of non effective hours, 70% of which will be paid for by the government at the hourly rental rate. The estimated hours contained in Lots 1 and 2 are based on (and are in the same ratio as) the estimated minimum production rates set forth in paragraph 2.1.1 of Section 02482A of the IFB (Amendment 0005). AR 231, 233, 272. These estimated minimum production rates are stated in

cubic yards per "pumping hour," and pumping hours are "effective time" under the definitions in paragraph SP 18c in section 00800A of the IFB. Id. AR at 242 (Amendment 0005).

This fact (that the bid schedule hours are effective hours only) is confirmed by the calculations made by the Corps regarding the estimated minimum production rates and estimated hours that are contained in Amendment 0005. See AR at 837-838. These calculations first determined estimated minimum production rates based on the area of the dredge's discharge pump. Id. The Corps then multiplied the estimated hours for the 29-inch dredge (1800) by the estimated minimum production rate for that dredge (1321.04 cy per pumping hour) to derive a quantity (2,377,872 cy). It then divided this quantity by the 27-inch dredge's per pumping hour production rate (1,145 cy per pumping hour) to determine the 27-inch dredge's estimated hours (2,076.5). Id. at 838. There is no consideration of non effective time anywhere in these calculations.

This omission of non effective hours from the bid schedules and price evaluation is important because non effective hours historically have constituted a significant number of the total hours under the predecessor rental contracts, especially when the Venture has performed the work. During the two years that the Venture performed the predecessor contracts, non effective hours were ***almost 25%*** of the total effective hours (621 non effective hours compared to 2,552 effective hours). AR at 639. Thus, these bid schedules and the IFB's price evaluation scheme are defective because they ignore a significant part of the actual work to be performed and paid for under the contract.

This omission is especially significant in the present case because it further deprives GLDD of the opportunity to compete for the maintenance dredging work on a fair and equal basis. GLDD has a historically proven advantage over Weeks with respect to non effective

hours incurred during the predecessor rental contracts. While the Venture's non effective time has averaged almost 25% of effective time, the Pontchartrain's non effective hours on the eight predecessor rental contracts it performed averaged ***only 8.5%*** of effective hours (1,729 non effective hours compared to 20,411 effective hours). AR at 639. Because the Pontchartrain has been a more efficient tool, the Corps paid GLDD for a significantly smaller proportion of non effective hours than it paid Weeks on the predecessor Memphis District rental contracts, but this GLDD price advantage is ignored in the IFB's price evaluation.

Indeed, as previously discussed, if the actual production rates achieved by the Pontchartrain and the Venture on the predecessor rental contracts are measured by cubic yards per hour paid for both effective and non effective time (i.e., 100% of effective time hours and 80% of non effective hours under those contracts), then the Pontchartrain has an 11.9% production ***advantage*** over the Venture:

| **Dredge** | **Cubic Yards** | **Pay Hours (100% Effective)** | **Cubic Yards/Hour** |
|---|---|---|---|
| Pontchartrain (8 years) | 22,335,433 | 21,795 | 1,025 |
| Venture (2 years) | 2,793,872 | 3,049 | 916 |

AR at 639. Yet this production ***advantage*** is not reflected anywhere in the bid schedules or price evaluation scheme, which instead assign the Pontchartrain a 15.4% estimated hours ***disadvantage***.

As a result, it is quite possible that the IFB's evaluation scheme could result in award of a contract to Weeks even though GLDD, due to its lower non effective time, could actually perform the work at a lower cost to the government. Robinson Mills & Williams, 90-1 C.P.D. ¶ 156 at 3 (Feb. 7, 1990); Associated Healthcare Sys., 86-2 C.P.D. ¶ 246 at 2.

The IFB here is per se defective for this very reason – its price evaluation scheme does not include a significant component of the actual work to be performed and therefore does not assure that the evaluated low bidder will be able to perform the actual work at the lowest cost to the government. Moreover, as noted above, the Administrative Record nowhere addresses GLDD's advantage with respect to non effective hours.

**F. GLDD Is Entitled To Injunctive Relief**

Before deciding whether to issue a permanent injunction, the Court must consider whether: (1) plaintiff has succeeded on the merits of the case; (2) whether plaintiff will suffer irreparable harm if an injunction is not granted; (3) whether the harm to the plaintiff if an injunction is not granted outweighs the harm to the government if an injunction is granted; and (4) whether granting the injunction is in the public interest. See, e.g., Bean Stuyvesant, 48 Fed. Cl. at 320-21 (citations omitted); A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 132 (2006) (citation omitted). No one factor is dispositive as the "weakness of the showing regarding one factor may be overborne by the strength of the others." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 709 (2006) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)); see Axiom Res. Mgmt., 80 Fed. Cl. at 535.

GLDD has demonstrated above that it succeeds on the merits of its case, satisfying the first prong of this test. GLDD also will be irreparably harmed if an injunction is not issued here. This Court repeatedly has held that a "protester suffers irreparable injury, when it has been deprived [of] the opportunity to compete fairly for a contract." Information Sciences, 73 Fed. Cl. at 127. See Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders . . . ."); United Payors & United Providers Health

Servs., Inc. v. United States, 55 Fed. Cl. 323, 333 (2003) ("[L]ost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.") (citations omitted).

Lost profits resulting from the inability to fairly compete for work also has been held to constitute irreparable harm. See Cardinal Maint., 63 Fed. Cl. at 110 ("Irreparable injury includes, but is not limited to, lost profits which would flow from the contract"); Red River, 60 Fed. Cl. at 549 ("'[T]he potential loss of a valuable business on [a] contract . . . has been found sufficient to prove irreparable harm'") (quoting Overstreet Elec. Co., 47 Fed. Cl. at 743-44). In addition, this Court repeatedly has held that the denial of the right of a contractor to have an offer fully and ***lawfully*** considered for award also constitutes irreparable injury. Great Lakes, 60 Fed. Cl. at 370; Overstreet Elec. Co., 47 Fed. Cl. at 744 n.25; Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 398 (1999). GLDD also has no adequate remedy in the absence of an injunction because if it waited until it lost the competition, its protest would be untimely. Weeks Marine, 79 Fed. Cl. at 36.

The balance of hardships also weighs heavily in favor of granting injunctive relief to GLDD. If no relief is granted, GLDD will suffer the hardship of being forced to participate in an unlawful procurement and will be denied the opportunity to compete on a fair and equal basis for the work subject to the IFB. See Information Sciences, 73 Fed. Cl. at 128 (balance of hardships favors protestors where, without injunctive relief, they "would lose the opportunity to compete on a fair basis for this contract" and the impact on the government is "minimal"); Weeks Marine, 79 Fed. Cl. at 36 (contractor's interest in seeing that the Corps complies with the law in soliciting and awarding contracts outweighs the government "hardship" of following procurement rules). Moreover, the government will suffer no harm at all if an injunction is

issued here. It already has postponed the bid opening until it receives a ruling in this case, and the injunction sought by GLDD (unlike the current IFB) will ensure that the bidders compete on a fair and equal basis and that award to the low bidder will result in the lowest cost to the government.

Finally, issuing a permanent injunction in this case will serve the public interest. It is well-established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring procurement officials to follow procurement laws, statutes and regulations. Axiom Res. Mgmt., 80 Fed. Cl. at 536-37; Great Lakes, 60 Fed. Cl. at 370; United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998). See also SAI Indus. v. United States, 60 Fed. Cl. 731, 747 (2004) ("The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts"). Here, the IFB's use of defective estimates, defective bid schedules and a defective price evaluation scheme lacks a rational basis, prevents fair competition and violates the Competition in Contracting Act and FAR 6.101. Therefore, issuance of an injunction prohibiting the Corps from proceeding on this basis will serve the public interest.

## IV. CONCLUSION

For all of the reasons set forth above, plaintiff GLDD respectfully requests that the Court grant GLDD's motion and issue an injunction that prohibits the Corps from soliciting the maintenance dredging work under the current IFB, prohibits the Corps from soliciting the maintenance dredging portion of the work unless it uses estimated minimum production rates and estimated hours based on actual, historical production information, and prohibits the Corps from using a price evaluation scheme that does not consider non-effective hours and does not adequately assure that award to the low bidder will result in the lowest cost to the government.

Respectfully submitted,

______________________________

Daniel C. Sauls
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902
dsauls@steptoe.com

Attorney of Record for Plaintiff
Great Lakes Dredge & Dock Company LLC

Dated: May 5, 2008