No. 08-282C
(JUDGE BRADEN)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

---

GREAT LAKES DREDGE & DOCK CO., LLC.,
Plaintiff,

v.

THE UNITED STATES,
Defendant

---

# DEFENDANT'S MOTION FOR JUDGMENT ON COUNTS I AND II UPON THE ADMINISTRATIVE RECORD

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

ROBERT C. BIGLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-0315
Fax: (202) 514-8624

Dated: May 5, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . iii

QUESTIONS PRESENTED . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . 12

I. THE UNITED STATES IS ENTITLED TO JUDGMENT UPON COUNTS I AND II OF PLAINTIFF’S COMPLAINT UPON THE ADMINISTRATIVE RECORD . . . . . . . . . 12

A. Plaintiff Must Show A Violation Of A Statute Or Regulation And Prejudice . . . . . . . . . . 12

1. Rule 52.1 Standards . . . . . . . . . . 12

2. Standard Of Review . . . . . . . . . . 13

B. Plaintiff Has Failed To Prove A Clear Violation Of A Regulation Or Procedure Or That The Corps Otherwise Acted In An Arbitrary And Capricious Manner. . . . . . . . . . . 15

1. The Corps Has Objective Rational Bases For Two Equalized Bid Schedules For Different Size Dredges . . . . . . . . . . 15

2. The Corps Equalized Bid Schedules Fiarly Estimates Dredge Time . . . . . . . . . . 21

3. The Corps Has Provided A Reasonable Basis For Establishing A Different Output For Different Size Dredges . . . . . . . . . . 23

C. Plaintiff Cannot Demonstrate Prejudice . . . . . . . . . . 24

II. PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF . . . . . . . . . . 24

A. Standard For Obtaining Injunctive Relief . . . . . . . . . . 24

B. Success On The Merits . . . . . . . . . . 25

C. Irreparable Harm And The Balance Of Harms . . . . . . . . . . 25

D. Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF AUTHORITIES

### CASES

A & D Fire Protection, Inc. v. United States,
72 Fed. Cl. 126 (2006) ........ 12

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
480 U.S. 531 (1987) ........ 25

Banknote Corp. of Am., Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) ........ 13, 14

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) ........ 12, 13

Bean Dredging Corp. v. United States,
19 Cl. Ct. 561, 568-69 (1990) ........ 17

CACI, Inc.-Federal v. United States,
719 F.2d 1567 (Fed. Cir. 1983) ........ 13

EP Productions, Inc. v. United States,
63 Fed. Cl. 220 (2005) ........ 13, 25

Emery Worldwide Airlines, Inc. v. United States,
264 F.3d 1071 (Fed. Cir. 2001) ........ 14, 24

Fire-Trol Holdings, LLC v. United States,
66 Fed. Cl. 36 (2005) ........ 14

Foundation Health Fed'l Servs. v. United States,
No. 93-1717, 1993 WL 738426 (D.D.C. 1993) ........ 25

Honeywell, Inc. v. United States,
870 F.2d 644 (Fed. Cir. 1989) ........ 14, 23

JDL Constr., Inc., v. United States,
14 Cl. Ct. 825, 829 (1988) ........ 27

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) ........ 13, 14

KSEND v. United States,
69 Fed. Cl. 103 (2005), aff'd, 184 Fed. Appx. 956 (Fed. Cir. 2006) ............................ 25

LABAT-Anderson, Inc. v. United States,
65 Fed. Cl. 570 (2005) ........................................................................................ 27

M. Steinthal & Co. v. Seamans,
455 F.2d 1289 (D.C. Cir. 1971) ............................................................................ 14

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) ........................................................................................ 26

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ............................................................................................. 14

OAO Corp. v. United States,
49 Fed.Cl. 478 (2001) ......................................................................................... 26

Overstreet Elec. Co. v. United States,
47 Fed.Cl. 728 (2000) ......................................................................................... 17

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) ............................................................................ 24

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) ........................................................................................ 12

Vanguard Sec. Inc. v. United States,
20 Cl. Ct. 90, 113 (1990).......................................................................................27

Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,
758 F.2d 669 (D.C. Cir. 1985)) (additional citation omitted ....................................... 25

**STATUTES**

5 U.S.C. § 706 ................................................................................................... 13

Administrative Procedures Act, 5 U.S.C. § 706 ........................................................... 3

10 U.S.C. § 2304(a) ........................................................................................ 3, 15, 21, 23

Tucker Act, 28 U.S.C. § 1491(b), as amended by the Administrative Dispute Resolution
Act of 1996 ("ADRA") ........................................................................................ 13

**MISCELLANEOUS**

L.K. Comstock, Inc. And Federal Sys., Inc., B-261711.5 ........................................................ 16

News Printing, Inc., B-2747732.2 ................................................................................ 20

C-Cubed Corp., B-289867 ........................................................................................... 20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | | |
|---|---|---|
| GREAT LAKES DREDGE & DOCK CO., LLC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-282 |
| | ) | (Judge Braden) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT ON**
**COUNTS I AND II UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the United States Court of Federal Claims ("RCFC") and the Court's order of April 17, 2008, defendant, the United States, respectfully requests that the Court grant its motion for judgment upon Counts I and II of plaintiff's complaint upon the administrative record. As the administrative record ("AR") in this case reveals, the decision of the U.S. Army Corps of Engineers ("Corps") to issue a sealed-bid solicitation to award a contract for the performance of harbor dredging was not arbitrary and capricious and did not violate any statute or regulation. Plaintiff also cannot demonstrate that it has suffered prejudice as a result of any alleged statutory or regulatory violation.

**QUESTIONS PRESENTED**

1. Whether the Corps is entitled to judgment upon the administrative record because it has not violated any of its regulations or procedures.

2. Whether plaintiff has demonstrated that it will suffer prejudice as a result of the alleged statutory or regulatory violations.

3. Whether plaintiff's request for permanent injunctive relief should be denied.

## STATEMENT OF THE CASE

Plaintiff, Great Lakes Dredge & Dock Co., LLC ("GLDD"), seeks injunctive relief to prevent the Corps from soliciting or awarding bids for harbor maintenance dredging in the Memphis District of the United States Army Corps of Engineers pursuant to Solicitation Number W912EQ-08-B-0001 (the "Solicitation" or "IFB"). GLDD claims that the solicitation, which sets estimated hours required based upon the size of the dredge, is defective. GLDD filed suit in this Court, seeking: (1) a temporary restraining order preventing the Government from receiving bids under the Solicitation; (2) a preliminary injunction preventing the Government from soliciting bids or awarding the contract; (3) a permanent injunction that prevents the Government from soliciting bids or awarding the contract for the maintenance portion of the work based upon the estimated hours for different size dredges. GLDD's claims for a temporary and preliminary injunction are currently moot as the Corps issued an amendment which postponed the bid opening indefinitely to allow the Court to resolve this dispute. However, if the dispute is not resolved before the critical window of time available for harbor maintenance dredging operations closes, the Corps may at some point be required to move forward with the solicitation to ensure that shipments of commercial commodities can continue to be transported along the Mississippi River.

GLDD focuses on one issue. GLDD alleges in its complaint that the bid schedule, which sets a different number of estimated hours for a 27 inch dredge as opposed to a 29 inch dredge, is defective. The bid schedule estimates that the larger 29 inch dredge will be approximately 15 percent more effective than the smaller 27 inch dredge. As a result, the bid schedule assumes, based upon the area of the pump discharge area and the minimum required horsepower, that the 27 inch dredge will require approximately 15 percent more hours to complete the maintenance

harbor dredging than the larger 29 inch dredge. GLDD relies upon data that it contends demonstrates that in the past the 27 inch dredge and 29 inch dredge have performed at almost exactly the same production rate.

As a result, GLDD alleges that the estimated hours to complete the maintenance dredging are not based upon the "best information available." GLDD contends that any estimates should be based on the production achieved during previous years within the Memphis District. GLDD claims that the use of the estimates contained in the bid schedule is a "clear and prejudicial violation of applicable procurement laws and regulations, including the requirement of 10 U.S.C. § 2304(a) (the Competition in Contracting Act) to provide full and open competition." Complaint, ¶ 27. GLDD also contends that the estimates in the bid schedule lack a rational basis and are arbitrary and capricious and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706. Id.

While GLDD alleges in its complaint that the bid schedule is unfair to the smaller 27 inch dredge, the Government's decision to include two bid schedules in the solicitation, one for a 27 inch dredge and one for a 29 inch dredge, is fully supported by the administrative record and has a clear rational basis that is based upon calculations comparing the two dredges which show, not surprisingly, that a larger more powerful dredge is more productive. GLDD also neglects to consider the considerable deference afforded agency decisions.

## STATEMENT OF FACTS

This case concerns the procedures for awarding contracts for harbor maintenance dredging in the Memphis District of the Corps. Dredging projects involve new work and/or maintenance dredging. New work occurs when an area is dredged that has never been dredged previously, such as a new channel or the widening of an existing channel. Maintenance

dredging involves removal of material which has shoaled since the previous dredging event and which causes limitations in vessel movements in navigable waterways. Many of the harbors and waterways are used by both commercial vessels and pleasure craft.

There is a critical window of time available for harbor maintenance dredging operations to geographically maintain the nine ports and support the construction of the new harbor dredging for barge shipment of commercial commodities on the Mississippi River, particularly during the low water stages of the Mississippi River that are historically typical during the summer months, which is also concurrent with harvest time for most agricultural commodities.

Sealed-bid solicitation W912EQ-08-B-0001, which is the subject of this pre-award bid protest, was issued by the Memphis District Corps of Engineers for the lease of one hydraulic cutterhead suction dredge with pipeline, fully operated with attendant plant, for maintenance dredging of the following harbors along the Mississippi River between Cape Girardeau, Missouri, and Greenville, Mississippi: (1) Hickman, Kentucky; (2) New Madrid, Missouri; (3) Caruthersville, Missouri; (4) Osceola, Arkansas; (5) Memphis, Tennessee; (6) Wolf River, Tennessee; (7) Helena, Arkansas, (8) Phillips County, Arkansas; and (9) Greenville, Mississippi as well as the construction of a new harbor, designated as the Northwest Tennessee Harbor, located near Tiptonville, Tennessee.[1] AR5-7. The initial solicitation was issued January 17, 2008, with a scheduled bid opening of February 20, 2008. AR 7. The solicitation required that once the contract was awarded the dredging contractor was required to commence work within 21 calendar days after receipt of Notice to Proceed, with dredging operations to be conducted 7 days a week, 24 hours per day. The Government anticipated dredging operations to

[1] GLDD is not protesting the portion of the solicitation relating to new harbor construction. GLDD's protest is limited to the maintenance dredging portion of the solicitation. Complaint, ¶ 23.

begin April 2008. AR 153, 235. The estimated cost range of the proposed contract is between $5 and $10 million dollars. AR 7, Block 10.

The maintenance dredging in the Memphis District is completed annually. AR639. During the last ten years, only two companies received the maintenance dredging contract from the Government. Eight of the past ten years, the protester, GLDD, has been awarded the maintenance dredging contract. AR639. GLDD performed the maintenance dredging by using its 27 inch dredge named Ponchartrain. AR639. Two of the last ten years, the maintenance harbor dredging was awarded to Weeks Marine, Inc. ("WMI"). AR639. During those two years, WMI performed the contract by using its 29 inch a dredge known as Venture. AR639. While others contractors could submit bids for the current contract, based upon past years, it is expected that only GLDD and WMI will submit bids under the current solicitation, GLDD with its 27 inch dredge and WMI with its 29 inch dredge.

The initial solicitation bid schedule is divided into two lots for two different size dredges. The lots are designated as: LOT 1, 27-inch dredge (Bid Items 0001 thru 0005), and LOT 2, 29-inch dredge (Bid Items 0006 thru 0010). AR 9-12, 230-233. The following bid schedule excerpts are provided below:

**LOT 1 27-INCH DREDGE**

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | Maintenance Dredging Rental of one fully operated hydraulic dredge with 27-inch ID pump discharge and attendant dredge plant including pipeline | | | | |
| 0002AA | First 1,384.5 hours | 1,384.50 | Hours | ___________ | ___________ |
| 0002AB | All over 1384.5 hours | 692 | Hours | ___________ | ___________ |

**LOT 2 29-INCH DREDGE**

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0007 | Maintenance Dredging Rental of one fully operated hydraulic dredge with 29-inch ID pump discharge and attendant dredge plant including pipeline. | | | | |
| 0007AA | First 1,384.5 hours | 1,200 | Hours | __________ | __________ |
| 0007AB | All over 1384.5 hours | 600 | Hours | __________ | __________ |

AR9-12, 230-233.

This bid schedule shows that the estimated number of hours for the maintenance harbor work is less for the larger dredge. A dredge with a 29 inch pump discharge will take less time to dredge the same amount of material at a given slurry velocity compared to a dredge with 27 inch

pump discharge. The lowest bid is determined by multiplying the contractor's proposed hourly rate by the Corps' estimated number of hours required to complete the harbor maintenance work. AR10, 12, 231, 233. The solicitation also states that if dredging output does not meet the minimum requirements, the total dredging hours will be reduced by the percentage that output is below the specified minimum. AR198.

The Government estimated the number of hours provided in the original January solicitation (and reinstated in the current solicitation, as amended by Amendment No. 0005) needed to complete the dredging based upon the discharge pump size of the dredge. The formula for the dredge discharge, as indicated in the Government's design calculation ( AR 837-838), is Q = VA, where Q, the discharge rate, (typically measured in cubic yards per hour ("CY/ hr")), and V, the velocity (typically measured feet per second ("ft/sec")), and A, the area of the dredging pipe used (typically measured in a square feet ("sq. ft")). The Government used an average slurry velocity of 18 ft/sec for both the larger and smaller dredges in its calculations. AR 837-838. The discharge area of the larger 29 inch dredge is approximately 15.4 percent larger than GLDD's smaller 27 inch dredge. GLDD does not dispute that the area of a 29 inch dredge is 15.4 percent greater than that of the smaller 27 inch dredge. Complaint, ¶ 10. Because the quantity discharged, Q, is obtained by simply multiplying the area of the pump discharge, A, by the velocity of the slurry, V, the quantity discharged by the larger dredge is also 15.4 percent greater than the quantity discharged by the smaller dredge. As a result, the discharge rate for the 27-inch dredge is 1145.11 cy/hr, and the discharge rate for the 29-inch dredge is 1321.04 cy/hr. AR837. The Corps estimates that the total amount of material to be dredged in 2008 will be approximately 2,377,872 cubic yards. Therefore, dividing the total quantity to be dredged of 2,377,872 cubic yards by the respective discharge rates of 1145.11 cy/hr for the smaller 27 inch

dredge and 1321.04 cy/hr for the larger 29 inch dredge yields an estimated total dredging time of 1800 hours for the larger 29 inch dredge and 2076.5 hours for the smaller 27 inch dredge. AR 231, 233.

The initial solicitation required that potential bidders provide a proposed hourly unit price for either a 27 inch pump discharge pipe or a 29 inch pump discharge pipe depending upon the size of the dredge that the contractor intended to employ. AR 9-12. As the above calculations demonstrate, a larger dredge, which incorporates a larger pump discharge, can pump and remove more cubic yards of material than a smaller dredge assuming that both pumps are operating with the same slurry velocity flowing through the pump and discharge pipe. AR 612, 831-837. Generally, a larger dredge requires greater horsepower, consumes more fuel, and has higher operational costs than that of a smaller dredge. This is especially true with the ever increasing costs of fuel. The solicitation specified a minimum brake horse power ("BHP") for a 29 inch dredge of 6,000 BHP, which is 54% greater than the specified minimum BHP of 3,900 BHP for a 27 inch dredge. AR 182, 272.

Because award of the contract is based upon the contractor's proposed unit hourly price multiplied by the number of estimated hours the Government determined would be required to complete the maintenance dredging, if the Government assumed that 27 inch and 29 inch dredges had the same productivity, the larger dredge would be at a competitive disadvantage since its hourly cost is more than the hourly cost of the smaller dredge. To compensate for this difference in operational output, and to level the competitive playing field, the number of

estimated hours provided on the bidding schedule for the larger dredge is reduced. This number is mathematically calculated as discussed above.[2] AR837-838.

After the solicitation was issued, GLDD submitted a letter, dated February 8, 2008, stating that it intended to use its 27-inch dredge for the proposed work and that GLDD was submitting the letter "in an attempt to avoid the need to file a pre-bid protest regarding IFB No. W912EQ-08-B-001." AR969-971. GLDD claimed that the actual achieved production of the 27-inch and the 29-inch dredges have been equal in the past and that the dredges should, therefore, be assigned the same number of hours to complete the maintenance dredging. Id. GLDD submitted with its letter a table of dredging data that it compiled from previous Memphis District dredging contracts for the last 10 years. AR971. The table showed that GLDD was awarded eight of the ten dredging contracts utilizing its 27-inch dredge. WMI, a competitor of GLDD, was awarded two of the dredging contracts in years 2004 and 2007. The Government, in response to GLDD's letter and attached table, stated:

> [T]hese figures alone do not demonstrate that production rates of 27" and 29" dredges are equal when dredging is performed under identical conditions. Dredging conditions vary from year to year and from location to location. The dredging conditions have a great effect on production as indicated by the yearly variations in the production of your Dredge Pontchartrain, from a low of 1,017 (cy/hr) to a high of 1,174 (cy/hr). Also

---

[2] Prior to issuing the solicitation on January 17, 2008, the Contracting Officer on January 11, 2008, (AR311-386), and on January 15, 2008, (AR388-415), reviewed other harbor dredging solicitations from the New Orleans District which provided similar bid schedules with multiple size dredge pump discharge sizes with the appropriate hourly unit of measure specifically calculated for dredge pump discharge diameters ranging from 20 inches to 30 inches. AR317-322, 342-348, 367-372, 389. The Memphis District, since 2001 had provided only one dredge pump discharge size in its bid schedule. In 1999 and 2000, Memphis District used two dredge pump discharge sizes in its bid schedule. AR839-854 However, in light of its calculations, and in reviewing another Corps District methodology (New Orleans), the Memphis District determined that a bidding schedule providing two dredge pump discharge pipe sizes (with mathematically adjusted line item hourly variations) would be more equitable and competitively equal.

> the table only includes two years of data for a 29" dredge, which is not considered to be enough for a representative sample to perform a fair analysis.

AR612.

GLDD's analysis is particularly distorted because the Venture encountered 358 hours of non-effective time during a year which had the lowest dredged quantity. The non-effective time is "reduced paid" time when the dredge is not dredging, through no fault of the contractor. Examples of such time are when the dredge has to move anchors, move from one job to another, add discharge pipe due to the progress of the work, make necessary repairs such as removing debris from the dredging pump or when the dredge encounters inclement weather. AR159.

The amount of dredged material that is available each year depends, in part, upon the amount of dredging appropriations the District will receive and the estimated material to be removed. Five to ten million dollars of dredging appropriations are anticipated to be available for this 2008 solicitation. AR7, Block 10. The estimated amount of material to be dredged is also dependent upon river elevations, and the duration of the river elevations. Flood stage elevation conditions deposit more silt and sedimentation into the Mississippi River and its harbors, than normal conditions. As stated above, the Memphis District has estimated that 2,377,872 cubic yards will be removed under the current maintenance dredging solicitation. AR837-838. This is an increase of estimated dredging work compared to last year. The District's 2007 Dredging Contract anticipated one to five million dollars of dredging appropriations and only 1,120,599 cubic yards was actually removed. AR639, AR882, Block 10.

After receiving GLDD's letter which indicated it would file a "pre-bid protest" if the quantity of hours for the 29 inch dredge were not increased, the Government issued Amendment No. 0002, postponing the bid opening indefinitely. AR199. In an effort to avoid the impact that

a protest would have on its schedule, the Government issued Amendment No. 0003 dated February 29, 2008, extending the bid opening date to March 11, 2008. AR201. This amendment deleted LOT 2 29-inch dredge from the bid schedule in its entirety, and changed Section 02482 by deleting the 29 in-ID pump discharge size. AR 204, 222. In other words, Amendment 0003, changed the solicitation from including two different bid lots for two different sizes of dredges (a 27 inch dredge and a 29 inch dredge) to a single bid schedule for all dredges that met the minimum requirements.

After the Government issued issuing Amendment 0003, WMI, in a letter dated March 4, 2008, filed an Agency Protest, stating that the amended solicitation provided an unfair competitive advantage relative to its equipment. WMI stated in part:

> Ideally, an additional dredging schedule should be included to "level" the competitive playing field for all bidders. Obviously, a larger dredge will be more productive than a smaller dredge and the bid schedule for the large dredge should include less hours than the smaller dredge (i.e. a larger dredge produces the same output as a smaller dredge in less time). Furthermore, there are built-in penalties in the event the dredge underperforms on an output basis.
>
> Interestingly, the solicitation was initially advertised with two bid schedules that essentially compensated for varying equipment output as alluded to above. Unfortunately in our case, Amendment No. 0003 dated February 29, 2008, eliminated the additional equipment schedule and reverted back to the historically uncompetitive method of procuring these services.
>
> WMI urges you to reconsider your decision to eliminate the multiple equipment bidding schedule approach and in doing so level the competitive playing field…

AR664-665.

After receiving WMI's protest, the Corps issued Amendment No. 0004, dated March 5, postponing the subject solicitation indefinitely. AR 226. After reviewing the WMI protest, the Memphis District reconsidered its decision to eliminate the 29 inch dredge from the solicitation, and added, Lot 2, for the 29 inch dredge back into the solicitation with the appropriate hourly

unit of measurement in the bidding schedule, as originally provided in the initial solicitation.[3] On April 15, 2008, GLDD filed a protest with this Court.

## ARGUMENT

### I. THE UNITED STATES IS ENTITLED TO JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT UPON THE ADMINISTRATIVE RECORD

#### A. Plaintiff Must Show A Violation Of A Statute Or Regulation And Prejudice

##### 1. Rule 52.1 Standards

Pursuant to RCFC 52.1,[4] this Court reviews the agency's procurement decision to determine whether it is supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. Bannum, Inc. v. United States, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (explaining basis for judgment based upon the administrative record). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record. . . ." Bannum, 404 F.3d at 1356. Thus, under RCFC 52.1, the Court determines whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. A & D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). The Court must make factual findings where necessary. Id.

---

[3] The new harbor construction unit of measurement was also reviewed and it was changed from an hourly rate to a cubic yard unit of measurement. See Amendment No. 0005, dated April 7, 2008. AR 228, 230, 230, 232-233.

[4] On June 20, 2006, following the Federal Circuit's decision in Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005), RCFC 52.1 replaced RCFC 56.1 to avoid any confusion with the standards applicable to summary judgment.

**2. Standard Of Review**

This Court's review of agency procurement decisions is quite limited. The Court possesses jurisdiction to entertain both pre-award and post-award bid protests under the Tucker Act, 28 U.S.C. § 1491(b), as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"). Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under the ADRA, the Court applies a standard of review adopted from the Administrative Procedure Act, codified at 5 U.S.C. § 706. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). This standard of review provides that a reviewing court shall set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." Id. at 1332 n.5.

In the bid protest context, this Court should enjoin a procurement decision only when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni, 238 F.3d at 1332. When a bidder's challenge implicates the first ground, the protestor "bears a heavy burden" of showing that the agency's decision had no rational basis. Id. at 1333. This heavy burden stems from the wide discretion afforded to contracting officers "upon a broad range of issues confronting them in the procurement process." Id. at 1332. Indeed, this Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" EP Productions, Inc. v. United States, 63 Fed. Cl. 220, 223 (2005) (quoting CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

When a challenge is brought on the second ground – a violation of regulation or procedure - the plaintiff must show a clear and prejudicial violation of applicable statutes or regulations. Banknote, 365 F.3d at 1351 (internal quotations and citations omitted) (quoting

Impresa, 238 F.3d at 1332-33). To show prejudice, plaintiff must show that there was a "substantial chance" that it would have been awarded the contract but for agency errors in the bid process. Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001).

An agency's decision could be found irrational if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). In evaluating an agency's decision, the Court may not substitute its judgment for that of the agency. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). In particular, when the Court considers "a purely factual question within an area of competence of an administrative agency created by Congress . . . the Court will recognize the relevant agency's technical expertise and defer to its analysis unless it is without substantial basis in fact." Fire-Trol Holdings, LLC v. United States, 66 Fed. Cl. 36, 40 (2005) (internal quotes and citations omitted). Nonetheless, an agency's decision is not shielded from a "thorough, probing, in-depth review." Id.

**B. Plaintiff Has Failed To Prove A Clear Violation Of A Regulation Or Procedure Or That The Corps Otherwise Acted In An Arbitrary And Capricious Manner**

**1. The Corps Has Objective Rational Bases For Two Equalized Bid Schedules For Different Size Dredges**

GLDD alleges that the Government violated 10 U.S.C. § 2304(a) which requires full and open competition. That section provides:

> (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and
>
> (B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement. In determining the competitive procedure appropriate under the circumstances, the head of an agency –

10 U.S.C. § 2304(a)(1).

In its first cause of action, GLDD alleges that the Corps's calculation of the output of the two dredges, which is based upon the area of the discharge pump, does not rely on the best information available. Instead, GLDD argues that the output of the different size dredges is basically the same based upon GLDD's table of data for harbor maintenance dredging in the Memphis District during the last ten years. AR639. GLDD further alleges that the full and open competition requirement stated in 10 U.S.C. § 2304(a)(1), requires that the Government's estimates of the productivity of the different sizes of dredges must be based upon the "best information available."

GLDD relies upon a table attached to its complaint which it claims demonstrates that its smaller dredge is just as productive as WMI's larger dredge. However, GLDD's reliance on this

table is misplaced for several reasons. First, the "best information" requirement does not apply in this situation.

A review of GLDD's complaint does not reveal the basis of GLDD's "best information available" requirement. However, GLDD's Memorandum in Support of Its Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction ("Memo. Temp. Rest. Order") relies upon various cases for the "best information available" requirement. Temp. Rest. Order at 9-10. However, GLDD's reliance upon these cases is completely misplaced. For example, GLDD relies upon L.K. Comstock, Inc. And Federal Sys., Inc., B-261711.5 et al., 96-1 C.P.D. ¶ 4 (Dec. 14, 1995). In Comstock, two bidders protested the award of a contract to a third bidder claiming that the Government's evaluation of the proposals were incorrect because the Government's evaluation included discounts provided by the winning bidder that were unlikely to be achieved because they were based upon estimated quantities that were not supported by the record. The Comptroller General agreed with the protesters because, among other things, the estimated quantities needed to support the discount must be based upon the best information available. The Comptroller General found that the "agency's evaluation approach - considering non-discounted prices for some offerors and a discounted price for another offeror for a quantity not likely to be realized - produced a distorted indictation of what proposal represented the likely lowest cost to the government." Id.

There are several problems with GLDD's reliance on the Comstock decision. First, as GLDD recognizes, decisions of the Comptroller General are not binding on this Court. Second, and more importantly, Comstock involved a post-award protest where the agency's approach to evaluating proposals was not reasonable because it considered non-discounted prices for some

offerors, yet used discounted prices for another where the likely quantity to be ordered would not be sufficient to trigger the discount.

Here, the situation is entirely different. This is a pre-award protest, not a post-award protest. More importantly, the Government action here is effectively the opposite of selectively applying discounts to certain contractors proposals even though the discount will not likely be achieved. Instead, the Government has calculated estimated productivity of two different size dredges in an effort to level the playing field for bidders with different size dredges. Certainly, there is a rational basis for the Government's conclusion that a larger more powerful dredge is more productive than a smaller dredge. The Government calculated the productivity of the dredges based upon pump discharge area. AR837-838. In simple terms, more slurry travels through a 29 inch dredge pipe than a 27 inch dredge pipe. The Government's conclusion is further supported by the fact that the 29 inch dredge is required to have 54 percent more horsepower than the smaller dredge. AR182.

GLDD's reliance upon other decisions, as shown in its motion for a temporary restraining order, are similarly misplaced because these decisions also involved rejecting bids that exceeded the agency's estimated cost for the project. Overstreet Elec. Co. v. United States, 47 Fed.Cl. 728, 734 (2000) (upholding a protest where the low bid was canceled because it exceeded the agency's estimated costs which were not accurately calculated); Bean Dredging Corp. v. United States, 19 Cl. Ct. 561, 568-69 (1990) (upholding protest where agency failed to prepare fair and reasonable estate of costs to be incurred and cancelled low bid because its bid exceeded the agency's estimated costs). The Corps' estimated cost for the project is not the issue here. The question is simply whether the Corps had a rational basis for concluding that it

would take a smaller 27 inch dredge approximately 15.4 percent more time to complete the required maintenance dredging than a larger 29 inch dredge.

Second, GLDD's arguments based on Comstock are misplaced because even if the "best information" requirement does apply, the data included in GLDD's table is flawed. Of the ten years included on the table, there are eight years of data for GLDD's smaller dredge, but only two years of data for WMI's larger dredge. AR639. This is particularly significant because a larger dredge is more effective when it is used to dredge a larger quantity. The table shows that in 2004 and 2007, the two years that the larger Venture dredge was employed, the amount of available material dredged was low and Venture dredged a total quantity of just under 2.8 million cubic yards. Yet in 1999 through 2003 when the smaller Ponchartrain dredge was employed, it dredged more than three million cubic yards in each of these years alone. AR639. GLDD's attempts to mask the large variances in the quantity dredged each year by taking "an average" of the dredged quantity.

A review of GLDD's own table shows that any dredge is more productive when there is a larger quantity of material to be dredged. GLDD's own data demonstrates this. For example, GLDD's Ponchartrain dredge was most productive in 2002 when the total quantity dredged was over three million cubic yards. By contrast, GLDD's lowest productivity occurred in 2006 when the available quantity dredged was only 1,249,686 cubic yards (the second lowest available dredged quantity of all of the years). As a result, the larger Venture dredge will be more productive if there is a larger quantity of material available to dredge.

As stated above, the Memphis District has estimated that 2,377,872 cubic yards will be removed pursuant to the current maintenance dredging solicitation. AR837-838. This is an increase of estimated dredging work compared to last year. The District's 2007 Dredging

Contract anticipated one to five million dollars of dredging appropriations and only 1,120,599 cubic yards was actually removed. AR639, AR882, Block 10. This larger quantity of material to be dredged this year will enable the larger Venture dredge to be more productive than in years past when the quantity dredge was much lower.

Even though only two of the ten years of data included in the table are for the larger dredge, the larger dredge has the highest production per effective hour. In 2007, the larger Venture dredge had a production of 1,207 cubic yards per hour. AR639. Even though the table includes eight years of data for GLDD's smaller dredge - four times as many opportunities for the smaller dredge to show its production - the smaller dredge never exceeded 1,174 cubic yards per hour. AR639. The data also demonstrates that the larger dredge, the Venture, is more productive because in 2007 it achieved 1,207 cubic yard per hour with an available dredged quantity of 1,120,599 cubic yards, while GLDD's dredge, the Ponchartrain, achieved only 1,017 cubic yards per hour, in 2006, when there was a greater dredged quantity of 1,249,686 cubic yards.

If the Government evaluated the bids based upon one bidding schedule, as GLDD advocates, the bigger dredge would be at an unfair disadvantage. While the calculations show that a larger dredge is more productive, its larger size and greater horsepower results in greater fuel costs and a larger crew resulting in higher operating costs. If the Government evaluated the two dredges as having the same productivity, the larger dredge would be at a disadvantage because it would have to compete with a smaller dredge with lower productivity and lower operating costs. The Corps adopted the two bid schedules to make the bidding fair for bidders with different size dredges. Because the Government leases the dredge by the hour, using

different bid schedules for different size dredges is fair to both bidders and results in the lowest cost to the Government to complete the work required.

GLDD also alleges in its complaint that the production estimates for the different size dredges "do not accurately reflect the agency's actual needs." Complaint, ¶ 25. While it is unclear what GLDD is referring to with respect to the agency's actual needs, in its motion for a temporary restraining order, GLDD relies upon various cases that state that estimated quantities must be based upon the actual needs of the agency. Memo Temp. Rest. Order at 10; News Printing, Inc., B-2747732.2 et al., 97-1 C.P.C. ¶ 68 (Feb. 11, 1997) (agency properly canceled IFB after bid opening where the agency reasonably determined that the solicitation's quantity estimate no longer represented agency's actual needs.); C-Cubed Corp., B-289867, 2002 C.P.D. ¶ 72 at 3 (April 26, 2002) (agency properly canceled IFB after opening where it determined that the solicitation's estimated quantities no longer represented the agency's actual needs.) But these cases are not applicable here because GLDD is not challenging the estimated quantity of material to be dredged. Instead, GLDD is apparently arguing that the estimates for the productivity of the different size dredges do not reflect the agency's actual needs. The amount of dredging needed is not in dispute and cannot be an issue because ultimately the contractor will be paid by the hour and, if additional dredging is needed, the contractor will be compensated at the hourly rate. The question is simply whether the agency had a rational basis for believing that a larger dredge is more productive than a smaller dredge.

In summary, GLDD's analysis, which is based upon incomplete data, is incorrect. Requiring a larger dredge to bid the identical number of hours as a smaller dredge places the larger dredge with a distinct competitive disadvantage, particularly with today's rising cost of fuel. Clearly, the Corps has objective rational bases for believing that a larger dredge, with a

15.4 percent larger pump area and 54 percent more horsepower, will be at least 15.4 percent more productive than the smaller dredge. As a result, the current solicitation which includes two bid schedules with different estimated hours based upon the size of the dredge is the most equitable because it places bidders with different size dredges on a level playing field. AR837, 838, 317-322, 342-348, 367-372.

**2. The Corps Equalized Bid Schedules Fairly Estimate Dredge Time**

In GLDD's second cause of action, it alleges that the Corps again violated 10 U.S.C. § 2304(a) by failing to provide full and open competition because the bid schedule fails to consider non effective dredging time. Plaintiff further claims that because the Government's solicitation, which provides that the Government will pay for non effective time (at a rate of 70 percent of effective time) fails to consider the cost of the non effective time, which could result in a low bidder winning the award of the contract even though that bidder may not result in the lowest cost to the Government for the actual work performed. Complaint, ¶31.

The Solicitation properly excludes the consideration of the non effective time when determining the lowest bidder because non effective time is not within the control of the contractor. AR159. Non-effective time is time when the dredge is not dredging, which includes lost time through no fault of the contractor. Examples of such time are when the dredge has to move anchors, move from one job to another, add discharge pipe due to the progress of the work, make necessary repairs such as removing debris from the dredging pump or when the dredge encounters inclement weather. AR159.

GLDD's table includes non effective pay hours for each of the ten years included in the table. According to GLDD's calculation, during the two years that the larger Venture dredge was awarded the contract, it performed 2,552 effective hours and 621 non effective hours, which

is approximately 25% of the effective time. During the eight years that GLDD's smaller Ponchartrain dredge was awarded the contract, it performed a total of 20,411 effective hours with 1,729 non effective hours or approximately 8.5% of the effective time. But GLDD's claim that the non effective time should be considered in determining the lowest bidder is wrong for two reasons. First, non effective time includes time that is beyond the control of the contractor and, therefore, should not be considered. Non effective time is determined by the conditions encountered by the dredge, which vary from year to year and location to location. As the table shows, in 1998, Ponchartrain only had 98 non effective hours, but in 2000, Ponchartrain had 357 non effective hours. AR639. The non effective hours did not rise from 1998 to 2000 because of anything GLDD did or did not do, the non effective hours increased simply because the conditions changed from one year to the other. Second, as we pointed out above, GLDD's reliance on the data to determine the non effective hours in the future is misplaced because the table includes 8 years of data for GLDD's smaller Ponchartrain dredge, but only two years of data for the larger Venture dredge. AR639.

Moreover, GLDD's reliance upon various GAO decisions holding that "[a]n award must be based on the most favorable cost to the government measured by the actual and full scope of the work to be awarded", Associated Healthcare Sys., Inc., B-222532, 86-2 C.P.D. ¶ 246 at 2 (Sep 2, 1986), does not help GLDD. These decisions hold that the evaluation must determine the full scope of the work awarded. That does not apply here, where the non effective time cannot be determined in advance and is outside the control of the contractor, but instead is determined by the location of the dredging and other unknown factors that vary from year to year and location to location.

Because the non effective time is not within the control of the contractor, the Government properly excluded it from consideration when determining the lowest bidder. For all these reasons, it is clear that the solicitation provides for full and open competition and, as a result, the Corps has not violated 10 U.S.C. § 2304(a).

### 3. The Corps Has Provided A Reasonable Basis For Establishing A Different Output For Different Size Dredges

As stated in detail above, the Corps has provided a rational basis for the solicitation which estimates that a larger dredge will have a greater output than a smaller dredge. The solicitation also states that if dredging output does not meet the minimum requirements, the total dredging hours will be reduced by the percentage that output is below the specified minimum. AR198. While GLDD claims that the larger dredge cannot meet the Corps estimated output, a contractor with a larger dredge has every incentive to meet the required output or its dredging hours, and thus its compensation, will be reduced accordingly.

Lastly, the Corps is not required to draft the perfect solicitation and is not required to perfectly estimate the output of each of the two sizes of dredges. Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might . . . have reached a different conclusion . . . .") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). The Corps is only required to show that it has a rational basis for the estimates provided in the solicitation. Clearly, the Corps conclusion that a larger dredge provides more output than a smaller dredge is supported by the calculations of the pump discharge area and the minimum horsepower requirements, as well as common sense that a larger more powerful dredge provides

greater output. Therefore, the Corps had a rational basis for concluding that the larger dredge would have a 15.4 percent greater output.

### C. Plaintiff Cannot Demonstrate Prejudice

When a protestor asserts a violation of a regulation or procedure, it must show that the violation is "clear and prejudicial." Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001). To show prejudice, plaintiff must show that there was a "substantial chance" that it would have been awarded the contract but for agency errors in the bid process. Id. Here, GLDD cannot claim that it is prejudiced by two bid schedules which simply ensure equal competition between bidders with smaller and larger dredges as discussed above. Further, it would be bizarre for a plaintiff to claim prejudice based upon a requirement that it actually face appropriate competition by leveling the playing filed for contractors with different size dredges in accordance with the purposes of the Competition in Contracting Act ("CICA"). Even under the two separate bid schedules, GLDD should still be able to provide a proposal that will provide the lowest cost to the Government because GLDD's smaller dredge has reduced operational costs which should allow it to bid a lower hourly rate which will result in a competitive bid even though the dredging hours will be more than that of a larger 29 inch dredge.

Because GLDD cannot demonstrate prejudice as a result of the alleged statutory or regulation violations, its claims should be rejected.

## II. PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF

### A. Standard For Obtaining Injunctive Relief

In deciding whether a permanent injunction should issue, the Court considers "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff

will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n. 12 (1987)).

Because "injunctive relief is so drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." EP Productions, Inc. v. United States, 63 Fed. Cl. 220, 224 (2005). That is, plaintiff must demonstrate its right to injunctive relief by clear and convincing evidence. KSEND v. United States, 69 Fed. Cl. 103, 112 (2005), aff'd, 184 Fed. Appx. 956 (Fed. Cir. 2006).

### B. Success On The Merits

As demonstrated above, GLDD has not shown that the Corps' actions were arbitrary, capricious, or otherwise not in accordance with applicable statutes and regulations. Accordingly, GLDD is not entitled to an injunction because it cannot succeed on the merits.

### C. Irreparable Harm And Balance Of Harms

GLDD cannot demonstrate that it will suffer irreparable harm. In its complaint, GLDD does not allege how it will suffer irreparable harm. Generally, economic loss does not constitute irreparable harm:

> Only economic loss that threatens the survival of a movant's business constitutes irreparable harm. . . . The plaintiffs do not claim that they will be destroyed if they do not obtain an injunction. Rather, they merely claim that they risk losing a valuable contract and some of their employees. This is insufficient.

Foundation Health Fed'l Servs. v. United States, No. 93-1717, 1993 WL 738426, at *3 (D.D.C. 1993) (quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C.

Cir. 1985)) (additional citation omitted); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("However, economic harm, without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

Here, GLDD has not alleged that it will lose profits under the Solicitation, but, even if it did, loss of profits is the same claim that can be advanced by every single disappointed bidder for a Government contract every time a competitor receives a contract award. That does not rise to the level of irreparable harm. It is also clear that any loss will not threaten the survival of GLDD's business. GLDD has not shown that it will suffer irreparable harm if a permanent injunction is not issued.

GLDD cannot claim that it will lose the opportunity to compete on a level-playing field because, as discussed above, the solicitation is designed to provide a level playing field for bidders with different size dredges. "Mere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury, however; if they were, any bid protest would involve an irreparable injury." OAO Corp. v. United States, 49 Fed.Cl. 478, 480 (2001). Finally, GLDD has made no showing that the competitive process here is anything but a level-playing field – for example, there is no evidence in the record that any one contractor or group of contractors will disproportionately benefit from this process. In fact, the Corps has formulated the solicitation determined expressly to provide for a level playing field. AR837-838.

In stark contrast to GLDD, the Corps will suffer severe harm if the Solicitation does not proceed. The critical window of time available for harbor maintenance dredging operations to geographically maintain the nine ports for barge shipment of commercial commodities on the Mississippi River may be further limited if an injunction is issued against this solicitation. This

is particularly critical during the low water stages of the Mississippi River that are historically typical during the summer months, which is concurrent with harvest time for most agricultural commodities. A delay of the dredging contract into that critical time will not only harm the Government but the economy.

**D. Public Interest**

The dredging work provided by the solicitation is essential and time-sensitive. The maintenance dredging required by this acquisition is essential to ensure the ability of commercial vessels to safely navigate waterways along the Mississippi River. The work is also time-sensitive because of work restrictions resulting from environmental windows that limit the time period during which major, contract-essential work may be performed. It is in the public interest that this work should continue as scheduled during the permissible work window.

This Court has also recognized the strong public interest in not interfering with the procurement process of Government agencies. See LABAT-Anderson, Inc. v. United States, 65 Fed. Cl. 570, 581 (2005) (public interest is not served by interfering with procurement process so long as the agency did not violate applicable laws and regulations); JDL Constr., Inc., v. United States, 14 Cl. Ct. 825, 829 (1988) (judicial intervention in the contract procurement and administration process is a drastic and extraordinary remedy). In addition, the public has an interest in “minimizing the costs of federal procurements.” Vanguard Sec. Inc. v. United States, 20 Cl. Ct. 90, 113 (1990). Under its anticipated procurement, as discussed above, the Corps will obtain the required dredging at the lowest cost to the Government.

In short, given GLDD’s inability to demonstrate success on the merit, the lack of harm to GLDD, the severe harm to the Government, and the public interest in insuring that the

Solicitation proceeds, GLDD has not and cannot show by clear and convincing evidence that the Court should take the extraordinary step of awarding injunctive relief.

**CONCLUSION**

For the foregoing reasons, the Court should deny GLDD's motion for judgment on the administrative record and should grant defendant's motion for judgment on the administrative record and motion to dismiss.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Robert C. Bigler
ROBERT C. BIGLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-0315
Fax: (202) 514-8624

May 5, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on this 5th day of May, 2008, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT ON COUNTS I AND II UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert C. Bigler