**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| **GREAT LAKES DREDGE & DOCK COMPANY LLC,** | **Electronically Filed On May 12, 2008** |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 08-cv-282 (Judge Braden)** |
| **UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON COUNTS I AND II UPON THE ADMINISTRATIVE RECORD**

Daniel C. Sauls
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-8054
Facsimile: (202) 429-3902
dsauls@steptoe.com

Attorney of Record for Plaintiff
Great Lakes Dredge & Dock Company LLC

Dated: May 12, 2008

# TABLE OF CONTENTS


**Page**

I. STATEMENT OF ISSUES ....1

II. STATEMENT OF FACTS/STATEMENT OF THE CASE ....1

III. ARGUMENT ....1

A. The IFB's Use Of Two Bid Schedules, Which Are Based On Defective Estimates And Give Weeks And The Venture An Unfair 15.4% Advantage, Is Unlawful ....1

1. Introduction ....1

2. Defendant's Contention That It Has No Obligation To Prepare Estimates That Are Based On The Best Available Information And That Reflect The Actual Quantity Of Work That Will Be Required Under the IFB Is Meritless ....4

3. Defendant's Assertion That GLDD's Production Data Is "Flawed" Cannot Withstand Scrutiny ....7

4. Defendant's Remaining Arguments Do Not Provide A Rational Basis For Use Of The Separate 29-Inch Dredge Bid Schedule ....11

a. Defendant's Mechanical Calculations Are Flawed And Do Not Provide A Rational Basis for Assigning A Higher Estimated Rate of Production/Lower Estimated Hours For the Venture ....11

b. Defendant's Belated Attempt To Rely On The Venture's Horsepower Cannot Justify A Higher Estimated Minimum Production Rate Or Lower Estimated Hours ....14

c. Use Of A Single Bid Schedule, With Both The Pontchartrain And The Venture Bidding On The Same Estimated Hours, Is Not Unfair To Weeks ....15

B. The IFB's Price Evaluation Scheme For Maintenance Dredging Improperly Ignores The Impact Of Non Effective Hours That Will Be Paid Under The Contract And Further Prevents GLDD From Competing Fairly For This Work ....17

C. GLDD Will Be Severely Prejudiced If The Solicitation Goes Forward Under The Current IFB ....20

D. GLDD Is Entitled To Injunctive Relief ....21

IV. CONCLUSION ....24

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL COURT CASES**

Aeroplate Corp. v. United States,
67 Fed. Cl. 4 (2005) ....................21

Axiom Res. Mgmt., Inc. v. United States,
80 Fed. Cl. 530 (2008) ....................20, 22

Bean Dredging Co. v. United States,
19 Cl. Ct. 561 (1990) ....................6

Bean Dredging Corp. v. United States,
22 Cl. Ct. 519 (1991) ....................22

Bean Stuyvesant LLC v. United States,
48 Fed. Cl. 303 (2000) ....................5

Blue Dot Energy Co., Inc. v. United States,
76 Fed. Cl. 783 (Fed. Cl. 2004), rev'd on other grounds, 179 Fed. Appx. 40 (2006) ....................21

California Marine Cleaning, Inc. v. United States,
42 Fed. Cl. 281 (1998) ....................8

Cardinal Maint. Serv., Inc. v. United States,
63 Fed. Cl. 98 (2004) ....................21, 23

Citizens to Preserve Overton Park v. Volpe,
401 U.S. 402 (1971) ....................6

Day & Zimmerman Services v. United States,
38 Fed. Cl. 591 (1997) ....................22

Essex Electro Engineers, Inc. v. United States,
3 Cl. Ct. 277 (1983) ....................22

Great Lakes Dredge & Dock Co. v. United States,
60 Fed. Cl. 350 (2004) ....................6, 8, 16, 22

Hawaiian Dredging Const. Co. v. United States,
59 Fed. Cl. 305 (2004) ....................22

Hunt Building Co., Ltd. v. United States,
61 Fed. Cl. 243 (2004) ....................23

Idea Int'l, Inc. v. United States,
74 Fed. Cl. 129 (2006) .....21

Information Sciences Corp. v. United States,
73 Fed. Cl. 70 (2006) .....20, 24

Information Sciences Corp. v. United States,
80 Fed. Cl. 759 (2008) .....23

Int'l Res. Recovery, Inc. v. United States,
64 Fed. Cl. 150 (2005) .....21

KSEND v. United States,
69 Fed. Cl. 103 (2005), aff'd, 184 Fed. Appx. 956 (Fed. Cir. 2006) .....21

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) .....22

MTB Group, Inc. v. United States,
65 Fed. Cl. 516 (2005) .....21

OAO Corp. v. United States,
49 Fed. Cl. 478 (2001) .....22

Overstreet Elec. Co. v. United States,
47 Fed. Cl. 728 (2000) .....6

Quality Transport Services, Inc. v. United States,
12 Cl. Ct. 276 (1987) .....22

Red River Serv. Corp. v. United States,
60 Fed. Cl. 532 (2004) .....22

Superior Helicopter LLC v. United States,
78 Fed. Cl. 181 (2007) .....23

Textron, Inc. v. United States,
74 Fed. Cl. 277 (Fed. Cl. 2006) .....21

Vanguard Security Inc. v. United States,
20 Cl. Ct. 90 (1990) .....4, 6

## COMPTROLLER GENERAL CASES

Burns and Roe Serv. Corp.,
B-291530, 2004 C.P.D. ¶ 85 (Jan. 23 2003) ....................................................................4

L.K. Comstock, Inc. and Licbert Federal Sys., Inc., B-261711.5 et al.,
96-1 C.P.D. ¶ 4 (Dec. 14, 1995) ....................................................................4, 5, 6

News Printing, Inc., B-274773.2 et al.,
97-1 C.P.D. ¶ 68 (Feb. 11, 1997) ....................................................................5

Sletager, Inc.,
B-244710, 91-2 C.P.D. ¶ 452 (Nov. 13, 1991) ....................................................................4, 5

Telos Computing, Inc.,
B-190105, 78-1 C.P.D. ¶ 235 (March 27, 1978) ....................................................................16

Thermacor Process, Inc.,
B-254068, 93-2 C.P.D. ¶ 277 (Nov. 16, 1993) ....................................................................16

## STATUTES

Competition In Contracting Act, 10 U.S.C. § 2304(a) ....................................................................3

## FEDERAL ACQUISITION REGULATIONS

FAR 6.101(a), (b) ....................................................................3

FAR 14.101(a) ....................................................................4

## I. STATEMENT OF ISSUES

1. Whether Plaintiff is entitled to judgment on the Administrative Record because the United States Army Corps of Engineers ("Corps"), in IFB No. W912EQ-08-B-0001 ("Solicitation" or "IFB"), used defective estimates that are not based on the best information available, do not do not accurately reflect the agency's needs, and deprive Plaintiff of the opportunity to compete for the work on a fair and equal basis.

2. Whether Plaintiff is entitled to judgment on the Administrative Record because the Corps used bid schedules and a price evaluation scheme in the IFB that do not consider a significant portion of the work required by the IFB, do not assure that award of a contract to the low bidder will result in the lowest cost to the government for the work actually performed, and deprive Plaintiff of the opportunity to compete for the work on a fair and equal basis.

## II. STATEMENT OF FACTS/STATEMENT OF THE CASE

To the extent that a Counter-Statement of Facts is required by RCFC 52.1(b), plaintiff Great Lakes Dredge & Dock Company LLC ("GLDD") hereby refers the Court to the Statement of Facts/Statement of the Case presented on pages 1-12 of its May 5, 2008 Memorandum In Support of Its Motion for Judgment on the Administrative Record (hereafter "GLDD May 5 Memo").

## III. ARGUMENT

### A. The IFB's Use Of Two Bid Schedules, Which Are Based On Defective Estimates And Give Weeks And The Venture An Unfair 15.4% Advantage, Is Unlawful

#### 1. Introduction

Defendant concedes that Amendment 0005 of the IFB gives Weeks Marine, Inc. ("Weeks") and its dredge Venture a 15.4% advantage in estimated minimum hourly production and in estimated hours over GLDD and the dredge Pontchartrain for the maintenance dredging portion of the work. Defendant's Motion for Judgment On Counts I and II Upon The Administrative Record (hereafter "Govt. May 5 Memo") at 2. Defendant also concedes that this advantage is based ***solely*** on calculations of estimated minimum production rates and estimated

hours that held all variables constant except discharge pump area. Govt. May 5 Memo at 3, 7, 17. Defendant asserts that it is these calculations that provide a "rational basis" for the use of bid schedules that give Weeks a 15.4% bidding advantage. Id. See AR at 837-38.

The issue before the Court regarding Count I of Plaintiff's Complaint is whether it was proper in this case for the Corps to base its estimated minimum production rates and estimated hours solely on these calculations. GLDD respectfully submits that the Corps' reliance on this approach is fundamentally flawed.

GLDD established in its May 5 Memo that the Corps' sole reliance on these calculations to estimate production and hours was arbitrary and capricious and in violation of law because the Corps failed to consider or use all relevant information. In particular:

- The Corps' calculation of estimated minimum production rates and estimated hours did not take into consideration the particular conditions that would be encountered by a contractor in performing the work required by the IFB (GLDD May 5 Memo at 4-5);

- After GLDD challenged the Corps' estimates, on February 25, 2008, the Corps prepared an analysis that did take these conditions into account. This analysis recommended that the Corps use a single bid schedule, with estimated hours based on a 27-inch dredge, because ***under the "conditions present in this work" "we will be unable to utilize the additional production capabilities of a larger 29-inch dredge."*** (emphasis added); (GLDD May 5 Memo at 8-9, 19-20; AR at 641-42);

- The Corps' calculation of estimated minimum production rates and estimated hours did not consider the actual, historical production rates achieved by the Venture and the Pontchartrain when performing the same work at the same harbors for the past ten years under the predecessor contracts, in violation of the Corps' own Estimating Regulation (ER 1110-2-1302), which states that such historical records are the most reliable source for estimating dredging production and should be used whenever possible. (GLDD May 5 Memo at 17-18; Appendix at 4-5); and

- This actual, historical production data establishes that the Venture and the Pontchartrain achieved almost identical production rates

> per effective hour performing the same work under the predecessor contracts and that the Venture has never come close to averaging 1,321 cubic yards ("cy") per pumping hour, the estimated minimum production rate for a 29-inch dredge set forth in the IFB. (GLDD May 5 Memo at 7).

Under these circumstances, the Corps plainly did not consider the most important factors, let alone all relevant factors, in determining its production and hours estimates. Nor does the Administrative Record contain a rational explanation for not using this information. In addition, as discussed below in more detail below at pages 11-14, the Corps' calculations themselves are based on improper assumptions.

Therefore, the Corps' decision to rely solely on its calculations and on discharge pump area to estimate the minimum production rates and estimated hours used in the IFB was arbitrary and capricious and an abuse of discretion. In addition, the Corps' use of estimates that give Weeks and the Venture a 15.4% production and hours advantage -- in direct conflict with its February 25 memorandum and with the extensive historical production information available -- will deny GLDD, ***one of only two likely bidders***,[1] from fairly competing for the work in violation of the Corps' obligation to promote, provide for, and obtain full and open competition. See 10 U.S.C. § 2304(a); Federal Acquisition Regulation ("FAR") 6.101(a), (b).

Defendant's May 5 Memo does not challenge the crux of GLDD's argument. Instead, Defendant primarily argues that it was not required to consider the best information available when developing its estimates and that the historical production data supplied by GLDD, which the Corps concedes are accurate (AR at 612), is somehow "flawed." Govt. May 5 Memo at 16-20. Each of these and the other arguments raised by Defendant regarding Count I of GLDD's Complaint is meritless, as shown below.

[1] Defendant concedes that "it is expected that only GLDD and [Weeks] will submit bids under the current solicitation." Govt. May 5 Memo at 5.

**2. Defendant's Contention That It Has No Obligation To Prepare Estimates That Are Based On The Best Available Information And That Reflect The Actual Quantity Of Work That Will Be Required Under the IFB Is Meritless**

Defendant first challenges GLDD's position that the government must base estimated quantities on the best available information. See Govt. May 5 Memo at 16. In essence, Defendant contends that in preparing the IFB, which is structured so that the estimated quantity of rental hours is one of the two critical components (along with hourly price) in determining who is the low bidder for the maintenance dredging work, the Corps had no obligation to consider the best and most relevant evidence of what the actual rental hours might be. This position is unwise, unsound, and completely unfounded.

FAR 14.101(a), *Preparation of invitations for bids*, expressly states that an IFB "must describe the requirements of the Government clearly, ***accurately***, and completely" (emphasis added). Where, as here, the government bases its requirements on estimates, those requirements will not be accurately described if the government is free, as Defendant suggests, to ignore relevant information. This principle is also reflected in the many cases holding that where the government uses estimated quantities as the basis for its price evaluation, it has a duty to base those estimates on the best available information. See, e.g., Burns and Roe Serv. Corp., B-291530, 2004 C.P.D. ¶ 85 at 8, n.8 (Jan. 23 2003); L.K. Comstock, Inc. and Liebert Federal Sys., Inc., B-261711.5 et al., 96-1 C.P.D. ¶ 4 at 4 (Dec. 14, 1995); Sletager, Inc., B-244710, 91-2 C.P.D. ¶ 452 at 4 (Nov. 13, 1991) (sustaining pre-award challenge to IFB); see also Vanguard Security Inc. v. United States, 20 Cl. Ct. 90, 109 (1990) (upholding cancellation of IFB because of understated staffing estimates and holding that "[t]o allow a contractor that was the low bidder under a defective solicitation an exclusive opportunity to contract for the agency's real, but unexpressed, needs would be prejudicial to other bidders").

These cases are fully consistent with the principle, which Defendant does not dispute, that accurate estimates are essential to enable bidders to compete on a fair and equal basis and to ensure the selection of the offeror whose bid will result in the lowest cost to the Government. See GLDD May 5 Memo at 16 (citing L.K. Comstock, 96-1 C.P.D. ¶ 4, and News Printing, Inc., B-274773 et al., 97-1 C.P.D. ¶ 68 (Feb. 11, 1997)). Further, Defendant's attempt to distinguish Comstock's holding that estimated quantities must be based on the best information available is completely unavailing for at least three reasons.[2]

First, as this court has repeatedly recognized, although GAO decisions are not binding, they are entitled to deference because of "GAO's expertise and role in the resolution of contested procurement decisions." Bean Stuyvesant LLC v. United States, 48 Fed. Cl. 303, 326 n. 13 (2000) (citing cases).

Second, the fact that Comstock was a post-award rather than a pre-award protest is completely irrelevant. There, as here, the issue was whether the government could properly base an award on a solicitation that was defective because the estimated quantities were not based on the best available information and did not accurately state the agency's needs. Moreover, GAO has applied the rule that estimates must be based on the best available information to pre-award challenges to the terms of IFBs. See Sletager, 91-2 C.P.D. ¶ 452 at 4.

Third, and contrary to Defendant's suggestion, the GAO's decision in Comstock was not based on the agency's selective application of the awardee's proposed volume discounts. Nor did the GAO conclude that the agency's consideration of those volume discounts was impermissible. Rather, the GAO specifically held that the evaluation was unreasonable because the ***estimated quantities*** on which the price evaluation was based were defective, calling into

[2] Defendant has not suggested that News Printing is distinguishable, and it is not.

question whether the discounts would be realized during contract performance.[3] See L.K. Comstock, 96-1 C.P.D. ¶ 4 at 4.

In addition, the Corps concedes that it must demonstrate that it had a rational basis for basing estimated minimum production rates and hours solely on discharge pump area. Govt. May 5 Memo at 3, 23. To do so, it must demonstrate that it considered all relevant factors, and it must articulate a rational connection between the facts found and the choice made. See, e.g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 358 (2004).

Where, as here, the Administrative Record (at 837-838) establishes that the Corps did not consider what its own Estimating Regulation defines as the best information available (historical production records for the same work) when it calculated the estimated productions and hours, the Corps plainly did not consider all relevant information. Moreover, the Administrative Record contains no rational explanation of why the Corps continued to ignore the ten year actual production history and its own February 25 memorandum when it issued Amendment 0005. Therefore, its decision to base the estimates solely on discharge pump area is arbitrary and capricious.

On pages 16-17 of its May 5 Memo, GLDD also cited several cases for the unremarkable proposition that quantity estimates in solicitations must reflect the agency's actual needs and the actual amount of work that will be required under the contract. Defendant asserts

[3] Defendant's attempt to distinguish cases such as Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728 (2000), and Bean Dredging Co. v. United States, 19 Cl. Ct. 561 (1990), on the ground that "the Corps' estimated cost for the project is not the issue here," Govt. May 5 Memo at 17, also misses the mark. Cases such as Overstreet and Bean, in which this Court has upheld protests challenging cancellation of IFBs where the Government estimates were flawed, are completely consistent with cases (such as those cited above) holding that estimates must be based on the best information available. See also Vanguard Security, 20 Cl. Ct. at 109 (upholding agency cancellation of IFB where agency's quantity estimates were defective).

that these cases are not applicable here and apparently contends that the IFB can use estimated hours that bear no relationship to the Corps' actual requirements to determine the low bidder. Govt. May 5 Memo at 20. The only basis offered by Defendant to support this position is that "GLDD is not challenging the estimated quantity of material to be dredged." Id.

While it is true that GLDD is not challenging the Corps' estimate of the total quantity of maintenance material to be dredged, this fact is completely irrelevant. The IFB does not seek bids to dredge a particular estimated quantity of maintenance material, and the contractor is not paid for the quantity of material removed. Instead, the IFB seeks to rent a dredge for an estimated number of hours, and those hours are stated in the bid schedules and used in the price evaluation. These estimated quantities of hours (and the estimated minimum production rates on which they are based) are precisely what GLDD is challenging here. Because the Corps' estimated minimum production rate for the Venture is substantially overstated, the Venture's estimated hours are substantially understated and do not reflect the Corps' actual needs. As a result, the Venture is being evaluated on far fewer hours than will be required for it to actually perform the work, improperly giving Weeks an unfair and unwarranted advantage in the bidding process.

### 3. Defendant's Assertion That GLDD's Production Data Is "Flawed" Cannot Withstand Scrutiny

On pages 18-19 of its May 5 Memo, Defendant argues at length that the historical production data provided by GLDD (AR at 639), although accurate, is somehow flawed. First, Defendant complains that eight of the ten years of data provided by GLDD are for the Pontchartrain, while only two years (2004 and 2007) are for the Venture. Govt. May 5 Memo at 18, 22. The two years for the Venture, however, provide a significant amount of data and include more than 2500 hours of dredging and the removal of almost 3 million cy of material

over two dredging seasons. AR at 639. Moreover, this is the very kind of data that the Corps' Estimating Regulation says should be relied on and that Corps personnel routinely rely upon to estimate dredge production. GLDD May 5 Memo Appendix at 4-5.

Second, Defendant appears to assert that the Venture will be more productive in 2008 than it has in the past because the current IFB anticipates that a larger quantity of material will be dredged this year as compared to last year. The logic of Defendant's argument appears to be:

- "a larger dredge is more effective when it is used to dredge a larger quantity" (Govt. May 5 Memo at 18);
- "any dredge is more productive when there is a larger quantity of material to be dredged" (id.);
- "the larger Venture dredge will be more productive if there is a larger quantity of material available to dredge" (id.);
- The estimated quantity of maintenance dredging in 2008 is more than what was actually dredged last year (id. at 18-19); and
- Therefore, the Venture will achieve a higher production rate in 2008 (id. at 19).

This argument, not the data provided by GLDD, is flawed for several reasons.

First, there is absolutely nothing in the Administrative Record to support the contention that the Corps ever considered this "total quantity of material to be dredged" theory before the present lawsuit was filed. This sort of post hoc rationalization, which is unsupported in the record, should be rejected. See e.g., Great Lakes, 60 Fed. Cl. at, 358, 365 (agency assertion during protest that has no support in the administrative record is an after-the-fact rationalization that should be rejected); California Marine Cleaning, Inc. v. United States, 42 Fed. Cl. 281, 295-96 (1998) (agency decision must be supported by evidence in the administrative record, not post hoc rationalization).

Second, as the Corps' own Estimating Regulation demonstrates, the total "quantity of material to be dredged" simply is not a factor that affects a dredge's production rate. Page G-3 of ER 1110-2-1302 (GLDD May 5 Memo, Appendix at 5) identifies at least nine factors that may affect cutter suction dredge production. Total quantity of material to be dredged is not one of them.

Third, the fact that a dredge's production rate is ***not*** affected by the total quantity of material dredged during a contract is confirmed by the very data on which Defendant attempts to rely. AR at 639. For example, Defendant's argument is based on the assertion that the Venture will achieve a higher production rate in 2008 because it is "more effective when it is used to dredge a larger quantity." Govt. May 5 Memo at 18. The Venture's actual performance on the predecessor contracts establishes otherwise:

| **Year** | **Dredge** | **Quantity (CY)** | **Production CY/ Effective Hour** |
|---|---|---|---|
| 2004 | Venture | 1,673,273 | 1,062 |
| 2007 | Venture | 1,120,599 | 1,207 |

AR at 639. Thus, despite dredging almost 50% more material in 2004 (149.3%), the Venture's 2004 production rate was significantly lower than its production rate in 2007.

The actual, historical production data from the ten Memphis District predecessor contracts also disproves Defendant's post hoc contention that "any dredge is more productive when there is a larger quantity of material to be dredged." Govt. May 5 Memo at 18. For example, in 2003, the Pontchartrain achieved essentially ***the same*** production rate as it achieved in 1998 while dredging ***twice*** the amount of material.

| Year | Dredge | Quantity (CY) | Production CY/ Effective Hour |
|---|---|---|---|
| 2003 | Pontchartrain | 3,524,728 | 1,153 |
| 1998 | Pontchartrain | 1,600,802 | 1,148 |

AR at 639.

Significantly, the historical data also demonstrates that the "larger dredge" Venture did not out produce the Pontchartrain (let alone by 15.4%) when they both dredged essentially the same quantity of material.

| Year | Dredge | Quantity (CY) | Production CY/ Effective Hour |
|---|---|---|---|
| 2004 | Venture | 1,673,273 | 1,062 |
| 1998 | Pontchartrain | 1,600,802 | 1,148 |

AR at 639. Therefore, Defendant's assertions regarding the quantity of material to be dredged provide no basis whatsoever for the Corps' estimated minimum production rate and estimated hours for the Venture.[4]

Defendant also attempts to rely on the fact that the Venture achieved the highest production rate over the last ten years (1,207 cy per effective hours excluding traffic). Govt. May 5 Memo at 19. GLDD does not dispute this fact, but points out that:

- The Venture also achieved one of the lowest production rates per effective hour (excluding traffic) of the past decade in 2004 (1,062 cy/hour) while dredging more material than in 2007;

[4] On page 9 of the Statement of Facts in its May 5 Memo, Defendant refers to a February 13, 2008 "response" to GLDD's initial February 8 letter, which provided historical production information and challenged the estimates in the original IFB. What Defendant has not told the Court is that this document (AR at 611-612) was a draft that never was sent to GLDD. Moreover, this document is contradicted and refuted by both the Corps' later February 25, 2008 memorandum (AR at 641-642), which concluded that the Pontchartrain and Venture would achieve equal production rates on the project, and the February 29, 2008 issuance of Amendment 0003 (AR at 201-225), which included a single bid schedule with a single estimated number of hours applicable to both dredges. Defendant also omits from its quotation of a paragraph from this document the portion of the same paragraph in which the Corps conceded that the historical production information provided by GLDD was accurate. AR at 612.

- When the Venture's production rate in both 2004 and 2007 is considered, its average production (1,116 cy per effective hour excluding traffic) is virtually identical to the Pontchartrain's average production rate on the eight predecessor contracts it performed over the past ten years (1,111 cy per effective hour excluding traffic); and

- The Venture has never come close to the 1,321 cy per effective hour (excluding traffic) minimum production rate set forth in the IFB when performing the same work under the predecessor contracts.[5]

AR at 639; GLDD May 5 Memo at 7. Therefore, the Venture's single year production rate also does not provide a rational basis to justify the 15.4% production rate and hours advantage contained in the IFB.

### 4. Defendant's Remaining Arguments Do Not Provide A Rational Basis For Use Of The Separate 29-Inch Dredge Bid Schedule

#### a. Defendant's Mechanical Calculations Are Flawed And Do Not Provide A Rational Basis for Assigning A Higher Estimated Rate of Production/Lower Estimated Hours For the Venture

It is undisputed that Defendant based its estimated minimum production rates and estimated hours solely on a mathematical formula. According to Defendant, it calculated the estimated quantity (Q) for each dredge based on two factors, average slurry velocity (V) and area of the discharge pump (A). Govt. May 5 Memo at 7. However, as noted in GLDD's May 5 Memo at 4, the record shows that the Corps calculated its estimated minimum production rates (and estimated hours) using a formula with three criteria -- the velocity of the dredge slurry, the

[5] Each of the production rates identified in the tables in the text and all of the production rates relied upon by GLDD in computing the Venture's (1,116 cy) and Pontchartrain's (1,111 cy) production rate per effective hour (excluding traffic) exclude non effective hours. AR at 639. Therefore, Defendant's assertion (Govt. May 5 Memo at 10) that "GLDD's analysis is particularly distorted" because of the Venture's non effective hours is simply incorrect.

area of the dredge pump, and the average percent solids, or slurry density, of the dredge slurry. AR at 837-838.[6]

The record also shows that the Corps assumed that both the Venture and the Pontchartrain would pump the slurry at the same velocity (18 feet per second) and that the dredge slurry for both dredges would contain 12% solids, leaving pump area as the sole determinant of production. Id. The Corps' use of this equation is overly simplistic here, and the Corps arbitrarily and incorrectly assumed that two critical variables -- velocity and percent solids/slurry density -- were the same for both dredges. For example, the Corps' erroneous assumption that the slurry density would be the same for both dredges invalidates its conclusion that the Venture would have a higher minimum production rate.

While more slurry will travel through a 29-inch dredge pump than a 27-inch pump at a given velocity, this does not mean that more soil (dredged material) travels through the larger pump. Here, the Corps' assumption that the percent solids/slurry density would be the same for both dredges fails to consider the particular circumstances under which this project will be performed. In particular, the Corps' assumption is refuted by the Corps' February 25, 2008 memorandum. AR at 641-642.

In that memorandum, Mr. Channell, who is the Corps' Technical Point of Contact for the IFB (AR at 13) and was very involved in drafting the dredging portions of the IFB (AR at 640), recognized that the bank height (thickness of the layer of material to be removed) for the Mississippi River harbors maintenance dredging will be limited. AR at 641. Therefore, he appropriately found that the limiting production factor in performing this work would be the

[6] Slurry consists of both water and soil (the latter being the material dredged and the basis for determining dredge production). Accordingly, in calculating a production rate, the slurry density (percent solids) must be taken into account to estimate how much of the slurry is dredged material.

"***speed with which the dredge can swing through the cut, not the pump capacity***." Id. (emphasis added). Further, because the swing speed of the Venture and Pontchartrain are practically equal, Mr. Channell concluded that the production rate achieved by both dredges on this project would be equal. Id. Thus, in this February 25 memorandum, the Corps specifically concluded that ***pump size was not the critical factor in determining production on this project*** and that "we will be unable to utilize the additional production capabilities of a larger 29-inch dredge." Id. at 642. There is nothing in the Administrative Record that refutes or even addresses these conclusions.

The February 25 memorandum's conclusions regarding the limited bank height mean that both the Venture and the Pontchartrain are able to remove the full bank of material as they dredge and that ***both dredges will be loading the same quantity of material into the pumping system*** as their dredge cutters' swing through the area at the same swing speed. In other words, due to the limited bank height, the Venture will not be able to load a greater quantity of soil into its pump than the Pontchartrain loads into its pump, notwithstanding the Venture's larger dredge pump. Since the two dredges will be loading the same quantity of material at the same rate, this means that although the larger 29-inch dredge can pump more slurry than the 27-inch dredge, the additional slurry is water, not solids. As a result, and contrary to the Corps' assumption, the 29-inch dredge will have a ***lower*** slurry density (percent solids) than the 27-inch dredge, and use of this lower percent solids in the Corps' equation will result in the Venture having the same production rate as the Pontchartrain. This is precisely what the Corps' February 25 memorandum concluded and precisely what is demonstrated by the actual performance of the dredges on the ten predecessor contracts. AR at 639.

Because the calculations relied upon by the Corps to support its estimated production rates (and hours) did not take into account the conditions applicable to this particular project (or the historical production information for the same work) and incorrectly assumed that the slurry density will be the same for both dredges, those calculations do not provide a rational basis for the Corps' actions here.

**b. Defendant's Belated Attempt To Rely On The Venture's Horsepower Cannot Justify A Higher Estimated Minimum Production Rate Or Lower Estimated Hours**

At several places in its May 5 Memo, Defendant appears to be attempting to argue that it was rational for the Corps to assign a higher estimated minimum production rate (and lower estimated hours) to the Venture because the Venture has more horsepower than the Pontchartrain. Govt. May 5 Memo at 2, 8, 17, 20-21. This assertion must be rejected because there is no support whatsoever for it in the Administrative Record. To the contrary, the Administrative Record makes plain that the sole determinant of the IFB's estimated minimum production rates and the estimated hours was discharge pump area. AR at 837-838. The Corps did not rely on horsepower in generating these estimates, and its attempt to do so now must be rejected. See Great Lakes, 60 Fed. Cl. at 358, 365 (rejecting agency argument that had no support in the administrative record and was made for the first time during the protest).

Defendant's attempt to rely on dredge horsepower also is refuted by the Corps' February 25 memorandum (AR at 641-42), which specifically concluded that the Corps would be unable to utilize the additional production capabilities of a larger 29-inch dredge. Id. at 642. In addition, the contention that the Venture's greater horsepower provided a production advantage on this project is completely at odds with the actual (and equal) production performance per effective hour (excluding traffic) of the Venture and the Pontchartrain over the past decade. AR at 639. This is because the maintenance dredging of the Mississippi River harbors normally

requires the dredges to pump the materials only 2,000 to 2,500 feet, which both the Venture and the Pontchartrain can do without using anywhere near their full horsepower.

**c. Use Of A Single Bid Schedule, With Both The Pontchartrain And The Venture Bidding On The Same Estimated Hours, Is Not Unfair To Weeks**

On pages 8 and 19 of its May 5 Memo, Defendant contends that the use of two bid schedules, with different estimated hours for the Venture and the Pontchartrain, is necessary to level the playing field and to prevent putting ***Weeks*** at an unfair competitive disadvantage. Initially, this argument seems curious given that for the past seven years, the Corps has solicited this work using a single bid schedule, with the same estimated hours for the Venture and the Pontchartrain, without controversy, and without a protest from Weeks. Moreover, the Administrative Record contains no explanation whatsoever for why the Corps decided to change the solicitation in 2008.

More important, Defendant's "fairness" argument is premised on the assumption that the Venture is a more productive dredge than the Pontchartrain for the maintenance dredging portion of the work solely because it has a larger pump discharge area. As noted above, however, the Corps' calculations are based on an erroneous assumption about slurry density, and the Corps concluded in it February 25 memorandum that, based on the conditions present in this particular work in the Mississippi River harbors, the Venture would not achieve a higher production rate than the Pontchartrain. AR at 642. In addition, the Venture historically has not out-performed the 27-inch Pontchartrain and has never come close to 1,321 cy per pumping hour production rate on which its estimated hours are based. AR at 639.

It is perfectly rational and fair to require two dredges that have achieved the same productivity to bid using the same estimated bid hours. Unless the IFB is changed, the only

unfair competitive disadvantage here will be suffered by GLDD, as it would be required to multiply its bid price by 15.4% more hours than Weeks despite the fact that the Pontchartrain has equaled (or exceeded when non effective hours are considered) the Venture's historical production rate for this work under the predecessor contracts.

Defendant also seeks to rely on the contention that the Venture has higher operating costs than the Pontchartrain. This must be rejected for at least two reasons. First, there is no evidence to support this contention in the Administrative Record and no evidence that the Corps considered the Venture's or the Pontchartrain's costs in preparing the IFB. Indeed, because all of the predecessor contracts have been solicited on a sealed bid basis, Weeks and GLDD have not submitted any cost data with their bids for the Corps to compare, and the Corps' comments about the relative cost of the dredges are based on speculation.

In addition, even if there is a cost differential that gives one bidder an advantage, there is nothing unfair about that advantage, as it does not result from any preferential treatment by the government. See Great Lakes, 60 Fed. Cl. at 369 (finding that where GLDD had a more efficient dredge and therefore could bid a lower price, there was "no requirement for equalizing competition by taking into consideration these types of advantages, nor do we know of any possible way in which such equalization could be effected") (quoting Telos Computing, Inc., B-190105, 78-1 C.P.D. ¶ 235 at 12 (March 27, 1978)); Thermacor Process, Inc., B-254068, 93-2 C.P.D. ¶ 277 at 3 (Nov. 16, 1993) (where one bidder has a cost advantage over another "there is no legal requirement that an agency equalize competition with respect to such advantag[e] unless that advantage results from preferential treatment on the part of the government"). Rather, a bidder's cost structure is something for the bidder to address in determining its prices as part of the competitive bidding process. Any attempt by the Corps to use the bid schedule to equalize

assumed, unproven differences in the bidders' costs would be completely improper and further undermine GLDD's opportunity to compete fairly for this work.

### B. The IFB's Price Evaluation Scheme For Maintenance Dredging Improperly Ignores The Impact Of Non Effective Hours That Will Be Paid Under The Contract And Further Prevents GLDD From Competing Fairly For This Work

Defendant concedes that IFB's maintenance dredging price evaluation completely excludes non effective time even though the Corps must pay for 70% of these hours at the full hourly rental price. Govt. May 5 Memo at 21. Based on historical experience, these non effective hours will constitute a significant portion of the work under the 2008 contract and will result in the payment of a significant dollar amount to the contractor.

For example, in the two years that Weeks has performed the same work under the predecessor contracts, its non effective hours have averaged 24.3% of its effective hours. AR at 639. The 2008 IFB bid schedule estimates 1800 effective hours for the Venture. AR at 233. Based on the historical dredging records, Weeks would have approximately 437 non effective hours in 2008, and the Corps would have to pay for 70% of these hours (306 hours) at Weeks' full hourly rate. At Weeks' 2007 hourly rental price of $2,050 per hour, this means that the Corps would pay more than $600,000 for non effective time.[7]

This example demonstrates that the 2008 IFB bid schedules and price evaluation scheme do not include a substantial portion of the work to be paid for under the contract. This plainly violates the requirement that a contract award must be based on the most favorable cost

[7] Even at the much lower rate of non effective hours experienced by GLDD (8.5 percent of effective time), AR at 639, GLDD would be paid over $200,000 for non effective time based on the estimated hours contained in the IFB.

to the government ***measured by the full scope of the work to be awarded***. See GLDD May 5 Memo at 24.

Defendant also does not contest the fact that GLDD and the Pontchartrain have a historically proven advantage over Weeks and the Venture with respect to non effective hours. The Venture's non effective hours have averaged almost 25% of effective hours when it has performed work under the predecessor contracts, while the Pontchartrain's non effective hours have averaged only 8.5% of its effective hours. AR at 639. This GLDD advantage, however, is ignored by the IFB's price evaluation scheme. Given the portion of dredging pay hours that are non effective hours, failure to consider this GLDD advantage creates a real risk that use of the IFB's price evaluation scheme could result in award of a contract to Weeks when GLDD, due to its lower non effective time, could perform the work at a lower cost. GLDD May 5 Memo at 25-26.

Defendant's response to this non effective hours issue is to state, without explanation or support, that it was proper for the Corps to exclude non effective time because such time "is not within the control of the contractor." Govt. May 5 Memo at 21. Defendant never explains the basis for this statement, but a review of the categories of non effective time set forth in the IFB reveals that for almost all of them, the amount on non effective time incurred by a contractor is not outside its control and instead is directly impacted by what equipment the contractor brings to the job site, and the skill and efficiency of its crew.

For example, the first category of non effective time listed in the IFB is time lost preparing to move from one job to another and time lost preparing the dredge and other equipment to work upon arrival at a new job site. AR at 243. This involves tasks such as breaking down pipeline, raising anchors, and preparing pipeline and equipment to be towed, and

then unloading equipment, setting up a new pipeline and preparing to pump at the new site. The time it takes to perform each of these activities is directly impacted by the equipment used by the contractor and by the level of resources, skill and urgency applied by the contractor to these tasks.

Similarly, the amount of non effective time it takes to move swing anchors will be affected by the weight of the anchors the equipment utilized, and the skill and efficiency of the crew. The amount of time it takes to perform other non effective time tasks, such as changing swing wires, making changes in discharge lines, and clearing debris from the dredge pumps and pipelines also is directly impacted by the skill and efficiency of the crew and the level of resources and urgency applied.[8]

Defendant's also asserts, without explanation, that non effective time is "determined by the conditions encountered by the dredge." Govt. May 5 Memo at 22. Yet the historical data demonstrates that over eight years of dredging on the predecessor contracts, the Pontchartrain's non effective time fits into a narrow band between 5.6% and 10.6% of effective time in each year, regardless of the number of effective dredging hours.

| **Year** | **Dredge** | **Effective Hours** | **Non Effective Hours** | **Non Effective Hours/Effective Hours** |
|---|---|---|---|---|
| 2007 | Venture | 951 | 358 | 37.64% |
| 2006 | Pontchartrain | 1,266 | 135 | 10.66% |
| 2005 | Pontchartrain | 1,725 | 182 | 10.56% |
| 2004 | Venture | 1,601 | 262 | 16.36% |
| 2003 | Pontchartrain | 3,102 | 175 | 5.64% |
| 2002 | Pontchartrain | 2,634 | 229 | 8.69% |
| 2001 | Pontchartrain | 3,618 | 298 | 8.24% |
| 2000 | Pontchartrain | 3,405 | 357 | 10.48% |

[8] GLDD agrees that lost time due to weather and to failure of retaining dikes, spill boxes and out falls through no fault of the contractor are not within the contractor's control, but in GLDD's experience in performing this work, very little non effective time fits within these categories.

| | | | | |
|---|---|---|---|---|
| 1999 | Pontchartrain | 3,255 | 255 | 7.83% |
| 1998 | Pontchartrain | 1,407 | 98 | 6.96% |

AR at 639. This table also demonstrates that the Venture's non effective time has been 16% and almost 38% of its effective time, far higher percentages than ***ever*** experienced by the Pontchartrain. This real difference should have been taken into account in the IFB's bidding schedule and price evaluation scheme, and the Corps' failure to do so further precludes GLDD from being able to bid for this work on a fair and equal basis.

### C. GLDD Will Be Severely Prejudiced If The Solicitation Goes Forward Under The Current IFB

Defendant's contention that GLDD will not be prejudiced by being forced to bid for the maintenance dredging work using a bid schedule that requires it to multiply its hourly price by 15.4% more hours than Weeks is meritless. The current IFB improperly imposes a 15.4% hours and pricing penalty on GLDD even though both the Corps' February 25 memorandum and the historical production records demonstrate that the Pontchartrain is at least as productive as the Venture for the maintenance dredging work required under the IFB. The IFB also entirely fails to consider non effective hours, which involve a significant amount of the time paid for under the contract, and where the Pontchartrain has a proven competitive advantage over the Venture.

For both of these reasons, the IFB prevents GLDD from competing for the work on a fair and equal basis. This Court repeatedly has held that the denial of "the opportunity to compete fairly for a contract" constitutes irreparable injury. Axiom Res. Mgmt., Inc. v. United States, 80 Fed. Cl. 530, 536 (2008); see Information Sciences Corp. v. United States, 73 Fed. Cl. 70, 127 (2006). In addition, there can be no question that GLDD has a substantial chance of

receiving an award if both dredges bid using the same estimated hours, as they have in the past, because GLDD has won seven of the last nine competitions.

## D. GLDD Is Entitled To Injunctive Relief

GLDD established in its May 5 Memo (at 27-29) that it satisfies this Court's criteria for issuing permanent injunctive relief. Those arguments will not be repeated here, and GLDD instead addresses only certain positions taken by Defendant in its May 5 Memo.

First, Defendant, cites a single case from the Court of Federal Claims, KSEND v. United States, 69 Fed. Cl. 103, 112 (2005), aff'd, 184 Fed. Appx. 956 (Fed. Cir. 2006), for the proposition that GLDD must show its right to injunctive relief by clear and convincing evidence. This decision runs counter to an overwhelming body of case law by this court holding that a party is entitled to injunctive relief if it meets its burden by a preponderance of the evidence. See, e.g., Blue Dot Energy Co., Inc. v. United States, 76 Fed. Cl. 783, 808 (Fed. Cl. 2004) (applying preponderance of the evidence standard in determining whether to issue injunctive relief in bid protest cases), rev'd on other grounds, 179 Fed. Appx. 40 (2006); Idea Int'l, Inc. v. United States, 74 Fed. Cl. 129, 137 (2006) (concluding that "[t]o obtain a permanent injunction, Plaintiff must show [the requisite elements] through a preponderance of the evidence"); Textron, Inc. v. United States, 74 Fed. Cl. 277, 286-87 (Fed. Cl. 2006) (same); Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 13 (2005) (same); MTB Group, Inc. v. United States, 65 Fed. Cl. 516, 525 (2005) (same); Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 159 (2005) (same); Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004) (same). GLDD has met this burden here.

Second, Defendant argues that economic harm and lost profits cannot constitute irreparable harm. Again, Defendant relies on a single case decided by this Court, which stated in

*dicta* that "economic harm without more, does not seen to rise to the level of irreparable injury." Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997).[9] This dicta is inconsistent with the large number of cases issued by this Court, and its predecessor, which have repeatedly and consistently held that the loss of ability to earn profits under a contract constitutes irreparable harm. See, e.g., Red River Serv. Corp. v. United States, 60 Fed. Cl. 532, 549 (2004) ("The loss of opportunity to compete for a contract and secure any resulting profit has been recognized as constituting 'significant harm'"); Great Lakes 60 Fed. Cl. at 369 ("The deprivation of potential profits has been found to constitute irreparable harm."); Day & Zimmerman Services v. United States, 38 Fed. Cl. 591, 610 (1997) (same); Hawaiian Dredging Const. Co. v. United States, 59 Fed. Cl. 305, 317 (2004) (same); Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 524 (1991) (same); Quality Transport Services, Inc. v. United States, 12 Cl. Ct. 276, 282 (1987) (same); Essex Electro Engineers, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983) (same).

Defendant also cites OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) for the proposition that "mere allegations of an unfair competitive bidding process are not sufficient to demonstrate irreparable injury." See Govt. May 5 Memo at 26. For the reasons set forth above, GLDD has done much more than allege an unfair competitive bidding process. It has established that the IFB here is defective, unfairly penalizes GLDD, and prevents GLDD from competing for the work on a fair and equal basis.

Moreover, despite the Government's claim to the contrary, this Court repeatedly has held that a bid protestor suffers irreparable injury "when deprived [of] the opportunity to compete fairly for a contract." Axiom Res. Mgmt., 80 Fed. Cl. at 536 (citations omitted); see

[9] In Minor Metals, which involved a motion for stay pending appeal, the court found that the plaintiff did not satisfy any of the four criteria for injunctive relief. Id. With respect to irreparable injury, the court found that the economic harm alleged by the plaintiff "is purely speculative." Id. at 382.

Information Sciences Corp. v. United States, 80 Fed. Cl. 759, 798 (2008); Superior Helicopter LLC v. United States, 78 Fed. Cl. 181, 195 (2007) (lost opportunity to compete on a level playing field is irreparable harm); see also Cardinal Maint. Serv., Inc., 63 Fed. Cl. at 110 ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders."); Hunt Building Co., Ltd. v. United States, 61 Fed. Cl. 243, 279-80 (2004) (same). Therefore, the unfair competitive advantage the IFB affords Weeks is a cause of irreparable harm to GLDD.

Finally, Defendant erroneously contends that issuance of an injunction here is not in the public interest because the work covered by the IFB is "essential" and "time sensitive." Govt. May 5 Memo at 26-27. These comments provide no basis to deny relief to GLDD.

The Corps has issued Amendment 0006, which suspends the IFB bid opening date indefinitely, in order to moot GLDD's motions for a temporary restraining order and a preliminary injunction. AR at 296-297. Defendant and GLDD have jointly agreed to an expedited schedule that finishes briefing in this matter on May 12, 2008, with a hearing on May 16, 2008. Therefore, this case can be resolved in a timely fashion, well before summer.

Moreover, issuing the injunction requested by GLDD will not unduly delay the project. The Corps has already issued one amendment (Amendment 0003) based on a single bid schedule, so it will not be difficult for the Corps to revise the IFB. The Corps also can request bids on an expedited basis and receive bids in a week or less once an amendment is issued.[10] Therefore, Defendant will not suffer any hardship if an injunction issued, while if an injunction is not issued, GLDD will suffer the hardship of being forced to compete in an unlawful procurement under which it will be denied the opportunity to compete on a fair and equal basis.

[10] When Amendment 0003 was issued, the Corps requested bids 11 days later. AR at 201.

See Information Sciences, 73 Fed. Cl. at 128. The overriding public interest in preserving the integrity of the procurement process also supports the relief sought by GLDD here.

## IV. CONCLUSION

For all of the reasons set forth above, GLDD respectfully requests that the Court issue an order that:

1. Grants Plaintiff's Motion for Judgment on the Administrative Record.
2. Denies Defendant's Motion for Judgment On Counts I and II Upon The Administrative Record; and
3. Enjoins the Corps from soliciting the maintenance dredging portion of the work under the current IFB, prohibits the Corps from soliciting the maintenance dredging portion of the work unless it uses estimated minimum production rates and estimated hours that are based on actual, historical production information, and prohibits the Corps from soliciting the maintenance dredging portion of the work using a price evaluation scheme that does not consider non effective hours and does not adequately assure that award to the low bidder will result in the lowest cost to the government.

Respectfully submitted,

s/Daniel C. Sauls
Daniel C. Sauls
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202-429-8054
Facsimile: 202-429-3902
dsauls@steptoe.com

Dated: May 12, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of May, 2008, a copy of Plaintiff's Reply Memorandum In Support of Its Motion for Judgment on the Administrative Record and In Opposition to Defendant's Motion for Judgment on Counts I and II Upon the Administrative Record was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Daniel C. Sauls
Daniel C. Sauls