No. 08-282C
(JUDGE BRADEN)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

---

GREAT LAKES DREDGE & DOCK CO., LLC.,
Plaintiff,

v.

THE UNITED STATES,
Defendant

---

DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT THE ADMINISTRATIVE RECORD

---

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

ROBERT C. BIGLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-0315
Fax: (202) 514-8624

Dated: May 12, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE UNITED STATES IS ENTITLED TO JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT UPON THE ADMINISTRATIVE RECORD . . . . . . . . . . 2

A. Plaintiff Has Not Shown A Violation Of A Statute Or Regulation And Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. The Corps Has Objective Rational Bases For Two Equalized Bid Schedules For Different Size Dredges . . . . . . . . . . . . . . . . . . . . . . 3

3. The Corps Equalized Bid Schedules Fairly Estimates Dredge Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. Plaintiff Cannot Demonstrate Prejudice . . . . . . . . . . . . . . . . . . . . . . . . 11

II. PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF . . . . . . . . . . . . . 12

A. Standard For Obtaining Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . 12

B. Success On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C. Irreparable Harm And The Balance Of Harms . . . . . . . . . . . . . . . . . . . 13

D. Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## CASES

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
480 U.S. 531 (1987) .......... 13

Banknote Corp. of America, Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) .......... 3

Bean Dredging Corp. v. United States,
19 Cl. Ct. 561, 568-69 (1990) .......... 5

CACI, Inc.-Federal v. United States,
719 F.2d 1567 (Fed. Cir. 1983) .......... 3

Cardinal Maint. Serv. Inc. v. United States,
63 Fed. Cl. 98 (2004) .......... 15

EP Productions, Inc. v. United States,
63 Fed. Cl. 220 (2005) .......... 3, 13

Emery Worldwide Airlines, Inc. v. United States,
264 F.3d 1071 (Fed. Cir. 2001) .......... 3, 11

Foundation Health Fed'l Servs. v. United States,
No. 93-1717, 1993 WL 738426 (D.D.C. 1993) .......... 13

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 2, 3

Information Sciences Corp. v. United States,
73 Fed. Cl. 70 (2006) .......... 14

KSEND v. United States,
69 Fed. Cl. 103 (2005), aff'd, 184 Fed. Appx. 956 (Fed. Cir. 2006) .......... 13

LABAT-Anderson, Inc. v. United States,
65 Fed. Cl. 570 (2005) .......... 15

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) .......... 13

OAO Corp. v. United States,
49 Fed.Cl. 478 (2001) .......... 14

Overstreet Elec. Co. v. United States,
47 Fed.Cl. 728 (2000) .......... 4, 5

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) .......... 11, 12

Vanguard Sec. Inc. v. United States,
20 Cl. Ct. 90, 113 (1990) .......... 15

Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,
758 F.2d 669 (D.C. Cir. 1985)) (additional citation omitted .......... 13

**STATUTES**

10 U.S.C. § 2304(a) .......... 11

**MISCELLANEOUS**

L.K. Comstock, Inc. And Federal Sys., Inc., B-261711.5 .......... 3

News Printing, Inc., B-2747732.2 .......... 3, 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | | |
|---|---|---|
| GREAT LAKES DREDGE & DOCK CO., LLC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-282 |
| | ) | (Judge Braden) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the United States Court of Federal Claims ("RCFC") and the Court's order of April 17, 2008, defendant, the United States, respectfully submits this response in support of our motion for judgment upon the administrative record, which we filed on May 5, 2008. As the administrative record ("AR") in this case reveals, the decision of the U.S. Army Corps of Engineers ("Corps") to issue a solicitation, which sets estimated hours required based upon the size of the dredge, for a contract for the performance of harbor maintenance dredging was not arbitrary and capricious and did not violate any statute or regulation. Plaintiff also cannot demonstrate that it has suffered prejudice as a result of any alleged statutory or regulatory violation.

In its memorandum in support of plaintiff's motion for judgment on the administrative record ("Pl's. Memo"), plaintiff, Great Lakes Dredge & Dock Company LLC ("GLDD"), attacks the solicitation ("Solicitation") proposed by the Corps by asserting that the Solicitation does not reflect the Corps needs and establishes quantities that place its dredge at a disadvantage.

The bid schedule estimates that the larger 29 inch dredge will be approximately 15 percent more effective than the smaller 27 inch dredge. As a result, the bid schedule assumes,

based upon the area of the pump discharge and the minimum required horsepower, that the 27 inch dredge will require approximately 15 percent more hours to complete the maintenance harbor dredging than the larger 29 inch dredge. GLDD relies upon data that it contends demonstrates that in the past the 27 inch dredge and 29 inch dredge have performed at almost exactly the same production rate.

## STATEMENT OF FACTS

Defendant incorporates the statement of facts from its initial brief filed on May 5, 2008, as its counter-statement of facts. Govt. Br. at 4-10.[1]

## ARGUMENT

### I. THE UNITED STATES IS ENTITLED TO JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT UPON THE ADMINISTRATIVE RECORD

#### A. Plaintiff Has Not Shown A Violation Of A Statute Or Regulation And Prejudice

##### 1. Standard Of Review

This Court's review of agency procurement decisions is quite limited. The standard of review provides that a reviewing court shall set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).

In the bid protest context, this Court should enjoin a procurement decision only when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni, 238 F.3d at 1332. When

---

[1] "Govt. Br. at __" refers to the Defendant's Motion for Judgment on Counts I and II upon the Administrative Record, filed on May 5, 2008.

a bidder's challenge implicates the first ground, the protestor "bears a heavy burden" of showing that the agency's decision had no rational basis. Id. at 1333. This heavy burden stems from the wide discretion afforded to contracting officers "upon a broad range of issues confronting them in the procurement process." Id. at 1332. Indeed, this Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" EP Productions, Inc. v. United States, 63 Fed. Cl. 220, 223 (2005) (quoting CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

When a challenge is brought on the second ground – a violation of regulation or procedure - the plaintiff must show a clear and prejudicial violation of applicable statutes or regulations. Banknote Corp. of America, Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal quotations and citations omitted) (quoting Impresa, 238 F.3d at 1332-33). To show prejudice, plaintiff must show that there was a "substantial chance" that it would have been awarded the contract but for agency errors in the bid process. Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001).

**2. The Corps Has Objective Rational Bases For Two Equalized Bid Schedules For Different Size Dredges**

In its motion for judgment on the administrative record, GLDD relies upon L.K. Comstock, Inc. And Federal Sys., Inc., B-261711.5 et al., 96-1 C.P.D. ¶ 4 (Dec. 14, 1995) and News Printing, Inc., B-2747732.2 et al., 97-1 C.P.C. ¶ 68 (Feb. 11, 1997) to argue that "when the government solicits offers on the basis of estimated quantities, those estimates must be compiled from the best information available and must be a reasonably accurate representation of the agency's needs." Pl. Memo. at 16. But as we pointed out in our motion, GLDD's reliance upon these cases is completely misplaced. Comstock involved a post-award protest where the

agency's approach to evaluating proposals was not reasonable because it considered non-discounted prices for some offerors, yet used discounted prices for another where the likely quantity to be ordered would not be sufficient to trigger the discount.

Here, the situation is entirely different. This is a pre-award protest, not a post-award protest. More importantly, the Government action here is effectively the opposite of selectively applying discounts to certain contractors proposals even though the discount will not likely be achieved. Instead, the Government has calculated estimated productivity of two different size dredges in an effort to level the playing field for bidders with different size dredges. Certainly, there is a rational basis for the Government's conclusion that a larger more powerful dredge is more productive than a smaller dredge. The Government calculated the productivity of the dredges based upon pump discharge area. AR837-838. In simple terms, more slurry travels through a 29 inch dredge pipe than a 27 inch dredge pipe. The Government's conclusion is further supported by the fact that the 29 inch dredge is required to have 54 percent more horsepower than the smaller dredge. AR182.

GLDD also argues that the production estimates for the 29 inch dredge do "not accurately reflect the government's needs or the amount of work that actually will be required." Pl. Memo. at 19. In support of this argument, GLDD relies upon various cases that state that estimated quantities must be based upon the actual needs of the agency. See News Printing, Inc., B-2747732.2 et al., 97-1 C.P.C. ¶ 68 (Feb. 11, 1997) (agency properly canceled IFB after bid opening where the agency reasonably determined that the solicitation's quantity estimate no longer represented agency's actual needs.); C-Cubed Corp., B-289867, 2002 C.P.D. ¶ 72 at 3 (April 26, 2002) (agency properly canceled IFB after opening where it determined that the solicitation's estimated quantities no longer represented the agency's actual needs.) But these

cases are not applicable here because GLDD is not challenging the estimated quantity of material to be dredged. Instead, GLDD is apparently arguing that the 29 inch dredge will not be as productive as the Government estimates resulting in an increased number of hours to complete the work. The amount of dredging needed is not in dispute and cannot be an issue because ultimately the contractor will be paid by the hour and, if additional dredging is needed, the contractor will be compensated at the hourly rate. The question is simply whether the agency had a rational basis for believing that a larger dredge is more productive than a smaller dredge.

GLDD also relies upon the Corps' Cost Estimating Regulations, Engineering Regulation 1110-1302 ("ER 1110"). The purpose of these regulations is to provide guidance and procedures for developing a Government cost estimate for all Corps civil works projects including dredging projects. Pl. Br., Appendix at 3. These regulations are to be followed when the Corps is developing a cost estimate for a dredging project. In other words, GLDD's reliance upon ER 1110 is just as misplaced as its reliance upon Overstreet Elec. Co. v. United States, 47 Fed.Cl. 728, 734 (2000) (upholding a protest where the low bid was canceled because it exceeded the agency's estimated costs which were not accurately calculated) and Bean Dredging Corp. v. United States, 19 Cl. Ct. 561, 568-69 (1990) (upholding protest where agency failed to prepare fair and reasonable estimate of costs to be incurred and cancelled low bid because its bid exceeded the agency's estimated costs) because these decisions involved rejecting bids that exceeded the agency's estimated cost for the project. As we stated in our motion, the Corps' estimated cost for the project is not the issue here. The question is simply whether the Corps had a rational basis for concluding that it would take a smaller 27 inch dredge approximately 15.4 percent more time to complete the required maintenance dredging than a larger 29 inch dredge.

Even if the "best information" requirement does apply, the data included in GLDD's

table attached to its complaint and its letter of February 8, 2008, is unreliable and its analysis is flawed. AR639; AR971. This data, even if accurate, is unreliable because it includes eight years of data for GLDD's smaller Ponchartrain dredge but only two years of data for the competitor's larger Venture dredge. But the data is even more misleading because the Venture was used in years when the quantity of dredged material was significantly less than other years. In fact, GLDD highlights these differences in the table in its motion for judgment on the administrative record in which it states that during the eight years of dredging completed by Ponchartrain, 22,335,433 cubic yards were dredged, while during the two years that Venture was used, only 2,793,872 cubic yards were dredged. In other words, the table is unreliable because approximately 88 percent of the data included in the table is for the smaller Ponchtarain, but only 12 percent of the data is for the Venture. Pl. Br. At 26.

GLDD argues that the Corps' production calculations, based upon the area of the discharge pump, are over simplified because the average velocity and average percent of solids are kept constant. Pl. Memo. at 4. While this is true, this was the only fair way to compare different dredges of different sizes. The larger dredge requires more horsepower to sustain the same velocity as the smaller dredge which is why the Solicitation requires that the larger dredge have at least 54 percent greater horsepower than the smaller dredge. Keeping the average percent of solids constant is also fair to both the smaller and larger dredge because it results in a comparison of two different size dredges that are dredging under the same conditions. Not surprisingly, nowhere in its brief does GLDD argue that the velocity should be greater for its smaller dredge or that the average percent solids should be higher, it simply points out that these two variables were kept constant even though, as we have shown above, that results in the fairest comparison of dredges of different sizes.

GLDD also complains that the Corps' estimated hours are inaccurate because the larger Venture cannot, according to GLDD's own table, provide 15.4 percent more production than GLDD's smaller Ponchartrain. But even GLDD's own table shows otherwise. In 2007, the Venture had an effective production of 1,207 cubic yards per hour ("cy/hr") which is 18.6 percent greater than Ponchartrain's production in 2006 of 1,017 cubic yards per hour. AR639.

GLDD also argues that the larger "Venture has never come close to averaging the 1,321 cubic yards per hour set as a minimum production for a 29 inch dredge in the solicitation." Pl. Memo. at 19. But GLDD ignores two very important points. First, the solicitation sets a minimum production rate of 1145 cy/hr for the smaller 27 inch dredge and 1321 cy/hr for the larger 29 inch dredge. AR182. While GLDD claims that the larger Venture has never achieved the minimum 1321 cy/hr required, GLDD's own table demonstrates that GLDD's Ponchtarain has averaged only 1,111 cy/hr which is less than the required minimum for a 27 inch dredge of 1145 cy/hr. AR639. More importantly, the solicitation requires that whoever is awarded the 2008 contract, whether it is the 27 inch Ponchartrain dredge or the larger 29 inch Venture dredge, will have to meet the required minimums for the appropriate size dredge as set forth in the solicitation. "Failure to maintain that quantity will result in a reduction of payments . . . ." AR182. If the Venture is awarded the contract, Venture will have to meet the minimum of 1321 cubic yards per hour. One would also assume that if the Venture cannot meet the minimum requirement, its owner, Weeks Marine, Inc. ("WMI"), will not bid on the contract knowing that its payments will be reduced. Indeed, WMI has provided its own table of data which shows that the output of the Venture varies from 1,321 cubic yards per hour to 2,197 cy/hr with an average production of 1,859 cy/hr which is well in excess of the required minimum of 1,321 cubic yards per hour. AR678.

GLDD also relies heavily on a February 25, 2008 memorandum from Mr. Channell in which he recognizes that the 29 inch dredge has a greater production capacity than a 27 inch dredge, but he continues by stating that "there are conditions present in this work which are expected to mitigate the production advantage of a larger dredge." AR641-42. GLDD is taking these comments out of context. The complete analysis provided by Mr. Channell in the memorandum does not support GLDD's conclusion. In the memorandum, Mr. Channell relies upon three paragraphs in which he discusses the differences between a 27 inch and 29 inch dredge. The first paragraph is not significant to our discussion. In the second paragraph, paragraph 2b, Mr. Channell analyzes the harbor maintenance portion of the solicitation and states that "[u]nder normal conditions, a 29-inch dredge will have higher production rates than a 27-inch dredge . . . ." AR641. Mr. Channell then goes on to state that the larger dredge may not have a higher production rate "[i]f there is a limited amount of material in the cut (less than full bank), the limiting factor becomes the speed with which the dredge can swing through the cut, not pump capacity." Id. (emphasis added).

Mr. Channell's discussion with regard to the harbor maintenance portion depends upon a "limited amount of material" which, as we showed in our motion for judgment on the administrative record, is not likely to be the case this year. Govt. Br. at 10. Mr. Channell recognized that his analysis depends on the amount of material to be dredged because he started the sentence with the word "if," which shows that he knew that there may not be a limited amount of material. That is exactly the case this year where the Memphis District has estimated that 2,377,872 cubic yards will be removed pursuant to the current maintenance dredging solicitation which is expected to result in a proposed contract for between $5 and $10 million dollars. AR837-838; AR 7, Block 10. This is an increase of estimated dredging work compared

to last year. The District's 2007 Dredging Contract anticipated one to five million dollars of dredging appropriations and only 1,120,599 cubic yards was actually removed. AR639, AR912, Block 10. In addition, in 2007, the solicitation only included seven harbors and added that three of those harbors likely would not be dredged because of a lack of funding. AR920; AR934; AR950. In this Solicitation, the Corps is anticipating that all nine harbors will require dredging. This larger quantity of material to be dredged this year will enable a larger dredge to be more productive than in years past when the quantity dredged was much lower.

In paragraph 2c of the memorandum, Mr. Channell analyzes whether a 29 inch dredge will be more productive regarding the new construction portion of the Solicitation and concludes, referring only to the new construction portion, that "the 29-inch dredge will not have any production advantages." AR641. However, as GLDD recognizes in its motion, the new construction portion was subsequently changed to a payment per cubic yard dredged basis which GLDD is not protesting. Pl. Memo. at 11. In the final paragraph, paragraph 2d, Mr. Channell states "[b]ased on the above . . . we will be unable to utilize the additional production capabilities of a larger 29-inch dredge." AR642. Therefore, Mr. Channell's conclusion that the Corps will be unable to utilize the additional production capacities of the larger 29-inch dredge is based on: 1) a limited amount of material to be dredged, which is not the case this year; and 2) that the 29-inch dredge will not have any production advantage with regard to the new construction dredging which GLDD is not protesting because it was subsequently changed to payment based on cubic yards dredged rather than payment by the hour. As a result, GLDD's reliance on Mr. Channell's memorandum is misplaced.

**3. <u>The Corps Equalized Bid Schedules Fairly Estimate Dredge Time</u>**

GLDD argues that the Corps failed to provide full and open competition because the bid

schedule fails to consider non-effective dredging time. Pl Memo. at 21. But as we stated in our motion, the Solicitation properly excludes the consideration of the non-effective time when determining the lowest bidder because non-effective time is not within the control of the contractor. AR159. In its motion, GLDD relies solely its own chart which shows that the two years of data for the Venture included more non-effective time on average than the eight years of data for when GLDD's Ponchartrain completed the harbor maintenance dredging. But GLDD ignores the fact that, generally, non-effective time is not within the contractors control and, therefore, it is impossible to predict the amount of non-effective time that will be encountered while completing the work. Non effective time is determined by the conditions encountered by the dredge, which vary from year to year and location to location.

Furthermore, GLDD does not suggest anyway for considering non-effective time in the Solicitation. This is because there is no way to predict the non-effective time that will be encountered. GLDD may argue that non-effective time should be calculated based upon its own table which provides non-effective hours for the last ten years. AR639. But again, this data is unreliable. First, because, as we showed above, 88 percent of the data is for the smaller Ponchartrain dredge while only 12 percent of the data is from the larger Venture dredge. Second, reviewing the non-effective hours included on the table shows that this time is highly variable and that it changes dramatically from year to year. As we pointed out in our motion, in 1998 Ponchartrain encountered only 98 hours of non-effective time, but in 2000, it encountered 357 hours of non-effective time. AR639. As a result, the Corps properly excluded non-effective time as a consideration in determining the lowest bidder.

GLDD's reliance upon various GAO decisions holding that the award of a contract must be determined by the full scope of the work awarded, do not apply. And because of that, the

Corps' decision to exclude non-effective time is correct because there is no way to predict the amount of non-effective time that will be encountered. See Associated Healthcare Sys., Inc., B-222532, 86-2 C.P.D. ¶ 246 at 2 (Sep 2, 1986); Professional Carpet Service, B-220913, 86-1 C.P.D. ¶ 158 at 2-3 (Feb. 13, 1986); Robinson Mills & Williams, B-236956.3, 90-1 C.P.D. ¶ 156 at 3 (Feb. 7, 1990). None of these decisions address the situation encountered here where the non-effective time cannot be determined in advance and is outside the control of the contractor, but instead is determined by the location of the dredging and other unknown factors that vary from year to year and location to location.

Because the non-effective time is not fully within the control of the contractor, the Government properly excluded it from consideration when determining the lowest bidder. For all these reasons, it is clear that the solicitation provides for full and open competition and, as a result, the Corps has not violated 10 U.S.C. § 2304(a).

**B. Plaintiff Cannot Demonstrate Prejudice**

When a protestor asserts a violation of a regulation or procedure, it must show that the violation is "clear and prejudicial." Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001). To show prejudice, plaintiff must show that there was a "substantial chance" that it would have been awarded the contract but for agency errors in the bid process. Id. Here, GLDD argues that it is prejudiced by the two bid schedules because the bid schedule provides the larger dredge with a 15.4 percent advantage. Pl. Memo. at 20. However, as we have shown above and in our motion, the bid schedule does not provide an advantage to the larger dredge. Quite the opposite, the Solicitation ensures fair competition by leveling the playing field for two different size dredges with different production capabilities and different operational costs. The larger dredge is required to have 54 percent more horsepower

than the smaller dredge which results in increased fuel consumption. In this case, with the rising cost of fuel, the playing field would not be level if different sized dredges were treated the same.

It is also worth noting that in 1999, the solicitation for the Memphis district included two bid schedules for two pump discharge sizes. AR 844-845. One for a 24 inch dredge and one for a 27 inch dredge. Like the Solicitation at issue in this case, the 1999 solicitation also provided different production rates based upon the size of the dredge. Id. GLDD did not protest that solicitation and was ultimately awarded the dredging contract for 1999 when its larger 27 inch dredge was chosen over a competitor with a smaller 24 inch dredge. However, now that GLDD has a smaller dredge, it claims that different production rates based on the size of the pump discharge puts the smaller dredge at a disadvantage, but this is not the case.

GLDD can still provide a proposal that will provide the lowest cost to the Government because GLDD's smaller dredge has reduced operational costs which should allow it to bid a lower hourly rate which will result in a competitive bid even though the dredging hours will be more than that of a larger 29 inch dredge. Because GLDD cannot demonstrate prejudice as a result of the alleged statutory or regulation violations, its claims should be rejected.

## II. PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF

### A. Standard For Obtaining Injunctive Relief

In deciding whether a permanent injunction should be issued, the Court considers "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." PGBA, LLC v. United States, 389 F.3d 1219, 1228-29

(Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n. 12 (1987)).

Because "injunctive relief is so drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." EP Productions, Inc. v. United States, 63 Fed. Cl. 220, 224 (2005). That is, plaintiff must demonstrate its right to injunctive relief by clear and convincing evidence. KSEND v. United States, 69 Fed. Cl. 103, 112 (2005), aff'd, 184 Fed. Appx. 956 (Fed. Cir. 2006).

**B. Success On The Merits**

As demonstrated above, GLDD has not shown that the Corps' actions were arbitrary, capricious, or otherwise not in accordance with applicable statutes and regulations. Accordingly, GLDD is not entitled to an injunction because it cannot succeed on the merits.

**C. Irreparable Harm And Balance Of Harms**

GLDD cannot demonstrate that it will suffer irreparable harm. GLDD argues that a "protester suffers irreparable injury, when it has been deprived [of] the opportunity to compete fairly for a contract." Pl. Memo. at 27 citing Information Sciences Corp. v. United States, 73 Fed. Cl. 70, 127 (2006). Respectfully, that decision and similar rulings by this Court that loss of fair competition causes irreparable harm is wrongly decided. Mere loss of business opportunity cannot be irreparable harm unless so extreme that it threatens the life of the business. Foundation Health Fed'l Servs. v. United States, No. 93-1717, 1993 WL 738426, at *3 (D.D.C. 1993) (quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)) (additional citation omitted); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("However, economic harm, without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir.

1983)). "Mere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury, however; if they were, any bid protest would involve an irreparable injury." OAO Corp. v. United States, 49 Fed.Cl. 478, 480 (2001). Moreover, as shown above, the Corps Solicitation was specifically designed to level the playing field between bidders with larger and smaller dredges. As the court recognized in Information Sciences, "[r]obust competition ensures that the costs to the taxpayer will be minimized." Id. at 128.

GLDD cannot claim that it will lose the opportunity to compete on a level-playing field because, as discussed above, the solicitation is designed to provide a level playing field for bidders with different size dredges. GLDD has made no showing that the competitive process here is anything but a level-playing field. In fact, the Corps has formulated the solicitation determined expressly to provide for a level playing field. AR837-838.

While GLDD claims that the Government will "suffer no harm at all if an injunction is issued[,]" that is simply wrong. Pl. Memo. at 28-29. If the dredging does not proceed in the very near future, the Corps will suffer severe harm because it may miss the critical window of time available to complete the harbor maintenance dredging operations necessary to maintain the nine ports for barge shipment of commercial commodities along the Mississippi River. This is particularly critical during the low water stages of the Mississippi River that are historically typical during the summer months, which is concurrent with harvest time for most agricultural commodities. A delay of the dredging contract into that critical time will harm both the Government and the economy. Therefore, this case is clearly unlike the cases relied upon by GLDD in which there was no urgent need to move forward with the procurement. See Information Sciences, 73 Fed. Cl. at 128 (limited injunctive relief awarded where further delay in awarding the contract would not threaten the continued operation of a new electronic

procurement system); Cardinal Maint. Serv. Inc. v. United States, 63 Fed. Cl. 98 (2004) (granting injunctive relief where an injunction would "cost the government some money and effort," but would not completely disrupt the procurement process.) Therefore, injunctive relief should not be awarded here because it would disrupt the procurement process for completing the harbor maintenance dredging which is necessary to ensure that commercial commodities can continue to transit the Mississippi River.

**D. Public Interest**

The dredging work provided by the solicitation is essential and time-sensitive. The maintenance dredging required by this acquisition is essential to ensure the ability of commercial vessels to safely navigate waterways along the Mississippi River. The work is also time-sensitive because of work restrictions resulting from environmental windows that limit the time period during which major, contract-essential work may be performed. It is in the public interest that this work should continue as scheduled during the permissible work window.

This Court has also recognized the strong public interest in not interfering with the procurement process of Government agencies. See LABAT-Anderson, Inc. v. United States, 65 Fed. Cl. 570, 581 (2005) (public interest is not served by interfering with procurement process so long as the agency did not violate applicable laws and regulations). In addition, the public has an interest in "minimizing the costs of federal procurements." Vanguard Sec. Inc. v. United States, 20 Cl. Ct. 90, 113 (1990). Under its anticipated procurement, as discussed above, the Corps will obtain the required dredging at the lowest cost to the Government.

In short, given GLDD's inability to demonstrate success on the merit, the lack of harm to GLDD, the severe harm to the Government and the public interest in insuring that the

Solicitation proceeds, GLDD has not and cannot show that the Court should take the extraordinary step of awarding injunctive relief.

**CONCLUSION**

For the foregoing reasons, the Court should deny GLDD's motion for judgment on the administrative record and should grant defendant's motion for judgment on the administrative record.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Robert C. Bigler
ROBERT C. BIGLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-0315
Fax: (202) 514-8624

May 12, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on this 12th day of May, 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert C. Bigler