UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GREAT LAKES DREDGE AND DOCK COMPANY, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 08-282C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 69

Place: Washington, D.C.

Date: May 29, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GREAT LAKES DREDGE AND DOCK COMPANY, LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No.: 08-282C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Room 505, Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday,
May 29, 2008

The parties met, pursuant to notice of the Court, at 10:00 a.m.

BEFORE: HONORABLE SUSAN G. BRADEN
Judge

APPEARANCES:

For the Plaintiff:

DANIEL C. SAULS, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
(202) 429-8054

THOMAS P. BARLETTA, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795
(202) 429-8058

APPEARANCES: (Cont'd)

For the Defendant:

ROBERT G. BIGLER, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, D.C. 20530
(202) 307-0315

CHARLES A. BRIGGS, Esquire
Agency Counsel
U.S. Army Corps of Engineers
Memphis District
B-202 Federal Building
Memphis, Tennessee 38103
(901) 544-3777

P R O C E E D I N G S

(10:00 a.m.)

THE CLERK: The United States Court of Federal Claims is now in session, the Honorable Susan G. Braden presiding.

THE COURT: Good morning.

I have a number of my summer interns here today. That's what your audience is. They're from the University of Texas, George Washington, and Tulane. And they played a valiant softball game last night. Pursuant to our strategy we lost, because we're going to play these guys again so we don't want them to know all of our tricks.

Plaintiff's counsel, ready?

MR. SAULS: Yes, Your Honor. I am. Thank you.

THE COURT: Just so you know, we have gone through probably about four drafts of the opinion, so we've been moving along. I think the most productive thing I could say this morning to the Plaintiff is I had a tremendous amount of trouble following what you were doing in your brief. In the sense of I've kind of reorganized it a bit, but you have some arguments where the law has been violated, there were violations of the law that you allege which is separate than the

Administrative Procedures Act arbitrary and capricious problem. I'd kind of like to focus on what you've got, what I would say in the strong suit. If you've got a violation of law, then we've got something to work with. More so. The arbitrary and capricious stuff is much more difficult in this area, as you know.

So I'd like to have you focus on your silver bullet.

MR. SAULS: Your Honor, in terms of violations of law, prejudicial violations, there are three or four.

First, providing our competitor, Weeks Marine, with an unwarranted 15 percent bidding advantage is a clear and prejudicial violation of the Competition in Contracting Act and FAR 6.101, both of which require the government when it solicits work to provide for, promote and obtain full and open competition.

Your Honor, there can be no full and open competition when there are only two likely bidders and one of the likely bidders is starting in a 15 percent hole because the Corps had given them an unjustified 15.4 percent bidding advantage by relying solely upon the pump discharge area to estimate production in

hours rather than looking at the more relevant and probative evidence.

THE COURT: So your argument is they're focusing on the size of the dredge. Am I saying it correctly?

MR. SAULS: Solely on the size of, the area of the pump.

THE COURT: The pump.

MR. SAULS: Without looking at historical production records, which their own regulation states is the most reliable way to estimate dredge production in hours. Without taking into account their own internal analysis prepared during the middle of this procurement on February 25, 2008, in which the Court, looking at the particular conditions of this job, concluded that Weeks Dredge VENTURE would not have a production advantage over Great Lakes Dredge PONCHARTRAIN.

In addition, Your Honor, the so-called calculation that the Corps did here, which I hesitate to call it calculation, because what they did is they took a formula which doesn't estimate production. It's a formula that measures the volume of flow through any pipe or any pump. They took that formula that had three variables and they said we're going to assume

that two of them are the same for both dredges. We're going to assume velocity and slurry density or percent solids are the same.

That means what in effect we're doing is we're assuming that the only factor that affects dredge production is pump discharge area. Your Honor, that in addition to violating the FAR provision I referred you to, violates their own estimating regulation which is attached to our opening brief and which this Court has relied upon on more than one occasion to strike down agency action based on improper government estimates. I refer to the Bean Dredging case and the Overstreet --

THE COURT: Why do you think the government would have done all these things?

MR. SAULS: It's hard for me to say, Your Honor, because one of the points in my prepared argument, which I'm obviously never going to get to, and that's fine --

THE COURT: Well, we're not in an appellate court and this is the only opportunity I'm going to have to talk to you.

You're going to have plenty of time to do whatever you want to do. Within reason anyway.

MR. SAULS: My answer is --

THE COURT: It seems like they went out of their way on numerous occasions to kind of rig this thing, if that's what you're saying.

MR. SAULS: I'm not suggesting that they went out of their way to rig it. I'm suggesting that they did not perform the sort of analysis that one would expect if one were changing a process that had been going on for years.

Keep in mind that the Corps has conceded in their briefs that for at least the last seven years they bid this same project involving the dredging of the same harbors using a single bid schedule where Weeks and Great Lakes bid using the same number of hours. This year, for whatever reason, they decided to change that.

THE COURT: That's their business.

MR. SAULS: But remember, in the prior seven years there were no protests, there were no controversies, the work was competed, the work was bid, the work was performed.

They changed it this year, but I searched the entire administrative record and I could find nothing about why a change was needed. What is different in 2008 than in all the previous years when a successful competition was performed?

I don't know why the Corps did it. It's certainly not in the administrative record, and I would think that adopting a change that has such a significant impact on the bidders, one would expect to see some basis for it in the administrative record, and the lack of that basis, Your Honor, I think is part of the reason why this action is arbitrary and capricious.

But I do want to get back to your initial question which is violations of law.

THE COURT: I want to focus on that first.

MR. SAULS: Yes, ma'am.

The Competition in Contracting Act and FAR 6.101 because of failure to provide for, promote and obtain full and open competition; violation of FAR 14.101 which requires, Your Honor, that when an agency procures work and issues a solicitation, it must state its requirements based on accurate estimates.

Throughout our briefs --

THE COURT: They would say they're accurate.

MR. SAULS: I think that is an issue here. We would say they are not accurate estimates because they do not rely, in violation of their own regulations, on the best information available. They ignored their own internal analysis. And they made an

assumption that first, the pump discharge area is the only thing that affects dredge production, which their own manual, ER-1110 states is not true. ER-1110 lists nine factors that affect cut or section dredge production. None of them is pump discharge area and none of those nine factors was considered by the Court here.

Your Honor, the other regulation that I suggest is violated here is the Corps zone engineering regulation. The Corps did not use the historical production information --

THE COURT: They said it's not relevant. They only have two years for the other competitor.

MR. SAULS: Yes. And I would --

THE COURT: To me that's a reasonable response, just so you know. It's not comparable. They don't have an evaluation for each year --

MR. SAULS: A couple of points on that, Your Honor.

First, I think it's important to consider that the Corps in an internal memorandum conceded the accuracy of the historical production data provided by Great Lakes. That's in the administrative record at page 612. I quote, "We do not dispute the accuracy of the figures in your table."

Your Honor, the reason there's eight years of data for one dredge and two years from the other is because that's what's available because the PONCHARTRAIN has done the work eight of the last ten years. The fact that more data is available from the PONCHARTRAIN does not make the admittedly accurate data from the VENTURE unreliable or --

THE COURT: That's not the point. I think the point basically is it's not a consistent, there's not a document that shows the consistent history for both. It's accurate in the sense that it tells what there is but it's not a full picture. That point I don't think it's productive to belabor. I don't think that's one of your strongest points.

MR. SAULS: Let me just point out one thing in that regard, Your Honor. That is this Court in its decision in the Mike Hooks case which also involved a challenge to the estimated productions and estimated hours in a dredge rental solicitation, held that it was appropriate for the Corps to establish estimated dredge production rates and rental hours when the Corps had less than 100 hours of dredging time for the dredge involved, had just over 100,000 cubic yards of dredging history for that dredge on jobs other than, different than the job that they were about to

perform.

Here, Your Honor, the Corps had 25 times as much data. More than 2500 hours, almost three million cubic yards, and it's for the same dredge in the same location. The ER says that is the most reliable way to determine dredge production. I'm sorry to disagree with the Court, but I would suggest that under their own regulation it was unreasonable per se for them to completely ignore that data.

Put yourself in the context of my client, Your Honor. We've been bidding this work against Weeks for years on a single bid schedule without complaint, without anything. The Corps hands Weeks a 15.4 percent advantage. We go back and look at the historical record and say okay, if his dredge is more productive than ours then the hours should be different, but the historical record demonstrates that his dredge is not more productive than ours and that he has never come close to achieving the production rate used by the Corps here to give him that 15.4 percent advantage.

THE COURT: Why are there only two bidders for this contract? No one has the equipment? Is that the problem?

MR. SAULS: I don't know that I can speak to

that, Your Honor.

THE COURT: Can you conceive of any circumstances under which the other bidder could ever qualify for this work? Your argument to me in part is like we've always had the work,therefore we should always have the work.

MR. SAULS: Oh, no, Your Honor. I said we've always competed for the work based on a bid schedule that treated the offerors equally.

THE COURT: Because you always got the work.

MR. SAULS: No, we didn't always get the work. Weeks got the work in two of the last five years.

THE COURT: Okay.

MR. SAULS: Why aren't there other people? I would suggest this for your consideration, Your Honor, is that the dredging industry is a rather small and concentrated industry and it is not unusual for there only to be two bids on a dredging project. It's not unusual at all.

I suspect it's because on this rental contract that Great Lakes and Weeks have the two dredges that are best fitted and best structured to do this particular work.

THE COURT: Okay.

MR. SAULS: Getting back to your first question, though, we have violations of Competition in Contracting Act, FAR 6.101, FAR 14.101, and the Corps of Engineering regulation.

I may have already gotten into this a little bit, but given that we had a two week break to step away from this after completing the briefs on May 12th, thank you for that.

THE COURT: We were not on break. We were working on the case.

MR. SAULS: I had a few other things to do myself, but I didn't spend all my time on this.

When I came back to this and took a look at it, two or three things struck me from a big picture perspective. Not going into detail, not going down into the weeds.

The first is one that I've already covered which is the Corps had successfully competed this work without controversy, without protest for years. They decided to make a change here but there's nothing in the record or in the briefs that says why 2008 is any different from 2007.

THE COURT: I don't know if this is true, maybe the government can tell me afterwards, but I think I mentioned, we were in New Orleans the week I

think the bid protest came in or shortly before and we saw -- the Corps was showing us, when we were down there, showing us the massive amount of stuff that was coming down the river from the west. Winter and spring. It was high flows and tremendous -- you could just watch and see the stuff coming down. It was really like watching a freight train. The water was really moving. That possibly might be an issue. Maybe the government will tell me. It may or may not be in the record.

MR. SAULS: It is certainly not in the record. And of course it rains every year and the river rises every year, so we have similar conditions under the previous contracts as well.

Second, a point I alluded to earlier, what did the Corps do when it decided to make this change? I certainly would have expected that when you're changing a longstanding successful practice that there would be some detailed analysis in support of why you're doing this.

THE COURT: Your argument is there is an analysis but some part of it doesn't agree. You agree they have this internal document, 612 at the record, that they did an analysis there that you agree with. They --

MR. SAULS: 641 to 642, Your Honor, is the analysis. That's the February 25th memorandum.

THE COURT: Okay, so they did that analysis, you liked that analysis, but they didn't rely on it, they didn't ultimately find that dispositive.

MR. SAULS: They relied upon that to change the solicitation in Amendment 3 back to a single bid schedule with single estimated hours. Then they flip-flopped and they went back to the original schedule. When they did that, Your Honor, there's no analysis in the record of the Weeks protest. There's no assessment of anything that Weeks said. No analysis in the record about the February 25th memorandum by Mr. Channell which was used as the basis for Amendment 3, but now for some reason that is unexplained, is not a basis for Amendment 5 which --

THE COURT: Why would you do a pre-award status, an analysis of Weeks' submission?

MR. SAULS: Weeks says you should change back to the original bid schedule with two bid schedules and an advantage for Weeks.

THE COURT: Right, but --

MR. SAULS: But that's what the Corps ultimately did. I'm just saying, Your Honor, there is no explanation in the record how they got from

Amendment 3 to Amendment 5, why they flip-flopped back and forth which to me is the hallmark of an arbitrary and capricious process; and why -- The other thing, the only thing in the record that really does any sort of detailed analysis of dredge production under this contract is the February 25th memorandum which concludes that both dredges will achieve the same production. There's no rebuttal to that memorandum anywhere in the record and yet they changed back without any explanation.

THE COURT: If the Administrative Procedures Act requires them to do make their decision rationally, we're not at that place yet.

MR. SAULS: The decision was made in Amendment 5 and the only thing that's in the record on this subject is totally --

THE COURT: -- awarded the contract yet.

MR. SAULS: The only reason we're here is because the Corps issued Amendment 5 and says we intend to award the contract on the basis of two separate bid schedules that give Weeks a 15.4 percent advantage on the maintenance dredging work that Great Lakes believes, based on the Corps' internal analysis, based on the historical evidence, and based on the mistakes in the Corps' calculation and assumptions, is

completely improper and precludes us from bidding for the work on a fair and equal basis.

THE COURT: Okay. Here's where I'm trying to break this out.

The 15.4 percent advantage scoring, let's put it that way, that they did. You're saying they had no analysis for that at all? You didn't think there was enough analysis?

MR. SAULS: The only thing that could be considered an analysis is two pages of calculations at pages 837 to 838 of the administrative record. Before I said let's put calculations in quotations, because it's not really even a calculation. They took a formula that has three variables; they assumed, erroneously, that two of those variables were constant; then they said oh, well if we assume that the area of the discharge pump is the only thing that affects dredge production, then a dredge with a slightly larger discharge pump is going to have an advantage so we're going to give this guy a 15.4 percent advantage.

That's not an estimate of dredge production, that is an assumption. That's an assumption that is completely refuted by the historical evidence because the VENTURE in fact has not outperformed the

PONCHARTRAIN and it's refuted by the Corps' own internal analysis in which Mr. Channell said I think under the specific and particular conditions that you encounter on this job dredging these harbors along the Mississippi River, that the VENTURE will not have a production advantage, and why is that?

THE COURT: That was his opinion, and that's okay.

MR. SAULS: Yes, but that's the only thing in the administrative record other than those two pages of "calculations" which aren't calculations and indeed are only assumptions, that relate to the production other than the information that Great Lakes provided the historical information --

THE COURT: What do you want them to go do, aside from giving you the contract?

MR. SAULS: I want the Corps to bid the contract fairly. If they bid it fairly and I don't get it, so be it.

THE COURT: How is fair?

MR. SAULS: Two things. Number one, it should be bid as it has been the past seven years with a single bid schedule, with both dredges bidding on the same number of estimated hours because the historical production records in the Corps' own

internal analysis demonstrate that both dredges will achieve the same production rate and therefore should have the same estimated hours.

The second thing we've asked for relates to the non-effective time which is a huge component of what is paid for under this contract, but as the Corps concedes and as the government concedes, it's not even considered anywhere on the bid schedule.

The problem with that, Your Honor, is that when you have a big chunk of work, and I'm talking hundreds of thousands of dollars here, that is going to be paid out under the contract but is not part of the bid schedule or price evaluation, the Corps can't know whether the evaluated low bidder which doesn't take that work into account will actually be able to perform the work for the lowest cost. The case law that we have cited states very clearly that you need to evaluate price and you need to have a price evaluation that considers all elements of the work.

So we think there should be a separate bid item on the bid schedule for non-effective time.

Now what should those numbers be? The Corps says it's too hard to estimate. It's not too hard to estimate. They have ten years of data they can look at.

THE COURT: But I'm not allowed to do what you just said. I'm not allowed to micro-manage the agency. The law won't allow me to do that. So what you're asking me to do is something I don't have the authority to do. I may be sympathetic with you, but my view is basically, in effect, give them a clear amount of deference, particularly in the areas of technical valuations. I don't know anything about dredges. I'd be totally incompetent to make a value judgment on that issue. That's why I switched roles with you, to try to get you to kind of see how I'm looking at this. I can't give you what you want.

MR. SAULS: And that's something that I don't understand because this Court has authority under the Tucker Act to issue injunctive relief to ensure that contracting officials follow procurement statutes and regulations.

THE COURT: I understand that, but I can't micro-manage them the way that you want me to.

MR. SAULS: I'm not asking you to micro-manage, Your Honor. I'm saying that the record here overwhelmingly supports a finding that the decision to give Weeks a 15.4 percent production advantage was arbitrary and capricious and violates a variety of statutes and regulations.

This Court is empowered to remedy that. I agree that this Court has been reluctant to issue mandatory injunctions that say you must do this, this and this. But I have been in front of a number of judges of this Court including two years ago Judge Miller, who asked me, can I issue a prohibitory injunction? I said yes, sir, you can. And you can issue an injunction that says I'm not going to tell the Corps they have to do the work a certain way, but I'm going to tell the Corps that they cannot solicit this work, a prohibitory injunction, you cannot solicit this work on a basis that is arbitrary and capricious and violates laws and statutes. And the way to do that here is to say you may not go forward, Corps of Engineers, under the current solicitation because the current solicitation violates clear and prejudicially laws, procurement statutes and regulations, and it's based on an arbitrary and capricious process. So you can't do that. And I'm not going to let you go forward unless you come up with a bid schedule based on the record before me that treats these bidders equally by using the same number of estimated hours.

THE COURT: -- the second portion of what you said I think really does exceed what we're

supposed to be doing under the case law. And as you know, the Federal Circuit looks at very few of these, so they're really looking at us to --

MR. SAULS: I don't think, Your Honor, that Congress when it gave this Court jurisdiction, expressed jurisdiction over pre-award bid protests, meant to give this Court jurisdiction in a meaningless way so that someone who had a proper grievance challenging a term of the solicitation, which is what this protest is, is remediless because you say you can't issue an injunction that tells the Corps that they have to follow the law and they have to do things in a certain way when that's what the record demonstrates is necessary.

I know that in the Great Lakes case, 60 Fed Claim 350, Judge Miller issued just the type of prohibitory injunction that I mentioned. I know that Judge Christine Miller routinely issues injunctions of this nature and in factI think I was sitting at that table last year when she gave a discourse on the authority of the Court not to just send it back to the Corps to do a re-over, but to call balls and strikes and to tell the Corps this record does not justify what you did, it's arbitrary and capricious, it's a violation of statute, and I will tell you now what

needs to be done in order to comply with the law.

The whole purpose of this, and I go back to the public interest standard. There is an overriding public interest in ensuring that procurement officials follow applicable procurement laws, regulations, and statutes. That's what I'm asking for here. If you tell me you don't have any authority to issue an injunction, then it seems to me that the protect jurisdiction that's applied to this Court is meaningless.

THE COURT: I didn't tell you that. I told you I don't have the authority basically to micro-manage the agency. I can enjoin them and say you figure out what to do. Then we can come back again and see if they do it right, or to your satisfaction or not.

MR. SAULS: Your Honor, if you see that as the extent of your authority, then certainly we would accept that. But I think if that's the nature then I think it should be based on a finding that the Corps' sole reliance here on an assumption, not a calculation but an assumption based on pump area which is refuted by the actual historical evidence, refuted by their own internal analysis, and an assumption which is based on a false premise, and I'll get to that in a

moment if you'll let me.

THE COURT: I don't think I've precluded you from going anywhere you want.

MR. SAULS: I fully agree, Your Honor. I guess I was just kind of mentally reminding myself to come back to that point, thank you.

But I think if you issued an injunction saying that what they've currently done does not meet the APA standard and violates procurement laws and regulations, I expect the Corps will get it right the second time. They have a need to do this work, they don't want to --

THE COURT: You've got a problem on your hands right now in terms of time.

MR. SAULS: I don't think that any problem with timing, Your Honor, would affect the appropriateness of providing injunctive relief here. If I might address that issue, I would like to, and I know you'll let me because you're letting me go wherever I want, thank you.

The Corps has asserted in their briefs that the work is time sensitive and there's a window of time to do it. Of course they haven't identified that window of time. Moreover, they agreed to an expedited schedule, we all agreed to an expedited schedule to

move Plaintiff's motions for a TRO and a PI. And the Corps also agreed to postpone this hearing based on a proposed decision dated June 17th. They signed off on that decision date.

The injunction that we seek will not cause undue delay or hardship on them, Your Honor, for a number of reasons. Number one, modifying the solicitation as I have suggested, whether by order of the Court or by the Corps' own analysis after a decision by the Court, will not take long. They've already done it twice before in Amendment 3 and Amendment 5. It won't take bidders long, the two bidders, to respond to this. They've been bidding on this solicitation for years.

And the administrative record, Your Honor, at page 235 requires the work to be started within ten days of notice to proceed.

So we're not talking about a long time period between issuance of a decision and injunction and getting the work started.

I would also point out, Your Honor, that we checked the dredging records for the last four years and identified the first date of dredging in each of those years. In 2007 it was September 4; 2006 it was August 21; 2005 it was August 3; 2004 it was July 31.

So we're talking about the end of July, beginning of August when dredging really needs to start here. If we get a decision by June 17th that leaves more than adequate time to get an amendment to the solicitation issued, to get the bids in, to make an award and to start the work.

So I don't think this is, the window of opportunity or time sensitivity is any reason not to grant injunctive relief here.

The point I was trying to remind myself to get to deals with what I think is the third fundamental flaw with the Corps' decision to give a 15.4 percent advantage to our competition, Weeks Marine.

The first two being failure to consider the historical production data and the second thing, failure to consider the particular conditions at the job site which were considered by the February 25th memorandum by Mr. Channell.

The third problem is with the Corps' calculation itself. As I've noted, Your Honor, that calculation is based on an assumption that pump area is the only factor that determines dredge production. That assumption is clearly at odds with the Corps' own cost estimating regulations which, as I said before,

has a lengthy, lengthy section on estimating dredge production because every time the Corps does a cost estimate it must estimate dredge production and estimated hours. Those are two critical components. They have to look at the same thing that they were going to look at here for the bid schedule.

ER-1110 lists nine factors. I don't have them listed in my notes and I certainly don't have them memorized.

THE COURT: What's your response to the government's argument that that's irrelevant in this case?

MR. SAULS: My response to that is that it's nonsensical. The Corps does the same thing in preparing a cost estimate that it did here. It starts with the total quantity. It then determines an estimated dredge production, and it then divides that quantity by the production to get an estimated number of hours.

The Corps has given no reason why it should be required to estimate production in hours one way in a cost estimate and then be free to ignore that and then do something totally different and contrary to what's in their estimating regulation when they're doing the bid schedule. There's no reason to do them

differently.

ER-1110 is a mandatory regulation applicable to all cost estimates. To prepare a cost estimate you must go through the same process, or you should go through the same process that you go through in this case to determine estimated hours and estimated production. And based on the fact that in every cost estimate the Corps does, they have to estimate, at least for a dredging contract, Your Honor, they have to estimate dredge production rates and estimated hours.

The ER goes into very extensive detail about how you should do that and what the best ways are. I think one thing that's important to recognize about the ER, Your Honor, is that it sets up a hierarchy of the data that should be used.

The most reliable data and the data that should be used whenever possible, is historical production records. Why? It's the most accurate. That's point one.

Point two, the Corps then gives three or four other categories of things that you can use, the last of which is computer programs. Not simple formulas like the Corps used here but sophisticated computer programs. And the ER says Corps, you can

only use sophisticated computer programs. That's the last one in the line, that's the matter of last resort, and you can only do it when historical dredge production information is not available.

It's available here. It's our position there was plenty of data available. This is the sort of data that the Corps relies upon all the time to estimate dredge production and to estimate hours and they should have relied upon it here. At a minimum, Your Honor, they can't just completely ignore that data.

I just look at this, and obviously I'm looking at this from the Plaintiff's perspective, but the Corps has a formula here which they ignore and hold everything constant and just make an assumption that because the dredge pump size is bigger the dredge is going to do better when in fact the dredge hasn't done better.

The bottom line here, Your Honor, is that the --

THE COURT: Why would the government do something that in a sense what you're arguing is contrary to their interest. They don't have any interest, presumably, in not having this project done successfully.

MR. SAULS: I don't know why the government did this, Your Honor. Again, I tell you, I searched the record. Their briefs say they did it to make it fair to Weeks because if you assume that the VENTURE is a more productive dredge then using the same estimated hours is not fair to Weeks.

With that assumption, I agree. But the problem is, Your Honor, that the best information available, the historical production data, and Mr. Channell's own internal analysis based on the bank height, both reach the same conclusions. That is that the dredges will have equal production under the circumstances of this project and therefore should have an equal estimated number of hours.

I did want to get back to the one point regarding the flaws and the assumptions made by the Corps in their so-called calculations. That is, and we addressed this briefly in our reply brief, Your Honor, is that the Corps assumed that the percent solids, that is the density of the dredge slurry, how much soil is in the slurry, would be the same for both dredges.

Your Honor, once again, this very assumption which is one of the bedrock assumptions they made, is refuted by their own February 25th memorandum.

The February 25th memorandum states that there's limited bank height of material. That's the thickness of the material to be dredged. Both dredges can handle it. Therefore, both dredges are loading the same amount of soil as they swing through the dredge area with their dredge cutter at the same speed.

If they're loading the same amount of soil, which is what Mr. Channell said, and if the VENTURE is pumping more slurry because it has a bigger pump opening, the additional slurry that's being pumped by the VENTURE is just additional water. All the VENTURE's doing is pumping more water. It's pumping the same amount of soil and more water which means that the percent solid for the VENTURE is lower than the percent solid for the PONCHARTRAIN.

So even the calculation and assumptions made by the Corps on pages 837 to 838 of their brief are refuted by their own internal memorandums which conclude that the production will be the same for the two dredges, which is corroborated by the actual historical information.

Your Honor, if you'd give me a minute if I could look through my notes.

THE COURT: And I want to find something I

want to talk to you about, too.

MR. SAULS: If you have any additional questions I'd be happy to answer them.

THE COURT: I do have one.

(Pause).

MR. SAULS: Your Honor, getting back just briefly for a second to the big picture points I made earlier, it jumps out of the record to me that this was an arbitrary and capricious process. The Corps changed a longstanding successful process without any explanation. They did it based on an assumption without doing any sort of detailed analysis whatsoever as to whether or not that assumption which gives Weeks a 15.4 percent advantage, was valid.

Great Lakes then provides the data, the Corps does an internal analysis, and the Corps issues Amendment 3, which goes back to the original plan. A single bid schedule, the same estimated number of hours.

The Corps then gets a two page protest which says nothing substantive. They don't analyze that protest. They don't do anything with it. Then they issue Amendment 5 a month later reverting back to the previous schedule approach, again, without having any explanation for the record about why they're flip-

flopping around. That is the definition of an arbitrary and capricious process. And for all the other reasons I've stated in terms of ignoring the most relevant information and in terms of ignoring the Channell memorandum, not explaining why the February 25th memorandum was good enough to issue Amendment 3 but not good enough when they issued Amendment 5, there's no support in the record for this 15.4 percent advantage. No credible support. And providing that advantage to Weeks prevents Great Lakes from competing for the work on a fair and equal basis.

Ultimately, Your Honor, I would suggest to you, no contractor can compete in a market where its equipment is just as good and just as productive as the competition's, but it starts the bid process and in a 15.4 percent hole. In that case the contractor really has no choice. They've got to get out of that market.

I would suggest to you, Your Honor, that it is not in the public interest to allow a penalty to be applied, a bidding penalty as you suggested, to be applied here that will drive one of only two bidders out of the market. It is not in the public interest to eliminate competition from this market.

THE COURT: Can you read FAR 14.101A into

the record for me, then we'll have a discussion about it.

MR. SAULS: Yes, ma'am.

Just a moment.

THE COURT: I can read it, but I want you to read it first and then I want to talk to you about it.

MR. SAULS: I'm sorry, did I misunderstand you. Are you talking 14.101?

THE COURT: Yes, I'm following the notes, you made reference to where you thought there were violations. One of them was at 14.101A.

MR. SAULS: That's fine. If you looked up you would have seen a very quizzical look on my face because I was looking at 14.401 and not seeing what I expected, so thank you.

THE COURT: Okay. This is one of the FAR provisions you felt were violated.

MR. SAULS: Yes.

14.101. Preparation of invitations for bid.

"Invitations must describe the requirements of the government clearly, accurately and completely. Unnecessarily restrictive specifications or requirements that might unduly limit the number of bidders are prohibited."

Anything else?

THE COURT: No.

Is it your view then that that provision does more than just go to the issue of the, let me see how I put it in my notes last night. It goes beyond the clarity of what is said to the content? Or does it just mean that the government's got to be very clear in what they say so you understand what they're saying? Is it contextual?

MR. SAULS: I typically attempt to read regulations and statutes so as to give all words meaning and to render no words surplusage.

THE COURT: That's kind of catchy. I think I've heard that before.

MR. SAULS: Okay. I didn't make it up.

THE COURT: I know.

(Laughter).

MR. SAULS: I would suggest that the only purpose of 14.101A were to say specifications must be written clearly and understandably then they could have stopped with clearly. But it goes forward and says "clearly, accurately and completely". I think the word accurately has some meaning, and I think that means the solicitation must accurately describe the government's requirements.

If you look at the case law at GAO, and some

case law in this Court including the Vanguard Security case --

THE COURT: Your argument is that they're saying that the solicitation does not accurately state --

MR. SAULS: No, because the solicitation provides a number of estimated hours for Weeks and the VENTURE which is not accurate and does not state the amount of time that will actually be required to perform based on the February 25th analysis and based on --

THE COURT: Is it misleading what the government is doing? What is the problem?

MR. SAULS: It's inaccurate. What it results in is that Weeks gets to multiply his hourly price by 15.4 percent less hours than Great Lakes. Or put it the other way, Great Lakes must multiply its hourly price by 15.4 percent more hours than Weeks. Thereby giving Weeks a 15.4 percent bidding advantage when the historical evidence and the February 25th analysis indicate that their production rates will be the same, and that therefore the estimated hours will not be the same.

The 29 inch bid schedule does not accurately state the Corps' needs because it overstates the

estimated production rate for Weeks, it understates the estimated hours, and it does so to the severe prejudice of Great Lakes because it gives Weeks that 15.4 percent bidding advantage which historical evidence and the Corps' own analysis shows that it cannot achieve or will not achieve.

Your Honor, I wondered if you had any other questions about --

THE COURT: We didn't spend a lot of time on your price argument I don't think, did we?

MR. SAULS: I was going to say, count two in my complaint, failure to include the non-effective hours.

I think it's a simple, straight forward argument. In order for the agency to be able to -- The agency has an obligation when it sets up a price schedule, a bid schedule and a price evaluating scheme, to ensure that the lowest evaluated bidder will actually be the one who was able to perform the work at the lowest cost. This comes up all the time in unbalanced bidding cases where bidders will bid a very high number for something they think is going to under-run, have less quantity than anticipated, a very low number for another thing. And in those situations tehre's all sorts of unbalanced bidding cases where

GAO and the Courts have said you can't proceed on this basis because your estimates of quantities are flawed and the unbalanced bidding leads to an evaluation result that doesn't affect reality, then you can't go forward.

THE COURT: That's what I was going to ask you. It seems to me that this is something of a cost realism argument as I was looking at it again last night. You didn't use that language.

MR. SAULS: It's not cost realism, Your Honor, because in order to perform a cost realism analysis you must require the bidders to submit actual cost data.

THE COURT: I see.

MR. SAULS: This is a price evaluation but not cost realism. What I'm saying is --

THE COURT: It seemed to me that that was what you were getting close to.

MR. SAULS: -- is if you perform a price evaluation that simply doesn't take into account in any respect a big chunk of the work, you're running a grave risk that the low bidder is determined by that price evaluation which doesn't consider a big chunk of the work, will not be the low cost performer, actually. And that risk is exacerbated here when you

look at the historical record because Great Lakes has historically been significantly more efficient than Weeks and has had significantly less non-effective time than Weeks.

So if you posit a situation where in actual performance Great Lakes is going to have significantly less non-effective time, which means that Weeks is going to get paid for significantly more non-effective time based on the historical record, then you have a situation where if all the other prices, if the evaluated prices are close, Great Lakes would actually be the low cost performer because of its lower non-effective time.

So what we're suggesting, Your Honor, is that the Corps needs to consider non-effective time in its price evaluation by adding a contract line item.

This is not a novel thing. This is not something I made up. Other Corps districts do this on dredge rental contracts all the time. I looked just last night at a rental solicitation from the Mobile District and from the Jacksonville District that had a line item for effective hours and has a line item for non-effective hours. That's to ensure that you're evaluating the large items of work that will actually get paid, and we think that should happen here.

THE COURT: Okay.

MR. SAULS: I guess I'll reserve an opportunity to speak after the government speaks, and I thank Your Honor.

THE COURT: Thank you.

MR. BIGLER: Good morning, Your Honor. Robert Bigler, United States Department of Justice representing the United States.

THE COURT: Do you have anybody with you today?

MR. BIGLER: Yes, I do. I have Charles Briggs who is with the Army Corps of Engineers.

THE COURT: Welcome.

MR. BRIGGS: Good morning.

THE COURT: Your colleague didn't do any better by his colleague. It just occurred to me that we have a bunch of people here who were very rude this morning to their colleagues, but I'll let you all duke it out at lunch.

MR. SAULS: It was focused, Your Honor.

THE COURT: I see. Okay.

MR. BIGLER: Your Honor, the Court should grant the government's motion for judgment on the administrative record because there is a rational basis for the solicitation issued by the Army Corps of

Engineers.

THE COURT: Let's go back and do it the same way I did with the Plaintiff. Let's talk about each of the areas where you think there are violations of law or regulation. Let's hit that first because to me that's really where you, that's the primary focus as far as I'm concerned this morning.

MR. BIGLER: His first violation I believe was, he claimed there was an unwarranted advantage which is a violation of FAR 6.101. There is certainly no unwarranted advantage of requiring a company with a larger dredge to do 15 percent more work. Of course they're paid, they can bid more, they can be paid slightly more, they can be paid 15 percent more per hour and still remain competitive, but what Plaintiff ignores is that they're required to do approximately 15 percent more work every hour. There are --

THE COURT: Because of the type of machine they have.

MR. BIGLER: Because of the larger dredge that they have. Yes, Your Honor.

There are minimums in the contract. The smaller dredge is required to meet a minimum of 1145 cubic yards per hour, yet the larger dredge is required to meet a higher minimum of 1321 cubic yards

per hour. There is a penalty provision in the contract which states that, and this is in the record at AR-182. It states, "Failure to maintain that quantity will result in a reduction of payments."

THE COURT: Maybe this is a naive question, but why don't you just tell them what you want to do. You can bring whatever equipment you want. You can bring 45,000 people with little teeny shovels. You don't have to use a dredge. This is the work we want to have accomplished, this is what, we want to see the best people doing this, in one sense basically you have these two machines and there are technical differences between the two of them so therefore you're going to give the full evaluation. Why don't you say this is what we want to have done? We don't really care how you do it.

MR. BIGLER: They pay the dredges under this solicitation and prior solicitations by the hour, and it might be at some point better to go to a cubic yard type measurement, but I believe in the past they haven't had the technology to do that type of measurement.

THE COURT: Who doesn't have the technology?

MR. BIGLER: The Corps, it didn't exist to measure by the cubic yard. Apparently now it does

because in the new Harbor Construction which is a part of the solicitation which they're not protesting, that's gone to cubic yards. But in the past they have not been able to measure by the cubic yard apparently.

THE COURT: Okay.

MR. BIGLER: My point with regard to, they keep referring to this as a 15 percent penalty. There's no penalty to expect one of your bidders to do more work and then pay them a little more to do that little more work. That's what this solicitation does. It simply ensures robust competition by noticing that a larger dredge has a greater capacity. Why not allow that larger dredge to use its greater capacity? Why not pay them a little more but expect them do to a little more work. Because if they have to compete as a 27 inch dredge, they're going to have to have basically exactly the same hourly rate or slightly lower than Great Lakes to be competitive and they're going to have larger costs. They have a larger dredge which has larger engines which has more horsepower which is less fuel efficient.

THE COURT: Are there only two sizes of these dredges?

MR. BIGLER: There are other sizes, but there are only two sizes that are apparently competed

for this particular project in the years past.

THE COURT: But when you're doing the solicitation you don't know who will come forth. Have you not limited, perhaps, the number of people that would come to bid on this by the way the solicitation is presented?

MR. BIGLER: That would be true, Your Honor. Tehre are smaller dredges, say 24 inch dredges. I think the Corps' concern on that is that they have so much they want to dredge this year, it's twice what they've dredged in years past and they don't believe that a 24 inch dredge could do it quickly enough.

THE COURT: That was my point. Apparently that issue is not in the record. Do you know why?

MR. BIGLER: Why they eliminated 24 inch dredges?

THE COURT: No, you're saying they're going to be doing more dredging this year than in the past.

MR. BIGLER: It is in the record --

THE COURT: Where?

MR. BIGLER: If you look at the prior solicitations -- Well, you can look at the calculations that the government did that are at 837, 838, and those show that this year they expect dredge 2.3 million cubic yards. Then if you look at

Plaintiff's chart you can see that in the last year they only dredged 1.2 million; the year before that only 1.249 million.

THE COURT: So that is in the record then.

MR. BIGLER: And if you look at the prior solicitations, the last couple of years they had said $1 to $5 million would be the contract, and this year it says $5 to $10 million.

THE COURT: Let me ask you a different issue. This really kind of goes to the issue I think I raised on the phone which is you only have presumably two people in this area that have come to bid. As a former antitrust lawyer I have some difficulty understanding why. But maybe it is that not too many people buy this equipment so they're kind of spread around geographically so that they work on each little leg within the river.

But why not split the work out between the two companies so you keep two viable competitors? These people have had the contract lo all these many years. Weeks has gotten the contract two years. I can understand why the government would want to keep them in business by giving them this contract. That may not be fair or not, but just that they have another competitor around. If one of these guys is

gone then you're pretty much at the mercy of one of these companies or you go out and buy your own dredges, which you might eventually wind up doing.

MR. BIGLER: I'm not sure of the answer to that, but I believe there is other work other than just the Army work in that area. The VENTURE dredge has been in that area, and it hasn't done a whole lot of work, but Weeks is a very large company and they have dredges all over the country.

THE COURT: Are both of these companies privately held or are they publicly held?

MR. BIGLER: I don't know the answer to that, Your Honor.

THE COURT: I was going to go on-line and learn a little bit more about both, that's the reason I asked.

MR. BIGLER: I'll go into, one of their other claim violations was a violation of FAR 14.101 which is that the government must have accurate requirements for contracts. The government has perfectly accurate requirements with regard to this contract. They do not contend that they don't. The government requires 1800 hours of dredging at 1321 cubic yards per hour which results in approximately 2.3 million cubic yards to be dredged. Or if they

apply and they have a 27 inch dredge then the government requires 2076 hours at 1145 cubic yards per hour, which again results in the same amount dredged, 2.3 million cubic yards.

So this idea of saying that the requirements aren't accurate, the requirements are perfectly accurate and they don't contend that they're not. Even if they were to be a little more dredging they're going to get paid by the hour for that. It's really not an issue.

I think they're trying to take the law on this and say well, the way they estimate the hours is not accurate but there is a rational basis. They performed those calculations based upon the pump discharge area. That calculation may not be perfect, but there's certainly a rational basis. I don't think they can contend that larger dredges can't do more work than smaller dredges in normal conditions.

Lastly, they point to a violation of the Corps' cost estimating regulations. Again, those cost estimating regulations are not for determining the production of dredges. Therefore, determining so that the Corps can determine its cost estimate for a project, that would only be an issue if the low bidder came in at a higher price than what the Corps had

estimated and that hasn't happened here because none of the bids have been opened.

One of the reasons, I know Plaintiff's counsel argued that they didn't, the Corps didn't look at all the other factors for dredging that they should have. The problem is, as you pointed out, there are nine different factors. They vary in different locations. They depend on things such as the depth of the water. They're going to be dredging in nine different harbors, different depths, all these things. There's no way to really accurately precisely predict what the production will be. What the Corps did was they based it on the size of the pump area which is again, not a perfect calculation but it certainly has a rational basis.

I'd also like to talk briefly about the historical data they provided. As the Court knows --

THE COURT: It's pure historical data, presumably.

MR. BIGLER: It was obtained, I'm not aware of exactly how they obtained it but I believe it was through FOIA.

What we argued in our brief was there's only two years of data for the larger dredge and it's not accurate for that reason and it can't be relied on --

THE COURT: It's accurate, it's just limited.

MR. BIGLER: Exactly. Their response to that was well, two years of data is enough data.

But if we look at two years of data, if we look at just the last two years where the larger dredged in one year and the smaller dredged in one year, it shows that the larger dredge had a production of 1207 cubic yards per hour and the smaller dredge only 1017 cubic yards per hour. That means that the larger dredge did 18 percent more per hour than the smaller dredge.

Even if you go back four years, so tehre's two years for each dredge, the smaller dredge did 1065 cubic yards per hour, and again, 1017 cubic yards per hour, the larger dredge did 1207 last year and in 2004 it did 1062. If you calculate the averages on that it will show that the larger dredge was nine percent more effective over those four years.

THE COURT: What is your response to, I asked your opponent to play me and to state what it is that you all should be doing. What is your response to his suggestion?

MR. BIGLER: I thought the Court was exactly right in its response. We would believe it's a

mistake, but all the Court could do would be say this solicitation is incorrect and the Corps couldn't then use this dual bid solicitation that it issued. What likely would happen is then it would have to, as he points out, he said well they could easily go back to the single bid solicitation and it's already been drafted and it could be done quickly and there won't be a problem getting it done.

The problem is that Weeks will most surely protest that solicitation. That's what happened before when they went to the single bid solicitation. Weeks protested. So then they decided well, we have to go back to the dual solicitation because whatever happens here, we're going to get a protest so we might as well go with what we think is the best and the fairest and that's the dual schedule, to allow the larger dredge to take advantage of its increased production capacity.

THE COURT: What's your response to the line items? I noticed your colleague was taking notes when he was talking about the line item issue, that presumably they're using in Mobile and other places.

MR. BIGLER: For non-effective time?

THE COURT: Yes.

MR. BIGLER: Again, we don't believe that

non-effective time can be predicted. I haven't seen those other solicitations, but in this solicitation whoever wins is still going to be paid 70 percent of their hourly rate. Maybe in other districts they let them bid, well, we'll do it for 60 percent of our hourly rate. Or 75 percent or whatever. But there's no way that I'm aware of, to predict how much non-effective time they're going to have.

It's caused by things, if they're dredging in a harbor that hasn't been dredged for a long time there's a lot more obstructions. Those obstructions get caught in the pump, they have to stop, they have to clear it out. If they're dredging somewhere where it was just dredged last year they're a lot less likely to hit things like that.

The other thing I would point out about their historical data is, and what's unfortunate is that we believe that larger dredges are more effective when there is a larger amount of material to be dredged, which is what we believe there will be this year because the water level has been so high. They haven't had the money, unfortunately, to do as much dredging as some of the prior years. This year they have more funds so they're going to do more dredging this year.

But if you look at their table, from years 1999 to 2003 when the larger dredge wasn't used and the Great Lakes dredge was used, those were very large years and they had higher production during those years with the exception of 2000. Each of those years they were dredging about 3.5 million cubic yards and their production each year was higher than most of the other years, it was in the 1100's. We believe this chart is unfair to the larger dredge because the years that the larger dredge was used it only dredged 1.6 million cubic yards in 2004 and 1.12 last year.

THE COURT: If you know you've got this additional material that you're doing, and you want a large dredge, why don't you sole source it?

MR. BIGLER: I don't have the answer to that.

THE COURT: If that's what you know you want to do, it seems to me that it might be more honest to say this is what we want. We want this particular dredge.

MR. BIGLER: The Corps believes that either of these dredges can do the job, but --

THE COURT: Can do the job. So that's the issue.

MR. BIGLER: They do believe that either of

these dredges can do the job, but they believe that this year especially, because it's going to be a larger year, that there's certainly an opportunity for the larger dredge to do more.

THE COURT: Is tehre any possible way then that Plaintiffs could win this contract? Since it doesn't have the same size dredge?

MR. BIGLER: We believe that they could win this contract. Obviously their hourly rate's going to have to be lower than the larger dredge. But they have a smaller dredge, they have less power, they presumably have lower operating costs. They could win, they would just have to have a lower hourly rate.

THE COURT: And we don't know what that rate is right now.

MR. BIGLER: No, we don't.

I don't have anything else unless the Court has other questions for me.

THE COURT: If I can read my own handwriting. As my law clerk would tell you, I should have been a pharmacist. I can't read my handwriting.

My question I had written on here, so price is an issue then for the Corps right now. It's not just the size of the thing.

MR. BIGLER: Right. They're trying to get

the lowest bid and we believe that this schedule ensure that by allowing the larger dredge to do more work and charge a little more. It will force them to compete more robustly.

THE COURT: Okay.

MR. BIGLER: Thank you, Your Honor.

MR. SAULS: Your Honor, I want to apologize in advance if I flip pages around and take a couple of pauses here in responding to the various points that counsel just raised. I'd like to be more organized but I'll do the best I can.

THE COURT: You can do whatever makes you feel more comfortable.

MR. SAULS: The first point is, I want to go back to FAR 14.101. I do think the word "accurate" has a meaning here.

What counsel for the government argued was that the solicitation is accurate because it has precise numbers for estimated hours and estimated production rates. That means that the solicitation, Your Honor is precise. Yes, those numbers are tehre. We can all see them. It doesn't mean that those numbers are accurate. And the government's entire argument, as I sat there listening to it, is completely premised on the assumption, and I

underscore the word assumption, that the VENTURE will be more productive than the PONCHARTRAIN.

What is that assumption based on? It is based on a calculation which is not even a calculation, that holds everything constant except for pump area. It's an assumption based on an assumption.

What does the real analysis and real data show? It shows that historically these two dredges have produced the same production rate per hour; and it shows that when the Corps looked at the particular circumstances of this job with the limited bank height available they concluded that the dredges would achieve the same production rate.

The government here has argued, Your Honor, that it is entitled to ignore relevant historical production information and its own internal analysis and rely solely on --

THE COURT: I don't think they ignored historic data. What they said is it's limited. Its value is not dispositive. It's a factor. That's my --

MR. SAULS: I don't see that reflected in the administrative record. But the point I wanted to make is that part of the APA standard under Citizens to Preserve Open and Parks, is that you must consider all relevant information and you must articulate a

rational basis for the decisions made in light of the facts in the record.

THE COURT: And Overton says all relevant information?

MR. SAULS: I believe it says all relevant factors, I think is the word, Your Honor.

There was a reference in counsel's argument to the price penalty that is contained in the IFP, and the suggestion that well, we're protected, we the government, if we in fact cannot achieve the estimated minimum production rate and the estimated hours because we can apply this price penalty. That price penalty, Your Honor, has been in all of the prior solicitations for this work. It's not there because they used a separate bid schedule for Weeks. It's always been there. And although that price penalty may protect the government from over-paying Weeks, all it does is protect the government during job performance if the contractor, Weeks, through its own fault fails to achieve the production rates. It does not even address, doesn't even come close to what the issue here is. We're not talking about what happens in job performance here. We're talking about the fairness of the bidding process and whether Great Lakes can compete on a fair and equal basis.

The fact that tehre may be a price penalty during performance doesn't change the fat that under the current IFB when the Corps sits down to evaluate bids, it would evaluate Weeks' bid based on 15.4 percent fewer hours than Great Lakes bid.

So tehre's no protection whatsoever to the integrity of the bidding process which is the focus of our protest. So the price penalty provision doesn't fit anything that's relevant to this case.

Your Honor, the Corps said that, excuse me, counsel for the government from Department of Justice, stated that the engineering regulation 1110 is not applicable, and I wrote this down. I think it's accurate. Not applicable to estimating dredge production.

Your Honor, if it's not applicable to estimating dredge production why does it have an entire section, an entire appendix on how to estimate dredge production that's mandatory for uses throughout the Corps? ER-1110 is directly applicable guidance throughout the entire Corps on how to estimate dredge production and the Corps' failure to follow it here is a clear and prejudicial violation of procurement rules and regulations.

The government also made the argument that

it expects the dredge VENTURE to do better this year because the total quantity of material to be dredged is expected to be more this year than it was last year.

We addressed this in our brief, Your Honor, but I would simply point out the following three things in response to that argument. I will call that the total quantity of material to be dredged, theory.

First, there's no support for it in the administrative record. The administrative record is crystal clear that the only thing the Corps relied upon in deciding to grant Weeks a 15.4 percent production advantage was the discharge pump area. This theory about total quantity of dredged material is a post hoc rationalization with no support in the administrative record, and this Court has routinely rejected those sorts of arguments and we cited some cases i our reply brief in that regard.

THE COURT: Let's take a look here just a second. The government claims though that that's in the record. I specifically asked him about that and he --

MR. SAULS: Your Honor, it's in the record that the estimated quantity this year is greater than the actual quantity from last year.

THE COURT: 837 and 838, is that right counsel for the government?

MR. BIGLER: Yes, Your Honor. Actually 838 is where it's shown.

THE COURT: Okay.

MR. SAULS: That's the estimated quantity for this year and that is in the record. And it is in the record what the quantity dredged last year was.

What's not in the record, Your Honor, is any indication whatsoever that the Court ever relied upon this theory at the time it decided to issue the two bid schedule, at the time it issued Amendment 3 when it went back to the one bid schedule approach, or at the time it issued Amendment 5.

This is a post hoc litigation rationalization. That's my point. The numbers are in the record. The reliance on those numbers plainly is not because the record establishes that they relied solely on pump discharge area.

Second, the Corps' estimating regulations which includes an entire section on estimating dredge production, lists nine factors that affect dredge production. Surprise, surprise. Total quantity of material to be dredged is not there. Why? Because the Corps has never thought that the total quantity of

material to be dredged affects dredge production.

Counsel for the government says well, we're going to be dredging more this year so it should be able to do better, but if you look at their reply brief, Your Honor, it gives an answer as to why there's going to be more dredging this year. The government says in its reply brief, and I apologize, I don't have the page number, that we're going to be dredging nine harbors this year instead of three or four last year. That means we're going to be dredging large areas that were not dredged last year. That's the reason that there's more dredging. You still have to cover that same area. The February 25th memorandum says if the dredges cover the area at the same rate and load the soil at the same rate their production is still going to be the same.

The government attempted to rely upon the historical production information in the administrative record at page 639 to argue that the VENTURE has been more productive.

First, it does it by comparing just two years of data. It says on the one hand, two years of data is not enough, then it uses two years of data instead of using all ten years of data.

But also if you look at that table, Your

Honor, in 2004, the government's theory is that all dredges will have a higher production rate when the total quantity of material dredged is greater.

In 2004 the VENTURE dredged 50 percent more material than it dredged in 2007. Under Defendant's theory, the VENTURE should have had a much higher production rate in 2004 than it did in 2007. What does this historical record show? No, it has a much lower production rate this year, in 2004. Why? Because the total amount of material to be dredged is not something that affects the production rate.

The same holds true for the PONCHARTRAIN, Your Honor. In 2003 the PONCHARTRAIN dredged more than twice the amount of material it dredged in 1998, and this is all from page 639 of the record, Your Honor. The PONCHARTRAIN dredged more than twice the amount of material that it dredged in 1998.

Under Defendant's theory, the PONCHARTRAIN should have had a substantially higher production in 2003. It did not. Its production rate in 2003 and 1998 are virtually the same.

There are many other examples. Take the PONCHARTRAIN in 2000 and 2006. In 2000 the PONCHARTRAIN dredged almost three times as much total quantity as it dredged in 2006. Under the Defendant's

theory it should have a significantly higher production rate. The production ratse are virtually the same.

Those are all comparisons of the same dredge which I think are completely valid, but I want to make one other point here. Compare 2004, the VENTURE, and 1998 the PONCHARTRAIN. They dredged essentially the same quantity of material, 1.6 million cubic yards. Under Defendant's theory, the VENTURE should have produced more because it is a, I put this in quotes, Your Honor, "bigger dredge". They dredged virtually the same quantity of material but the PONCHARTRAIN out-produced the VENTURE significantly.

My point, Your Honor, is not to rely on any individual years here as saying that's what the overall production should be projected to be. I'm just saying comparison of these individual years totally debunks the government's theory that the total quantity of material to be dredged will be greater, excuse me. That the total quantity of material dredged affects dredge production rates. It does not.

For that reason, Your Honor, that undercuts one of the primary reasons they say they shouldn't look at the historical production data. They say oh, well, it's flawed and unreliable because we should do

better when more quantity's going to be dredged. False. Can't be considered. The failure to look at the historical production record results in a bid schedule that unfairly penalizes Great Lakes by requiring it to multiply its price by 15.4 percent more hours than the VENTURE.

The government also suggested, Your Honor, that the Court shouldn't issue any injunction here because if it does Weeks and the Corps decide to issue a single bid schedule, that Weeks will protest again. Your Honor, if this Corps makes --

THE COURT: That's not relevant to me. I don't care, people can protest from now to doomsday.

MR. SAULS: I was simply going to say, and maybe I'll direct this at the government, if this Court issued a decision that says that what the Corps has done to date is unlawful and in violation of statute and regulation and the Corps responds to that by taking corrective action with a single bid schedule, I don't see how Weeks would have any basis for a protest. I just throw that out.

THE COURT: I'm sitting here thinking about the poor soul with the 30 inch dredge. I mean the biggest problem I have really is that the government assumes there are only going to be two people

basically bidding on the contract, and basically did the solicitation to take into account that. Not other potential competitors. I haven't decided what to do with that yet, but that does concern me.

I'm concerned by having the same two companies over and over again. Unless the government decides basically they want to alternate years or something, there should be, it would seem to me you should have somebody else competing in this contract than what we've got.

MR. SAULS: Your Honor, that is not the issue that we have raised.

THE COURT: I understand.

MR. SAULS: And it's not one that I really know quite how to address today.

But what I do know how to address is that the government's conclusion that a bigger dredge necessarily will do better on this particular job is refuted by their own internal memorandum and by the historical evidence.

What is it supported by? It's supported in the record by a calculation which is not a calculation, which indeed is merely an assumption that a larger dredge will do better because it has a bigger pump.

THE COURT: You told me that before.

MR. SAULS: I did tell you that before, and if you let me go on long enough I may get an assumption on an assumption on an assumption, but that's a bad idea.

But in looking at the overall record, Your Honor --

THE COURT: I wanted to assure you I was listening.

MR. SAULS: Very good. But in terms of the overall record, you have analysis, detailed data indicating that the dredges will have the same production rate.

What do you have that supports the Corps' decision here? An assumption. That is all. And it is our view that an assumption is not a basis for giving Weeks an undeserved and unwarranted 15.4 percent production advantage. It is our view that giving Weeks that production advantage precludes us from fairly competing for the work. And when you take one of two bidders --

THE COURT: You can compete. You may not necessarily like the price you have to do the work at, therefore it may not be worth it to you.

MR. SAULS: Your Honor, the statute --

THE COURT: You're saying basically you can --

MR. SAULS: The statutes and regulations say you have to have a full and open opportunity to compete. IF you're starting at a 15.4 percent hole --

THE COURT: Back to my point, I don't know what's happened with the poor guys with the 30 inch dredge or, I don't know, the 22 inch dredge. It seems to me the solicitation has been tailored for two companies.

MR. SAULS: We have 30 inch dredges, and I supposed if they had a 30 inch bid schedule we could consider that one too. We have 32 inch dredges.

THE COURT: You understand my point. The government --

MR. SAULS: Your point is whether the solicitation on a whole, I assume, has antitrust implications. My point is, putting that aside and focusing on the issues that we raised, assuming, just focusing on the point that we raised, it's that the solicitation is fundamentally unfair to my client and precludes us from effectively competing.

Sure, we can throw in a price, but if we have to cull our price by 15.5 percent in order to be competitive we can't make a profit.

THE COURT: That's not my problem.

MR. SAULS: But it is your problem.

THE COURT: Why?

MR. SAULS: Because FAR 6.101 and the Competition --

THE COURT: Says you should get a profit?

MR. SAULS: No. In the Competition and Contracting Act require the Corps and all agencies to use solicitation procedures that allow for fair and open competition. We cannot fairly compete if --

THE COURT: I agree.

MR. SAULS: -- we have to bid every job at a loss. If we have to bid every job at a loss because the agency has given our opponent an unfair competitive advantage by giving them a 15 percent advantage that is not deserved because the historical evidence and the Corps' own internal analysis demonstrates that that dredge is not more productive than our dredge.

Thank you, Your Honor.

THE COURT: The battle of the dredges.

What is our turn-around time for the reporter, Joe? Have you all made any requests yet?

MR. SAULS: I have not, Your Honor.

MR. BIGLER: We have not Your Honor.

THE COURT: I'm supposed to get you guys to do it first so we don't have to pay for it, but I will do it.

Let's go off the record and see what the Court Reporter's options are here.

(Discussion held off the record).

(Whereupon, at 11:37 a.m., the hearing in the above-entitled matter was concluded.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

REPORTER'S CERTIFICATE

DOCKET NO.: 08-282C

CASE TITLE: Great Lakes Dredge and Dock Company, LLC

HEARING DATE: May 29, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: May 29, 2008

______________________________

Theodore Fambro
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018